# EXHIBIT D

1  MELISSA J. FASSETT, State Bar No. 135290
   PRICE, POSTEL & PARMA LLP
2  3330 Cameron Park Drive, Suite 100
   Cameron Park, California 95682-7652
3  Telephone:   (805) 962-0011
   Facsimile:   (805) 965-3978
4
5  Attorneys for Defendants
   Nusil LLC and Nusil Technology LLC
6
7
8              SUPERIOR COURT OF THE STATE OF CALIFORNIA
9                   FOR THE COUNTY OF SAN BERNARDINO
10

| | |
|---|---|
| 11  BRITTANY BILLETTS, an individual; VIVIAN AGUIAR, an individual; ANN DELMONICO, an individual; CORNELIA DITTO, an individual; LEAH JOHNSON, an individual, | Case No.: CIVDS1905706 |
| 12 | **NOTICE OF DEMURRER AND DEMURRER OF NUSIL TECHNOLOGY LLC AND NUSIL LLC TO PLAINTIFF'S COMPLAINT; DECLARATION OF MELISSA J. FASSETT** |
| 13 | |
| 14          Plaintiffs, | |
| 15          vs. | Date:    June 6, 2019 |
| 16  MENTOR WORLDWIDE, LLC; NUSIL, LLC; NUSIL TECHNOLOGY, LLC; and DOES 1-100, inclusive, | Time:    8:30 a.m. Dept:    S24 |
| 17 | Complaint Filed:      2/22/19 |
| 18          Defendants. | |

19
20
21         TO PLAINTIFFS AND TO THEIR ATTORNEYS OF RECORD:
22         PLEASE TAKE NOTICE that on June 6, 2019, at 8:30 a.m. or as soon thereafter as the
23  matter may be heard in Department S24 of the above-entitled Court located at 247 West Third
24  Street, San Bernardino, CA 92415-0210, Defendants NuSil Technology LLC and NuSil LLC
25  (collectively "NuSil Defendants") will, and do hereby demur to the Plaintiffs' Complaint.
26         This demurrer is brought pursuant to CCP section 430.10 on the grounds that Plaintiffs'
27  claims for negligence/negligence per se, strict products liability – failure to warn, and strict
28  products liability – manufacturing defect are expressly and impliedly preempted by Federal law.

1   Additionally, each of those claims fails because it is uncertain and fails to state facts constituting a

2   cause of action as against the NuSil Defendants.

3         This demurrer is based on this Notice of Demurrer and Demurrer, the accompanying

4   Memorandum of Points and Authorities, the accompanying Declaration of Melissa J. Fassett, the

5   Request for Judicial Notice filed herewith, the pleadings and files in this matter, and such

6   argument and evidence as may be presented at the hearing on this matter.

7

8                              Respectfully submitted,

9   Dated:  May 1, 2019          PRICE, POSTEL & PARMA LLP

10

11                         By:_____

12                              MELISSA J. FASSETT
                               Attorneys for Defendants
13                              Nusil LLC and Nusil Technology LLC

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## DEMURRER

NuSil Defendants demur to Plaintiffs' Complaint in this action on the following grounds:

### DEMURRER TO FIRST CAUSE OF ACTION

#### (Negligence/Negligence Per Se)

1. NuSil Defendants demur to Plaintiffs' claim for negligence and negligence per se (Count 1) on the grounds that Plaintiffs' claim is expressly and impliedly preempted by federal law because it seeks to impose labeling and manufacturing requirements that go beyond what the U.S. Food and Drug Administration ("FDA") has mandated and because it also seeks to enforce exclusively federal requirements that are not grounded in state tort law. Count 1 also fails to plead facts which constitute a claim against either of the NuSil Defendants. To the extent that Count 1 alleges that either of the NuSil Defendants had an obligation to provide a warning directly to any Plaintiff, it is also barred by state law, including the learned intermediary doctrine.

### DEMURRER TO SECOND CAUSE OF ACTION

#### (Strict Liability – Failure to Warn)

2. NuSil Defendants demur to Plaintiffs' claim for strict liability – failure to warn (Count 2) on the grounds that this claim is expressly and impliedly preempted by federal law because it seeks to impose labeling requirements that go beyond what the FDA has mandated and because it also seeks to enforce exclusively federal requirements that are not grounded in traditional   state law. Count 2 also fails to plead facts which constitute a claim against either of the NuSil Defendants. To the extent that Count 2 alleges that either of the NuSil Defendants had an obligation to provide a warning directly to any Plaintiff, it is also barred by state law, including the learned intermediary doctrine.

### DEMURRER TO THIRD CAUSE OF ACTION

#### (Strict Liability – Manufacturing Defect)

3. NuSil Defendants demur to Plaintiffs' claim for strict liability – manufacturing defect (Count 3) on the grounds that this claim is expressly and impliedly preempted by federal law because it seeks to impose manufacturing requirements that go beyond what the FDA has mandated and because it also seeks to enforce exclusively federal requirements that are not

1 grounded in traditional state tort law.  Count 3 also fails to plead facts which constitute a claim

2 against either of the NuSil Defendants.  To the extent that Count 3 alleges that either of the NuSil

3 Defendants had an obligation to any Plaintiff, it is also barred by state law, including the learned

4 intermediary doctrine.

5

6                                 Respectfully submitted,

7 Dated:  May 1, 2019             PRICE, POSTEL & PARMA LLP

8

9                                 By:

10                                     MELISSA J. FASSETT
                                       Attorneys for Defendants
11                                     Nusil LLC and Nusil Technology LLC

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

4

Ex. D - 4

NUSIL TECHNOLOGY LLC AND NUSIL LLC'S DEMURRER TO PLAINTIFF'S COMPLAINT

# **TABLE OF CONTENTS**

**PAGE**

I.    INTRODUCTION ............................................................................ 9

II.   BACKGROUND ............................................................................. 9

III.  ARGUMENT .................................................................................. 11

    A.    The Legal Standard for Demurrer ......................................... 11

    B.    The MDA Preempts Plaintiffs' Common Law Claims ......................................... 11

        1.    The Medical Device Amendments of 1976 ............................. 11

        2.    Express Preemption of Medical Device Claims Under *Riegel* ................. 13

        3.    Preemption of Medical Device Component Claims................................... 14

    C.    Implied Preemption under MDA ........................................................... 16

    D.    The Narrow Gap Through Which State Law Claims Must Fit to Service ............ 17

    E.    Courts Routinely Find that Claims Involving Breast Implants are Preempted ................................................................ 17

    F.    Plaintiffs' Claims for Negligence and Strict Liability Relating to Implants and Their Components are Expressly and Impliedly Preempted and Deficiently Pleaded ................................................................ 18

        1.    Plaintiff's Failure to Warn Claims (Counts 1 and 2) are Preempted and are Deficiently Pleaded .................................................. 18

        2.    Plaintiffs' Manufacturing Defect Claims (Counts 1 and 3) are Preempted and are Deficiently Pleaded ...................................... 20

IV.   CONCLUSION ............................................................................... 22

NUSIL TECHNOLOGY LLC AND NUSIL LLC'S DEMURRER TO PLAINTIFF'S COMPLAINT

**TABLE OF AUTHORITIES**

**PAGE**

**CASES**

*Ankeny v. Lockheed Missiles & Space Co.* 88 Cal.App.3d 531 (1979) ........................................ 11

*Artiglio v. General Electric Co.* 61 CAl.App.4th 830 (1998) .................................................... 20

*Blank v. Kirwan* 64 Cal.3d 311 .(1985) ............................................................................ 11

*Blankenship v. Medtronic, Inc.*, 6 F.Supp.3d 979 (E.D. Mo. 2014) ........................................... 22

*Bass v. Stryker Corp.*, No. 4:09-CV-632-Y, 2010 WL 3431631
    669 F.3d 501 (5th Cir. 2012) ..................................................................................... 14

*Bentley v. Medtronic, Inc.*, 827 F. Supp.2d 443
    (E.D. Pa. 2011) ..................................................................................................... 14

*Bockrath v. Aldrich Chem. Co.* 21 Cal.4th 71 (1999) ........................................................... 11

*Buckman Co. v. Plaintiffs' Legal Comm.* 531 U.S. 341 ................................................ *passim*

*Carlin v. Superior Court* 13 Cal.4th 1104 (1996) ................................................................ 18

*Cornwell v. Stryker Corp.*, No. 1:10-CV00066-EJL
    2010 WL 4641112 (D. Idaho Nov. 1, 2010) .................................................................. 16

*Cottengim v. Mentor Corp.*, No. 05-1-DLB, 2077 WL 2782885
    (E.D. Ky. sept. 24, 2007) ........................................................................................ 22

*Couvillier v. Allergan, Inc.* 2011 W.L. 8878258 (W.D. La. Jan. 20, 2011) ................................ 17

*De La Paz v. Bayer Healthcare LLC*, 159 F.Supp.3d 1085, 1097
    (N.D.Cal. 2016) .................................................................................................... 22

*Dorsey v. Allergan* 2009 W.L. 703290 (M.D. Tenn. Mar. 11, 2009) ......................................... 17

*Dougherty v. Source Nats, Inc.*, 148 F. Supp.3d 831 (E.D.Mo. 2014) ...................................... 13

*Ebrahimi II v. Mentor Worldwide, LLC*, 2018 WL 2448095,
    (C.D.Calif. May 25, 2018) ...................................................................................... 17

*Enraets v. Intermedica Intraocular, Inc.* 29 Cal.App.4th 779 (1994) ......................................... 14

*Funke v. Sorin Grp. USA, Inc.* (C.D. Cal. 2015) ................................................................. 20

*Glennen v. Allergan, Inc.* 247 Cal.App.4th 1 (2016) ....................................................*passim*

*Gross v. Stryker Corp.*, 858 F. Supp.2d 466
    (W.D. PA. 2012) ................................................................................................... 14

*Laux v. Mentor Worldwide, LLC* 2017 W.L. 5186329 (C.D. Cal. Nov. 8, 2017) ........................ 17

*Levy v. Skywalker Sound* 108 Cal.App.4th 753 (2003) ................................................................ 17

*Lewkut v. Stryker Corp.*, 724 F.Supp. 2d 648
    (S.D. Tex. 2010) ....................................................................................................................... 14

*Malonzo v. Mentor Worldwide LLC* 2014 W.L. 2212235 (N.D. Cal. May 28, 2014) ................. 17

*Martin v. Telectronics Pacing Sys., Inc.* 105 F.3d 1090 (6th Cir. 1997) .................................... 12

*McGuan v. Endovascular Techs, Inc.*, 182 Cal.App.4th 974 (2010) ........................................... 13

*Medtronic, Inc. v. Lohr.* 518 U.S. 470 (1996) ............................................................................. 12

*In re Medtronic, Inc., Sprint Fidelis Leads Products Liability Litigation*
    623 F. 3d 1200 (8th Cir. 2010) ......................................................................................... *passim*

*Mize v. Mentor Worldwide LLC,* 2018 WL 1364257 ..................................................................... 17
*People v. Ex Rel. Lungren v. Superior Court* 14 Cal.4th 294 (1996) .......................................... 11

*Prakashpalan v. Engstrom, Lipscomb & Lack* 223 al.App.4th 1105 (2014) .............................. 11

*Riegel v. Medtronic, Inc,* 552 U.S. 312 (2008) ...................................................................... *passim*

*Riley v. Cordis Corp.*, 625 F.Supp.2d 769
    (D. Minn. 2009) ....................................................................................................................... 12

*Rowe v. Mentor Worldwide, LLC* 2018 WL 1320251 (M.D. Fla. March 2, 2018) ....................... 17

*Robinson v. Endovascular Tech.* 190 Cal.App.4th 1490 (2010) .................................................. 14

*Scanlon v. Medtronic Sofamor DAnek USA Inc.* 61 F. Supp.3d 403 (D.Del. 2014) ................... 17

*Sciborski v. Pac Bell Directory* 205 Cal.App.4th 1152 (2012) ................................................... 17

*Seidler v. Municipal Ct.* 12 Cal.App.4th 1229 (1993) ............................................................... 11

*Valentine v. Baxter Healthcare Corp.* 68 Cal.App.4th 1467 (1999) ........................................... 20

*Williams v. Allergan USA, Inc.* 2009 WL 3294873 (D. Ariz. Oct. 14, 2009) .............................. 17

*Zaccarello v. Medtronic, Inc.* 38 F.Supp.3d 1061
    (W.D. Mo. 2014) ..................................................................................................................... 22

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**STATUTES**

Code of Civil Procedure
   Section 425.10(a)(1) ................................................................................ 11
   Section 425.10(e) ...................................................................................... 11

21 C.F.R. §150(b) ............................................................................................ 18
21 C.F.R. §801.109 ......................................................................................... 10
21 C.F.R. §812.20 ........................................................................................... 12
21 C.F.R. §812.25 ........................................................................................... 12
21 C.F.R. §812.27 ........................................................................................... 12
21 C.F.R. §812.30 ........................................................................................... 13
21 C.F.R. §812.30 (b)(5)(ii) ........................................................................... 13
21 C.F.R. §812.50(a) ...................................................................................... 19
21 C.F.R. §814.39(d) ...................................................................................... 19
21 C.F.R. §814.44(d)(1) .................................................................................. 10

21 U.S.C. §301 et seq. .................................................................................... 10
21 U.S.C. §337(a) ........................................................................................... 16
21 U.S.C. §360e(c)(1) ..................................................................................... 12
21 U.S.C. §360e(d)(2) ..................................................................................... 10
21 U.S.C. §360(i) ............................................................................................ 18
21 U.S.C. §360j(g) .......................................................................................... 12
21 U.S.C. §360k(a) ......................................................................................... 13
21 U.S.C. §3360 .............................................................................................. 10
21 U.S.C. §878.3530 ....................................................................................... 10
21 U.S.C. §878.3530(c) ,,,,,,,,,,,,,,,,,,,,,,,,,,,,,,,,,,,,,,,,,,,,,,,,,,,,,,,,,,,,,,,,,,,,,,,,,,,,,,,,,,,,,,,, 10

## MEMORANDUM OF POINTS AND AUTHORITIES

### I. INTRODUCTION

This action is a product liability action involving Mentor MemoryGel Silicone Breast Implants ("MemoryGel Implants"), brought by five women. Other than Plaintiff Billetts, all of the plaintiffs reside out of state (Florida, Rhode Island, Mississippi (Complaint ¶1- 5). Plaintiffs allege that they were implanted with MemoryGel implants at various times and various locations around the country between 2007 and 2016.

Plaintiffs collectively assert three claims for negligence/negligence per se, strict products liability – failure to warn, and strict liability – manufacturing defect, without identifying any specific party against whom any of the claims is asserted. Each of these claims is preempted by federal law, which governs the design, manufacture, and labeling of the Plaintiffs' implants and their components. The United States Supreme Court has held that common law claims, such as Plaintiffs', which challenge the safety and efficacy of medical devices regulated by the FDA, are expressly preempted. See *Riegel v. Medtronic, Inc*. (2008) 552 U.S. 312, 316-318. Plaintiffs' complaint is composed entirely of state law claims challenging the safety and efficacy of Mentor MemoryGel implants and their components, and are therefore expressly preempted.

Further, to the extent Plaintiffs seek to enforce federal regulations governing the devices and their components, they are impliedly preempted under *Buckman v. Plaintiffs' Legal Comm.* (2001) 531 U.S. 341.

### II. BACKGROUND

On February 22, 2019, the Plaintiffs filed this action alleging that between 2007 and 2016, they were implanted with MemoryGel implants, and that they developed injuries related to the implants which they attribute to gel bleed and/or rupture of the implant shells and the release of silicone gel (Complaint, ¶21-39). Plaintiffs attribute these conditions to manufacturing defects in the implants. Plaintiffs allege that the NuSil Defendants "are silicone raw material suppliers and manufactured, produced, supplied, and shipped the silicone to Mentor used in the Mentor MemoryGel Silicone Implants" (Complaint ¶11) but do not allege any viable legal claim or wrongdoing by either of the NuSil Defendants. The Complaint mentions NuSil Defendants,

1    collectively, a bare handful of times, but alleges no violation of any obligation to any Plaintiff by

2    a NuSil Defendant.

3           Mentor MemoryGel Silicone Breast Implants are Class III medical devices as defined by 21

4    C.F.R. §878.3530, which are subjected to the most stringent controls under the Medical Device

5    Amendments, 21 U.S.C. §3360 et seq. to the FDCA, 21 U.S.C. §301 et seq.  See *Riegel*, 552 U.S. at

6    316.  Because of the Class III status, the sale of Mentor MemoryGel Breast Implants to healthcare

7    professionals was conditioned upon the devices receiving premarket approval from the FDA.  See 21

8    C.F.R. §878.3530(c). Premarket Approval ("PMA") is the process by which a manufacturer provides

9    the FDA with reasonable assurance that a Class III device is both safe and effective.  See 21 U.S.C.

10   §360e(d)(2).  Premarket approval is a rigorous process that requires a manufacturer to submit a PMA

11   application containing specific information and data about the safety and efficacy of the Class III

12   device and its components, which is then scrutinized by the FDA.  *Riegel,* 552 U.S. at 317-318.  This

13   includes the design specifications, manufacturing processes, composition, and labeling proposed by

14   a manufacturer, as well as those of its components.  The FDA grants PMA only if the agency has

15   reasonable assurance that the device is safe and effective under the conditions of use included on the

16   label.

17          On December 12, 2003, Mentor submitted a PMA application for MemoryGel Silicone

18   Breast Implants.  See PMA Approval Order and Summary of Safety and Effectiveness Date (SSED)

19   for P030053, dated November 17, 2006 (RJN - Exh. B, C (Approval Order, SSED)[1].  On November

20   17, 2006, the FDA determined that Mentor MemoryGel Silicone Breast Implants as designed,

21   manufactured and labeled are safe and effective and issued an Approval Order (RJN - Exh. C).

22          Thereafter, Mentor MemoryGel Silicone Breast Implants could only be sold to healthcare

23   professionals in accordance with the design, manufacturing, and labeling specifications approved by

24

25

26

27   [1] Because PMA approvals are documented in the Federal Register, courts are required to take
     judicial notice of them.  See 21 C.F.R. §814.44(d)(1) (2010) (FDA will publish in the Federal
     Register after each quarter a list of the approvals announced in that quarter; 44 U.S.C. §1507 (the

28   contents of the Federal Register shall be judicially noticed.)  It is a matter of public record that
     Mentor MemoryGel Silicone Breast implants first received PMA on Nov. 17, 2006.

1    the FDA.  Id., see also 21 C.F.R. §801.109.  The approvals for Mentor's MemoryGel Silicone Breast

2    Implants remain in effect and have never been suspended or withdrawn.

3    **III.    ARGUMENT**

4          **A.    The Legal Standard for a Demurrer**

5          California is a fact pleading jurisdiction, requiring that a complaint contain a statement of the

6    facts constituting the cause of action.  CCP section 425.10(a)(1)  A complaint is subject to demurrer

7    if the pleading does not state facts sufficient to constitute a cause of action.  CCP section 430.10(e)

8          The Court, in ruling on a demurrer, must determine whether the complaint states a cause of

9    action.  *People v. Ex Rel. Lungren v. Superior Court* (1996) 14 Cal.4th 294, 300.  The Court may

10   assume the truth of allegations in the Complaint that have been properly pleaded, but not

11   contentions, deductions, or conclusions of fact or law.  *Blank v. Kirwan* (1985) 64 Cal.3d 311, 318.

12   To survive a demurrer, a plaintiff must allege facts demonstrating a plausible claim.  See

13   *Prakashpalan v. Engstrom, Lipscomb & Lack* (2014) 223 Cal.App.4th 1105, 1120 ("the facts to be

14   pleaded are those upon which liability depends… Such facts must be plausible."); *Ankeny v.*

15   *Lockheed Missiles & Space Co.* (1979) 88 Cal.App.3d 531, 537 (confirming that "the essential facts

16   upon which a determination of the controversy depends should be stated with clearness and

17   precision").  In cases such as this, a plaintiff must also plead "specific facts" explaining how the

18   defendant's alleged conduct caused or contributed to her injury.  *Bockrath v. Aldrich Chem. Co.*

19   (1999) 21 Cal.4th 71, 78.  A demurrer should be sustained where the facts alleged are insufficient to

20   state a cause of action.  CCP section 430.10(e).  Moreover no leave to amend should be allowed

21   where "the nature of the plaintiff's claim is clear but under the substantive law, no liability exists."

22   *Seidler v. Municipal Ct.* (1993) 12 Cal.App.4th 1229, 1233.

23         **B.    The MDA Preempts Plaintiffs' Common Law Claims**

24               1.    <u>The Medical Device Amendments of 1976</u>

25         In 1976, Congress enacted the Medical Device Amendments ("MDA") to the Food Drug and

26   Cosmetic Act to allow the FDA to regulate medical devices.  The MDA assigns each medical device

27   to one of three "classes".  Class III devices, which include breast implants, are subjected to the most

28   rigorous safety evaluation via the PMA process to establish that the devices are safe and effective.

1   *Riegel v. Medtronic, Inc.*, 552 U.S. 312 at 317 (2008); *In re Medtronic, Inc., Sprint Fidelis Leads*

2   *Products Liability Litigation* 623 F.3d 1200, 1203 (8th Cir. 2010).  Premarket approval is a

3   "rigorous" process. *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 477 (1996).  A manufacturer must submit

4   what is typically a multivolume application which includes, among other things, full reports of all

5   studies and investigations of the device's safety and effectiveness that have been published or should

6   reasonably be known to the applicant; a "full statement" of the device's "components, ingredients

7   and properties and of the principle or principles of operation"; "a full description of the methods

8   used in, and the facilities and controls used for, the manufacture, processing, and, when relevant,

9   packing and installation of, such device"; samples of device components required by the FDA; and a

10   specimen of the proposed labeling. § 360e(c)(1); *Riegel, supra*, 552 U.S. at 317.

11          Prior to obtaining premarket approval, a manufacturer of a Class III device may apply for

12   FDA approval to use the device for clinical testing pursuant to an investigational device exemption

13   ("IDE").  21 U.S.C. §360j(g).  An IDE is designed "to encourage, to the extent consistent with the

14   protection of public health and safety and with ethical standards, the discovery and development of

15   useful devices intended for human use." 21 U.S.C. §360j(g).  Investigational devices are subject to

16   complex and comprehensive regulations and detailed procedures for determining whether the

17   devices are safe and effective. *Martin v. Telectronics Pacing Sys., Inc.* (6th Cir. 1997) 105 F.3d

18   1090, 1095.  To qualify for an IDE, a manufacturer must submit an application that includes a

19   "complete report of prior investigations of the device" and a "description of the methods, facilities,

20   and controls used for the manufacture, processing, packing, storage, and where appropriate,

21   installation of the device." 21 C.F.R. §812.20.  The manufacturer must also submit a statement

22   concerning the intended use of the device and the objectives and duration of the investigation; a

23   written protocol describing the methodology to be used and an analysis of the protocol

24   demonstrating that the investigation is scientifically sound; an analysis of all the increased risks to

25   which subjects will be exposed by the investigation and how the risks will be minimized; a

26   description of each component, ingredient, property, and principle of operation of the device; the

27   procedures for monitoring the investigation; and copies of all labeling for the device.  21 C.F.R.

28   §812.25.  Finally, the manufacturer must submit a report of prior investigations, including

1    information from non-clinical testing.  21 C.F.R. §812.27.

2         The FDA will not approve an investigational device if it determines that "the risks to the

3    subjects are not outweighed by the anticipated benefits to the subjects and the importance of the

4    knowledge to be gained, or informed consent is inadequate, or the investigation is scientifically

5    unsound, or there is reason to believe the device as used is ineffective." 21 C.F.R. §812.30.  Once it

6    approves an investigational device, the FDA may withdraw its approval at any time if it determines

7    that it is unreasonable to continue the investigation due to the inadequacy of the methods, facilities,

8    and controls used for the manufacturing, processing, packaging, storage, and where appropriate,

9    installation of the device." 21 C.F.R. §812.30(b)(5)(ii).

10        2.    Express Preemption of Medical Device Claims Under *Riegel*

11        To ensure that FDA oversight of approved medical devices is not controverted by state law,

12   Congress included the following express preemption provisions:

13        "[N]o State or political subdivision of a State may establish or continue in effect with respect
     to a device intended for human use any requirement –
14        (1) which is different from, or in addition to, any requirement applicable under this chapter to
     the device, and
15        (2) which relates to the safety or effectiveness of the device or to any other matter included in
     a requirement applicable to the device under this chapter."
16        21 U.S.C. §360k(a)

17        The Supreme Court in *Riegel* held that the MDA's express preemption clause bars common

18   law claims challenging the safety and effectiveness of a medical device given PMA approval by the

19   FDA.  *Riegel*, 552 U.S. at 328-329.

20        The Supreme Court in *Riegel* established a two-part test for preemption under the MDA:  (1)

21   the court must determine whether the federal government has established requirements relating to

22   the device at issue and, if so, (2) the court must determine whether a state-law claim imposes any

23   requirement relating to the safety and effectiveness of a device that is "different from or in addition

24   to" the federal requirement.  *Riegel, supra*, 552 U.S. at 321-323; See also *In re Medtronic, Inc.,*

25   *Sprint Fidelis Leads Prod. Liab. Litig.*, 623 F.3d at 1205; *Dougherty v. Source Nats, Inc.,* 148

26   F.Supp.3d 831, 833 (E.D.Mo. 2015). A claim that imposes such a requirement is preempted.

27        Courts routinely follow *Riegel* in applying 360k(a) to dismiss claims involving PMA-

28

1  approved devices.  See *Glennen v. Allergan, Inc.* (2016) 247 Cal.App.4th 1, 4-5 (affirming dismissal

2  of negligence claim as preempted under MDA); *McGuan v. Endovascular Techs, Inc.* (2010) 182

3  Cal.App.4th 1490, 1499-1500 (Strict liability and negligence claims dismissed as preempted under

4  MDA).  Similarly, courts also apply 360k(a) to dismiss claims involving IDE-approved devices.

5  *Robinson v. Endovascular Tech.* (2010) 190 Cal.App.4th 1490, 1499-1500 (holding that "*Riegel* is

6  controlling in cases involving medical devices that have received IDE approval" and reasoning that

7  there are "no material differences" between the IDE and PMA processes (quoting *Kemp v.*

8  *Medtronic, Inc.* (6th Cir. 2000) 231 F.3d 216, 227); *Evraets v. Intermedica Intraocular, Inc.* (1994)

9  29 Cal.App.4th 779, 787-788 (affirming dismissal of negligence and strict liability claims in case

10  involving Class III investigational device, and holding the manufacturer "cannot be sued under state

11  law theories of negligence or strict liability" because such claims "undermine the congressional

12  purpose of allowing lens manufacturers leeway in developing and perfecting their product").

13        Section 360k(a), however, "does not prevent a state from providing a damages remedy for

14  claims premised on a violation of FDA regulations because the state duties in such a case parallel,

15  rather than add to, federal requirements." *Riegel,* 552 U.S. at 330.  In order for a state requirement to

16  be parallel to a federal requirement and thus not expressly preempted, the plaintiff must show that

17  the requirements are "genuinely equivalent".  *Glennen, supra,* 247 Cal.App.4th at 10.  State and

18  federal requirements are not equivalent if a manufacturer could be held liable under state law

19  without having violated federal law.  *Glennen, supra,* 247 Cal.App.4th at 10.  As more fully

20  explained below, Plaintiffs are unable to satisfy this requirement.

21                3.        Preemption of Medical Device Component Claims

22        The courts have similarly applied 360k(a) to claims involving device components, finding

23  that preemption also bars separate claims arising out of the components used in medical devices

24  which were granted PMA approval.  *Gross v. Stryker Corp.,* 858 F.Supp.2d 466 (W.D.Pa. 2012);

25  *Bass v. Stryker Corp.,* No. 4:09-cv-632-Y, 2010 WL 3431637, rev'd on other grounds 669 F.3d 501

26  (5th Cir. 2012); *Bentley v. Medtronic, Inc.,* 827 F.Supp.2d 443, 451-452 (E.D.Pa. 2011); *Riley v.*

27  *Cordis Corp.,* 625 F.Supp.2d 769, 780 (D.Minn. 2009); *Lewkut v. Stryker Corp.,* 724 F.Supp.2d 648,

28  656 (S.D.Tex. 2010).  In each of the foregoing cases, it was found that, by granting PMA approval of

a medical device, the FDA had likewise approved its component parts.  The *Lewkut* court explained:

> "[T]his Court cannot see the logic in holding that the ceramic components of the Trident System were PMA-approved for use with the acetabular shell, but that that acetabular shell itself was not PMA approved. An acetabular shell being used in conjunction with the identified ceramic components is precisely the device that was approved via PMA. To require that a distinction be drawn between the approval process of the individual components of the system and the system itself, would, it seems, add a level of complication to the medical device approval process not anticipated by Congress, the FDA, or medical device manufacturers." *Id.*, at 656.

It is well-documented that as part of the rigorous PMA approval process, a device manufacturer must provide information about the device components, including a "full statement" of the device's "components, ingredients, and properties and of the principle or principles of operation… samples or device components required by the FDA". §360e(c)(1)." See *Riegel, supra,* at 317.  Information about the components and ingredients used in the devices is a critical feature of the FDA's analysis of the design of the device before granting PMA approval.

A review of the FDA's approval in 2006 of the MemoryGel implants in question confirms that a complete and thorough assessment of the component materials was performed and considered as part of the PMA approval of the MemoryGel implants.  The SSED which accompanied the approval of MemoryGel implants contains a careful analysis of all aspects of the materials making up the shell and patch and gel used in the device.  The SSED contains twelve pages of analysis of the silicone components used in the MemoryGel implants, the silicone shell, patch, and gel, which includes Chemistry Data (including the Extent of Cross-Linking; analysis of Volatiles; analysis for Extractables; Heavy Metal Analysis; and analysis of Silica Filler); Toxicology Data (including Pharmacokinetics, Biocompatibility Testing – Cytotoxicity, Short Term Irritation and Implantation, Acute Systemic Toxicity, Hemocompatibility, Pyrogenicity, Immunotoxicity, Sensitization, Muscle Implantation, Subchronic Toxicity, Reproductive Toxicity and Teratogenicity, Genotoxicity, and Carcinogenicity); Mechanical Data (including for fatigue, gel bleed, and gel cohesivity); Modes and Causes of Rupture; and Shelf Life Data. (RJN - Exh. 2, pp. 3-15) It is apparent that the FDA carefully considered the safety and efficacy of the silicone materials which were used in the implants, and approved the use of those materials as part of its analysis and approval of the implant design.  It is also apparent that Plaintiffs' allegations in the present action against NuSil attack the

1  very criteria and findings employed by the FDA when it approved the MemoryGel implants and

2  their components.

3          Conceding, as they must, that the FDA's PMA approval of the MemoryGel implants

4  preempts claims for design defect, Plaintiffs cannot pick apart the composition of the raw materials

5  and apply different preemption analyses to the different components. *Gross v. Stryker Corp.*, 858

6  F.Supp.2d 466 (W.D.Pa. 2012); *Bass v. Stryker Corp.*, No. 4:09-cv-632-Y, 2010 WL 3431637, rev'd

7  on other grounds 669 F.3d 501 (5th Cir. 2012); *Bentley v. Medtronic, Inc.*, 827 F.Supp.2d 443, 451-

8  452 (E.D.Pa. 2011); *Riley v. Cordis Corp.*, 625 F.Supp.2d 769, 780 (D.Minn. 2009); *Lewkut v.*

9  *Stryker Corp.*, 724 F.Supp.2d 648, 656 (S.D.Tex. 2010).

10         The court similarly rejected a product liability claim involving component parts of a medical

11  device in *Cornwell v. Stryker Corp.*, No. 1:10–cv00066–EJL, 2010 WL 4641112, at *3–4, 2010 U.S.

12  Dist. LEXIS 116824, at *8–9 (D.Idaho Nov. 1, 2010):

13             "The Court finds the record in this case supports that the Trident System,

14         *including its component parts*, received PMA approval under the PMA process.

15         Plaintiff argues the Trident acetabular cup was initially approved via the § 510(k)

16         process and even though it was later approved for use with the ceramic-on-ceramic

17         Trident System which received PMA approval, claims regarding the acetabular cup

18         are exempt based on its original approval under § 510(k). This argument has been

19         rejected by every other court determining whether the acetabular cup received

20         approval via the PMA process.... Having found the medical device at issue in this

21         case was approved via the PMA process, the Court finds Plaintiff's product liability

           claims are preempted by the MDA and must be dismissed.  (emphasis added)"

22  **C.      Implied Preemption under the MDA**

23         Even if a plaintiff's claim is not expressly preempted, it is impliedly preempted if it is

24  cognizable only by virtue of the FDCA. *Buckman Co. v. Plaintiffs' Legal Comm.* (2001) 531

25  U.S.341, 343 (holding "fraud on the FDA" claims are impliedly preempted because they "exist

26  solely by virtue of the FDCA disclosure requirements").  Implied preemption under the MDA bars

27  claims seeking to enforce an exclusively federal requirement that is not grounded in traditional state

28  tort law. *Glennen, supra*, 247 Cal.App.4th, at 10-11 (explaining that such claims "are essentially

1  private actions to enforce the FDCA" and are thus barred by 21 U.S.C. section 337(a), which solely

2  authorizes the federal government to enforce the MDA).

3  **D.    The Narrow Gap Through Which State Law Claims must Fit to Survive**

4  Together, express and implied preemption create a "narrow gap" through which a state law

5  claim must fit to escape preemption.  Glennen, supra, 247 Cal.App.4th, at 11-12.  As the Glennen

6  court explained, "The plaintiff must be suing for conduct that *violates* the FDCA (or else his claim is

7  expressly preempted by §360k(a)), but the plaintiff must not be suing *because* the conduct violates

8  the FDCA (since such a claim would be impliedly preempted under *Buckman*)." *Id.*, at 12. "Stated

9  another way, '[i]n order to survive preemption, such claims "must be premised on conduct that both

10 (1) violates the FDCA and (2) would give rise to a recovery under state law even in the absence of

11 the FDCA." ' *Glennen, supra*, 247 Cal.App.4th 12, citing *Scanlon v. Medtronic Sofamor Danek*

12 *USA Inc.* (D.Del.2014) 61 F.Supp.3d 403, 411.

13 **E.    Courts Routinely Find that Claims Involving Breast Implants are Preempted**

14 Applying the preemption principles above, courts across the country routinely find that

15 failure to warn and manufacturing defect claims involving breast implants – including the

16 MemoryGel implants here at issue, are subject to dismissal. *Rowe v. Mentor Worldwide, LLC*, 2018

17 WL 1320251, at *5, *8-9 (M.D.Fla. Mar.2, 2018); *Ebrahimi v. Mentor Worldwide, LLC*, 2017 WL

18 4128976, at *4-7 (C.D.Cal. Sept. 15, 2017); *Laux v. Mentor Worldwide, LLC*, 2017 WL 5186329, at

19 *3-4 (C.D.Cal. Nov. 8, 2017); *Malonzo v. Mentor Worldwide, LLC*, 2014 WL 2212235, at *3

20 (N.D.Cal. May 28, 2014); *Couvillier v. Allergan, Inc.*, 2011 WL 8878258, at *1-2 (W.D.La. Jan. 20,

21 2011).  Courts have also specifically dismissed claims involving investigational breast implants

22 placed pursuant to FDA-approved adjunct studies.  *Dorsey v. Allergan*, 2009 WL 703290, at *7

23 (M.D.Tenn. Mar. 11, 2009); *Williams v. Allergan USA, Inc.*, 2009 WL 3294873, at *1, 4 (D.Ariz.

24 Oct. 14, 2009).  The federal court decisions are entitled to substantial deference.   See *Sciborski v.*

25 *Pac Bell Directory* (2012) 205 Cal.App.4th 1152, 1165 ("a federal court's interpretation and

26 application of federal preemption law … is entitled to substantial deference." (citing *Levy v.*

27 *Skywalker Sound* (2003) 108 Cal.App.4th 753, 762, n. 8 ("decisions of the lower federal courts on

28 questions of federal law are persuasive and entitled to great weight".)).

1    More recently, the Los Angeles Superior Court added its voice to this long-standing

2  recognition that such product liability claims are expressly and impliedly preempted.  In *Mize v.*

3  *Mentor Worldwide LLC*, 2018 WL 1364257, this Court found that a complaint essentially the same

4  as the present complaint, prepared by the same attorneys, alleging negligence and strict products

5  liability in connection with silicone breast implants, was expressly and impliedly preempted under

6  the reasoning discussed above.  In *Mize*, this Court ruled as follows:

7          "Plaintiff alleges that Mentor failed to adequately inspect, test, and validate
         the materials and components of the Mentor MemoryGel Silicone Gel Breast
8        Implants… Plaintiff also alleges that the implants were defective at the time of sale
         and that Plaintiff was implanted with a device that was manufactured from
9        nonconforming materials and uncertified components. … However, Plaintiff does not
         allege the respects in which Mentor's inspection, testing and validation of the product
10       or the product itself as implanted in Plaintiff violated FDA requirements. "[T]o
         survive both express and implied preemption, a state law cause of action 'must be
11       premised on conduct that both (1) violates the FDCA and (2) would give rise to a
         recovery under state law even in the absence of the FDCA." (*Coleman v. Medtronic,*
12       *Inc.* (2014) 223 Cal.App.4th 413, 427 (citation omitted).)  Plaintiff must allege facts
         that constitute a violation of the Food Drug and Cosmetic Act in addition to alleging
13       how that violation caused injury to Plaintiff.  The current operative complaint does
14       not do so." *Mize II, supra*, at *2. (RJN – Exh. E)

15       Even after Plaintiffs tried to amend their Complaint, the Court found it continued to suffer

16  the same deficiencies, failing to state a viable claim and being expressly and impliedly preempted.

17  *Mize III* at *2, RJN – Exh. F.  The Complaint in the present case is virtually the same as the

18  defective complaint in *Mize*.  There is no reason for this Court to deviate from its earlier sound

19  reasoning and it should continue to uphold the preemption analysis as previously applied in the

20  present case, as well.

21       **F.      Plaintiffs' Claims for Negligence and Strict Liability Relating to Implants and**
22  **Their Components are Expressly and Impliedly Preempted, and Deficiently Pleaded**

23       Plaintiffs' claims do not fit through the "narrow gap" between express and implied

24  preemption.

25       1.    Plaintiffs' Failure to Warn Claims (Counts 1 and 2) are Preempted and are
            Deficiently Pleaded
26

27       Plaintiffs have asserted negligent failure to provide warnings concerning risks and dangers in

28  MemoryGel implants relating to the following:

1    • unanticipated adverse device effects pursuant to 21 C.F.R. §150(b) (Complaint ¶121-122)

2    • Adverse Action Reports pursuant to 21 C.F.R. §360i (Complaint ¶123)

3    • product labeling changes, pursuant to 21 C.F.R. §814.39(d) (Complaint ¶132)

4    • defects in the implants and its component parts and materials, in violation of 21 C.F.R.

5        §812.5(a), which requires a manufacturer to provide a description of "all relevant

6        contradictions, hazards, adverse effects, interfering substances or devices, warnings and

7        precautions." (Complaint, ¶139)

8        Plaintiffs have further asserted liability for failure to warn, stating that Mentor failed to

9    provide proper warnings concerning defects in the device, including use of improper and non-

10   conforming parts and materials, in violation of California law and 21 CFR §812.50(a).

11       Plaintiffs allege that Defendants breached duties owed under state law, in addition to those

12   imposed by federal law.  However, all of their allegations assert duties of a device manufacturer and

13   they cite no obligations owed or violated by a supplier of components or raw materials used in

14   Plaintiffs' implants.  The only allegations addressed to NuSil Defendants are that:

15   • "NuSil Defendants formulated, made, created, labeled, packaged, tested, constructed,

16       assembled, advertised, manufactured, sold, distributed, marketed, and promoted its silicone

17       elastomer and gel kits for use in the MemoryGel Breast Implants, including the products that

18       were implanted into plaintiffs." (Complaint ¶115)

19   • "The NuSil Defendants knew or reasonably should have known that its kits were dangerous

20       or were likely to be dangerous when used or misused in a reasonably foreseeable manner."

21       (Complaint ¶119)

22       Plaintiffs have not cited any violations of the FDCA by NuSil.  However, it is apparent from

23   the allegations that Plaintiffs are seeking to impose on the NuSil Defendants duties which are

24   different from and in addition to those imposed by the federal law.  This they may not do.

25       Plaintiffs have further failed to plead facts which create any obligation on the part of NuSil,

26   which assert the breach of any applicable law or regulation, or otherwise assert any wrongdoing for

27   which NuSil may be held responsible.  Plaintiffs fail to state how either NuSil Defendant owed a

28   duty to any plaintiff, who either NuSil Defendant should have warned and what they should have

1   included in such warnings.  Plaintiffs also fail to satisfy the requirement of stating how NuSil

2   Defendants violated the FDCA and how such an alleged violation caused injury to the Plaintiffs.

3           It must further be noted that Plaintiffs cannot assert claims based on the theory that NuSil

4   Defendants had a duty to warn them directly.  Any such claim fails as a matter of state law because,

5   under the learned intermediary doctrine, in the case of prescription drugs and implants, a duty to

6   warn runs only to the prescribing physician, not the patient.  See *Carlin v. Superior Court* (1996) 13

7   Cal.4th 1104, 1116; *Valentine v. Baxter Healthcare Corp.* (1999) 68 Cal.App.4th 1467, 1483.  A

8   supplier of components or raw materials is even further removed than a device manufacturer and has

9   no duty to warn a patient. *Artiglio v. General Electric Co*. (1998) 61 Cal.App.4th 830, 839.

10  Moreover, any such claim would be expressly preempted because Plaintiffs have not identified a

11  federal law requiring raw material suppliers, such as NuSil, to warn patients directly.  See *Funke v.*

12  *Sorin Grp. USA, Inc*. (C.D.Cal. 2015) (holding that plaintiff's claim was expressly preempted absent

13  such a showing.)  Therefore, even if Plaintiffs had tried to plead a failure to warn on the part of

14  either NuSil Defendant, which they have not, their Complaint is barred by this doctrine, also.

15          2.      Plaintiffs' Manufacturing Defect Claims (Counts 1 and 3) are Preempted and
                    are Deficiently Pleaded

16

17          In attempting to plead manufacturing defect, both in the negligence/negligence per se claim

    (Count 1) and in the strict liability claim (Count 3), Plaintiffs have similarly failed to plead necessary
18

19  facts.   In fact, Plaintiffs do not even mention the NuSil Defendants at all in either claim alleging

20  defect in manufacturing.  At the end of each such claim, Plaintiff alleges:

21          "159. As a proximate and legal result of Mentor's failure to exercise
        reasonable care and the resulting defective condition of its MemoryGel Silicone Gel
22      Breast Implants implanted into Plaintiffs, they suffered injuries and will continue to
        suffer injuries … for which she is entitled to compensatory and other damages in an
23      amount to be proven at trial."  (Complaint ¶159 1st CA)

24          "225. As a proximate result and/or substantial factor of Mentor MemoryGel
        Silicone Gel Breast Implants defective condition at the time they were sold, Plaintiffs
25      suffered and will continue to suffer severe physical injuries, severe emotional
        distress, mental anguish, economic loss, future medical care and treatment, and other
26      injuries for which she is entitled to compensatory and other damages in an amount to
        be proven at trial"  (Complaint ¶225 3d CA)
27

28

1    As the Court can see, there is no reference at all to any NuSil entity and no attempt to state

2 any basis upon which either NuSil Defendant may be held liable to any Plaintiff on any theory.

3    However, Plaintiffs' conclusory allegations make it clear that, even if they had pleaded any

4 facts which could be arguably attributed to any NuSil Defendant, their claims will be preempted.

5 Plaintiffs' allegations are the same ones that prior courts have found to be preempted – that

6 Plaintiffs' implants differed in some undisclosed way from requirements and specifications imposed

7 by the FDA (Complaint ¶150), that they included "nonconforming materials and uncertified

8 components" that somehow differed from those approved by the FDA (Complaint ¶154), that

9 Mentor violated record keeping requirements (Complaint ¶153), and that Mentor failed to follow

10 unidentified specifications and regulations required by the FDA (Complaint ¶151).  Conclusory

11 allegations such as these would be insufficient to constitute a violation of the FDCA, even if there

12 had been an attempt to include NuSil in the allegations.  See *Evraets, supra*, 29 Cal.App.4th at 785

13 (holding that alleged statutory violations must be specifically pleaded and "cannot make respondents

14 and the court guess at which law was violated".).

15    Plaintiffs' product liability claims are comparable to the claims that the Supreme Court found

16 to be preempted in *Riegel*.  *Riegel* held that strict liability and negligence claims like those of

17 Plaintiffs seek to impose requirements different from, or in addition to, those imposed by the FDA

18 and are preempted.  *Riegel*, 552 U.S. at 324-25 (stating that state tort law, applied under either a

19 negligence or strict liability standard, which goes beyond the FDA's requirements disrupts the

20 federal scheme.)  Likewise, Plaintiffs here are attempting to impose labeling, manufacturing, testing,

21 inspection and sale requirements which are different from, or in addition to, the device-specific

22 requirements imposed by the FDA.

23    For example, in the first cause of action for negligence, Plaintiffs assert obligations on the

24 part of NuSil defendants "under California law" to exercise reasonable care to provide adequate

25 warnings of potential dangers of which they were aware (Complaint ¶116, 117), that defendants

26 marketed, advertised, and promoted the product while failing to monitor, warn or otherwise ensure

27 the safety and efficacy in violation of California law (Complaint ¶128), that defendants had a post-

28 sale duty to warn under California law (Complaint ¶125), and that defendants failed to provide

1  warnings about "the use of improper and nonconforming component parts and materials in violation

2  of California law (Complaint ¶139).   However, these materials were subject to scrutiny during the

3  PMA process when the design, manufacture, labeling, and composition of the silicone raw materials

4  were approved by the FDA for use in Mentor's implants.   Plaintiffs' broad and conclusory

5  allegations attempt to circumvent and expand upon the preemptive Federal regulations and to assert

6  state law claims relating to the sale, testing, validation, quality assurance, quality control, and

7  distribution which impose obligations under state law different from, and in addition to, the Federal

8  regulations by which these raw materials are exclusively governed.

9       The Supreme Court has held that once a device has received premarket approval, "the MDA

10  forbids the manufacturer to make, without FDA permission, changes in design specifications,

11  manufacturing processes, labeling, or any other attribute, that would affect safety or effectiveness,"

12  which would prohibit any change in the composition of the implants or the silicone used. *Riegel,*

13  *supra*, 552 U.S. at 319.  Therefore, to the extent that Plaintiffs have attacked the composition or

14  manufacture of the silicone used in Plaintiffs' implants, which the FDA approved, they seek to

15  impose responsibilities that are different from, or in addition to, the federal requirements and

16  therefore expressly preempted. *Zaccarello v. Medtronic, Inc.*, 38 F.Supp.3d 1061, 1067 (W.D.Mo.

17  2014); *Cottengim v. Mentor Corp.*, No. 05-1-DLB, 2007 WL 2782885, at 4-5 (E.D.Ky. Sept. 24,

18  2007) (plaintiff's manufacturing claim was preempted because 'mere allegations are not enough to

19  avoid preemption"); *Blankenship v. Medtronic, Inc.*, 6 F.Supp.3d 979, 988 (E.D.Mo. 2014) (plaintiff

20  did not adequately plead a manufacturing defect and attempted to impose responsibilities different

21  from or in addition to the federal requirements, which are expressly preempted under §360k(a)).

22       Because federal law, the Approval Order and SSED solely govern the labeling, manufacture

23  and composition of the implants and their components, Plaintiffs' strict liability claims are

24  necessarily preempted. *De La Paz v. Bayer Healthcare LLC*, 159 F.Supp.3d 1085, 1097 (N.D.Cal.

25  2016).   Therefore, to the extent that it could be argued that either the second or third causes of

26  action could be construed to apply to either of the NuSil Defendants, those claims are also expressly

27  preempted.

28  ///

V.   **CONCLUSION**

For the reasons set forth above, NuSil Defendants respectfully request that the Court sustain their demurrer to each of Plaintiffs' claims against NuSil Defendants without leave to amend.

Respectfully submitted,

Dated: May 1, 2019                    PRICE, POSTEL & PARMA LLP


By:
    Melissa J. Fassett
    Attorneys for Defendants
    Nusil LLC and Nusil Technology LLC

## PROOF OF SERVICE

STATE OF CALIFORNIA, COUNTY OF SANTA BARBARA

I am employed in the County of Santa Barbara, State of California.  I am over the age of eighteen (18) and not a party to the within action.  My business address is 200 East Carrillo Street, Fourth Floor, Santa Barbara, California 93101.

On May 1, 2019, I served the foregoing document described as **DEMURRER OF NUSIL TECHNOLOGY LLC AND NUSIL LLC TO PLAINTIFF'S COMPLAINT; DECLARATION OF MELISSA J. FASSETT** on all interested parties in this action by the original and/or true copy thereof enclosed in sealed envelopes, addressed as follows:

See attached Service List

☒   BY MAIL: I placed the original and/or true copy in a sealed envelope addressed as indicated herein.  I am readily familiar with the firm's practice of collection and processing documents for mailing.  It is deposited with the U.S. postal service on that same day in the ordinary course of business.  I am aware that on motion of the party served, service is presumed invalid if the postal cancellation date or postage meter date is more than one day after the date of deposit for mailing in affidavit.

☐   BY PERSONAL DELIVERY: I personally delivered the original and/or true copy in a sealed envelope addressed as indicated herein.

☐   BY OVERNIGHT DELIVERY: I placed the original and/or true copy in a sealed, fully prepaid FedEx, Next Day Air envelope addressed as indicated herein, which is picked up by FedEx on that same day in the ordinary course of business.

☐   BY FACSIMILE:  Based on an agreement of the parties to accept service by fax transmission, I faxed the referenced document(s) from fax number (805) 967-3978 at [*insert time*] to the person(s) indicated herein at the fax number(s) indicated herein.  No error was reported by the fax machine that I used.  A copy of the record of the fax transmission, which I printed out, is attached.

☐   BY E-MAIL: I caused to be e-mailed a true copy to the e-mail addresses listed herein.

☒   (***STATE***)  I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

☐   (***FEDERAL***)  I hereby certify that I am employed in the office of a member of the Bar of this Court at whose direction the service was made.

Executed on May 1, 2019, at Santa Barbara, California.

_____
Signature
Elizabeth Wright

## SERVICE LIST

**Brittany Billetts, et al. v. Mentor Worldwide, LLC, et al.**
**Santa Bernardino County Superior Court Case No. CIVDS1905706**

| | |
|---|---|
| Jennifer A. Lenze<br>Amanda D. McGee<br>LENZE LAWYERS, PLC<br>1300 Highland Avenue, Suite 207<br>Manhattan Beach, CA 90266<br>jlenze@lenzelawyers.com<br>McGee@lenzelawyers.com | Plaintiffs |
| Lowell W. Finson<br>FINSON LAW FIRM<br>126 Westwind Mall<br>Marina del Rey, CA 90292<br>Lowell@finsonlawfirm.com | Plaintiffs |
| Monee Takla Hanna<br>Tucker Ellis LLP<br>515 S. Flower Street, 42nd Floor<br>Los Angeles, CA  90071-2223<br>Monee.hanna@tuckerellis.com | Mentor Worldwide, LLC |

1   MELISSA J. FASSETT, State Bar No. 135290
    PRICE, POSTEL & PARMA LLP
2   3330 Cameron Park Drive, Suite 100
    Cameron Park, California 95682-7652
3   Telephone:   (805) 962-0011
    Facsimile:   (805) 965-3978
4

5   Attorneys for Defendants
    Nusil LLC and Nusil Technology LLC
6

7

8                     **SUPERIOR COURT OF THE STATE OF CALIFORNIA**

9                           **FOR THE COUNTY OF SAN BERNARDINO**

10

11  BRITTANY BILLETTS, an individual;          Case No.: CIVDS1905706
    VIVIAN AGUIAR, an individual; ANN
12  DELMONICO, an individual; CORNELIA         **REQUEST FOR JUDICIAL NOTICE IN**
    DITTO, an individual; LEAH JOHNSON, an     **SUPPORT OF DEMURRER OF NUSIL**
13  individual,                                **TECHNOLOGY LLC AND NUSIL LLC**
                                               **TO PLAINTIFF'S COMPLAINT**
14                    Plaintiffs,
                                               **[Notice of Demurrer and Demurrer to**
15            vs.                              **Plaintiff's Complaint filed concurrently**
                                               **Herewith]**
16  MENTOR WORLDWIDE, LLC; NUSIL,
    LLC; NUSIL TECHNOLOGY, LLC; and
17  DOES 1-100, inclusive,                     Date:      June 6, 2019
                                               Time:      8:30 a.m.
18                    Defendants.              Dept:      S24

19                                             Complaint Filed:        2/22/19

20

21

22          Pursuant to California Rules of Court, Rules 3.1306(c) and 3.1113(l), and Evidence Code

23  sections 452 and 453, Defendants NuSil LLC and NuSil Technology LLC respectfully request that

24  the Court take judicial notice of the documents identified below in support of their Demurrer to

25  Plaintiff's Complaint.

26          1.  Plaintiff's Complaint filed with the San Bernardino Superior Court on February 22, 2019.

27  A true and correct copy of the Complaint is attached hereto as **Exhibit A**.

28

1        Pursuant to Evidence Code section 452(d), the Court may take judicial notice of the records

2    of any court of this State.

3        2.  November 17, 2006, Premarket Approval ("PMA") letter from the Center for Devices and

4    Radiological Health ("CDRH") of the Food and Drug Administration ("FDA") granting PMA to

5    Mentor Corporation for Mentor MemoryGel Silicone Gel-Filled Breast Implants.  This PMA letter is

6    publicly available on the FDA's web site at

7    https://www.accessdata.fda.gov/scripts/cdrh/cfdocs/cfpma/pma.cfm?id=P030053.  A true and correct

8    copy of the PMA Letter is attached as **Exhibit B**.

9        Pursuant to Evidence Code section 452(c), the Court may take judicial notice of the official

10   acts of the legislative, executive and judicial departments of the United States and of any state of the

11   United States. Similarly, pursuant to Evidence Code section 452(b), the Court may take judicial

12   notice of regulations and legislative enactments issued by or under the authority of the United States

13   or any public entity in the United States.

14       3.  Summary of Safety and Effectiveness Data ("SSED") which accompanied the November

15   17, 2006, PMA letter from the CDRH of the FDA for Mentor MemoryGel Silicone Gel-Filled Breast

16   Implants.  The SSED is publicly available on the FDA's web site at

17   https://www.accessdata.fda.gov/scripts/cdrh/cfdocs/cfpma/pma.cfm?id=P030053.  A true and correct

18   copy of the SSED is attached as **Exhibit C**.

19       Pursuant to Evidence Code section 452(c), the Court may take judicial notice of the official

20   acts of the legislative, executive and judicial departments of the United States and of any state of the

21   United States. Similarly, pursuant to Evidence Code section 452(b), the Court may take judicial

22   notice of regulations and legislative enactments issued by or under the authority of the United States

23   or any public entity in the United States.

24       4.  Federal Register/Vol. 72, No. 63, April 3, 2007 Notices, TABLE 1: List of Safety and

25   Effectiveness Summaries for Approved PMAs Made Available from October 1, 2006 to December

26   31, 2006, which identifies the FDA's November 17, 2006 PMA approval of Mentor MemoryGel™

27   Silicone Gel-Filled Breast Implants.  This section of the Federal Register is available at

28   https://www.federalregister.gov/documents/2007/04/03/E7-6166/medical-devices-availability-of-

1  safety-and-effectiveness-summaries-for-premarket-approval, last visited on August 1, 2018.  A true

2  and correct copy of this section of the Federal Register is attached as **Exhibit D**.

3       Pursuant to Evidence Code section 452(c), the Court may take judicial notice of the official

4  acts of the legislative, executive and judicial departments of the United States and of any state of the

5  United States. Similarly, pursuant to Evidence Code section 452(b), the Court may take judicial

6  notice of regulations and legislative enactments issued by or under the authority of the United States

7  or any public entity in the United States.

8       Because PMA approvals are documented in the Federal Register, courts are required to take

9  judicial notice of them.  See 21 C.F.R. §814.44(d)(1) (2010) ("FDA will publish in the Federal

10  Register after each quarter a list of the approvals announced in that quarter."); 44 U.S.C. §1507

11  ("The contents of the Federal Register shall be judicially noticed.").

12       5. Order of the Los Angeles Superior Court in *Rexina Mize v. Mentor Worldwide LLC*, 2018

13  WL 1364257, (March 13, 2018).  A true and correct copy of that Order is attached hereto as **Exhibit**

14  **E**.

15       Pursuant to Evidence Code section 452(d), the Court may take judicial notice of the records

16  of any court of this State.

17       6. Order of the Los Angeles Superior Court in *Rexina Mize v. Mentor Worldwide LLC*, 2018

18  WL 5085716, (October 1, 2018).  A true and correct copy of that Order is attached hereto as **Exhibit**

19  **F**.

20       Pursuant to Evidence Code section 452(d), the Court may take judicial notice of the records

21  of any court of this State.

22       **CONCLUSION**

23       Under Evidence Code section 453, this request for judicial notice pursuant to any matter

24  specified in Section 452 is conditionally mandatory and must be granted if sufficient notice is given

25  to the adverse party and if the court is furnished with sufficient information to enable it to take notice

26  of the matter.  *People v. Maxwell* (1978) 78 Cal.App.3d 124, 130-131.  By this Request, Defendants

27  give sufficient notice and gives this Court sufficient information to enable it to take judicial notice of

28  the documents attached as Exhibits A, B, C, and D.

1

2                                     Respectfully submitted,

3   Dated:  May 1, 2019               PRICE, POSTEL & PARMA LLP

4

5                                     By: 

6                                         MELISSA J. FASSETT
                                          Attorneys for Defendants
7                                         Nusil LLC and Nusil Technology LLC

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# EXHIBIT A

SUM-100

# SUMMONS
## (CITACION JUDICIAL)

**FOR COURT USE ONLY**
*(SOLO PARA USO DE LA CORTE)*

**NOTICE TO DEFENDANT:**
*(AVISO AL DEMANDADO):*

MENTOR WORLDWIDE, LLC; NUSIL, LLC; NUSIL
TECHNOLOGY, LLC; and DOES 1-100, inclusive,

**YOU ARE BEING SUED BY PLAINTIFF:**
*(LO ESTÁ DEMANDANDO EL DEMANDANTE):*

BRITTANY BILLETTS, an individual; VIVIAN AGUIAR, an
individual; ANN DELMONICO, an individual; [continued on attachment]

**FILED**
SUPERIOR COURT OF CALIFORNIA
COUNTY OF SAN BERNARDINO
SAN BERNARDINO DISTRICT

MAR 1 9 2019

BY _____
SAMANTHA NEUBAUER, DEPUTY

NOTICE! You have been sued. The court may decide against you without your being heard unless you respond within 30 days. Read the information below.

You have 30 CALENDAR DAYS after this summons and legal papers are served on you to file a written response at this court and have a copy served on the plaintiff. A letter or phone call will not protect you. Your written response must be in proper legal form if you want the court to hear your case. There may be a court form that you can use for your response. You can find these court forms and more information at the California Courts Online Self-Help Center (www.courtinfo.ca.gov/selfhelp), your county law library, or the courthouse nearest you. If you cannot pay the filing fee, ask the court clerk for a fee waiver form. If you do not file your response on time, you may lose the case by default, and your wages, money, and property may be taken without further warning from the court.

There are other legal requirements. You may want to call an attorney right away. If you do not know an attorney, you may want to call an attorney referral service. If you cannot afford an attorney, you may be eligible for free legal services from a nonprofit legal services program. You can locate these nonprofit groups at the California Legal Services Web site (www.lawhelpcalifornia.org), the California Courts Online Self-Help Center (www.courtinfo.ca.gov/selfhelp), or by contacting your local court or county bar association. NOTE: The court has a statutory lien for waived fees and costs on any settlement or arbitration award of $10,000 or more in a civil case. The court's lien must be paid before the court will dismiss the case.

¡AVISO! Lo han demandado. Si no responde dentro de 30 días, la corte puede decidir en su contra sin escuchar su versión. Lea la información a continuación.

Tiene 30 DÍAS DE CALENDARIO después de que le entreguen esta citación y papeles legales para presentar una respuesta por escrito en esta corte y hacer que se entregue una copia al demandante. Una carta o una llamada telefónica no lo protegen. Su respuesta por escrito tiene que estar en formato legal correcto si desea que procesen su caso en la corte. Es posible que haya un formulario que usted pueda usar para su respuesta. Puede encontrar estos formularios de la corte y más información en el Centro de Ayuda de las Cortes de California (www.sucorte.ca.gov), en la biblioteca de leyes de su condado o en la corte que le quede más cerca. Si no puede pagar la cuota de presentación, pida al secretario de la corte que le dé un formulario de exención de pago de cuotas. Si no presenta su respuesta a tiempo, puede perder el caso por incumplimiento y la corte le podrá quitar su sueldo, dinero y bienes sin más advertencia.

Hay otros requisitos legales. Es recomendable que llame a un abogado inmediatamente. Si no conoce a un abogado, puede llamar a un servicio de remisión a abogados. Si no puede pagar a un abogado, es posible que cumpla con los requisitos para obtener servicios legales gratuitos de un programa de servicios legales sin fines de lucro. Puede encontrar estos grupos sin fines de lucro en el sitio web de California Legal Services, (www.lawhelpcalifornia.org), en el Centro de Ayuda de las Cortes de California, (www.sucorte.ca.gov) o poniéndose en contacto con la corte o el colegio de abogados locales. AVISO: Por ley, la corte tiene derecho a reclamar las cuotas y los costos exentos por imponer un gravamen sobre cualquier recuperación de $10,000 ó más de valor recibida mediante un acuerdo o una concesión de arbitraje en un caso de derecho civil. Tiene que pagar el gravamen de la corte antes de que la corte pueda desechar el caso.

The name and address of the court is:
*(El nombre y dirección de la corte es):* San Bernardino District – Civil Division

247 West Third Street
San Bernardino, CA. 92415-0210

**CASE NUMBER:**
*(Número del Caso):*
CIVDS1905706

The name, address, and telephone number of plaintiff's attorney, or plaintiff without an attorney, is:
*(El nombre, la dirección y el número de teléfono del abogado del demandante, o del demandante que no tiene abogado, es):*
Jennifer A. Lenze, 1300 Highland Ave, Suite 207 Manhattan Beach, CA 90266 Tel:(310) 322-8800

DATE:
*(Fecha)*    MAR 1 9 2019

Clerk, by
*(Secretario)* Samantha Neubauer

, Deputy
*(Adjunto)*

*(For proof of service of this summons, use Proof of Service of Summons (form POS-010).)*
*(Para prueba de entrega de esta citación use el formulario Proof of Service of Summons, (POS-010)).*

[SEAL]

COPY

**NOTICE TO THE PERSON SERVED:** You are served
1. [  ] as an individual defendant.
2. [  ] as the person sued under the fictitious name of *(specify):*

3. [X] on behalf of *(specify):* NUSIL, LLC

under: [  ] CCP 416.10 (corporation)          [  ] CCP 416.60 (minor)
       [  ] CCP 416.20 (defunct corporation)  [  ] CCP 416.70 (conservatee)
       [  ] CCP 416.40 (association or partnership) [  ] CCP 416.90 (authorized person)
       [X] other *(specify):* CCP § 17061 (Limited Liability Company)
4. [  ] by personal delivery on *(date):*

Page 1 of 1

Form Adopted for Mandatory Use
Judicial Council of California
SUM-100 [Rev. July 1, 2009]

**SUMMONS**

Code of Civil Procedure §§ 412.20, 465
www.courtinfo.ca.gov

Ex. D - 31

SUM-200(A)

| SHORT TITLE: | CASE NUMBER: |
|---|---|
| BRITTANY BILLETT, et al v. MENTOR WORLDWIDE, LLC., et al. | |

**INSTRUCTIONS FOR USE**

→ This form may be used as an attachment to any summons if space does not permit the listing of all parties on the summons.
→ If this attachment is used, insert the following statement in the plaintiff or defendant box on the summons: "Additional Parties Attachment form is attached."

**List additional parties** *(Check only one box. Use a separate page for each type of party.):*

[✓] Plaintiff    [ ] Defendant    [ ] Cross-Complainant    [ ] Cross-Defendant

CORNELIA DITTO, an individual; LEAH JOHNSON, an individual;

Page __2__ of __2__

Page 1 of 1

Form Adopted for Mandatory Use
Judicial Council of California
SUM-200(A) [Rev. January 1, 2007]

**ADDITIONAL PARTIES ATTACHMENT**
**Attachment to Summons**

Ex. D - 32

1   Jennifer A. Lenze, CA Bar# 246858
2   Amanda D. McGee, CA Bar#282034
    **LENZE LAWYERS, PLC**
3   1300 Highland Avenue, Suite 207
    Manhattan Beach, CA 90266
4   Tel: (310) 322-8800 F: (310) 322-8811
    jlenze@lenzelawyers.com
5   mcgee@lenzelawyers.com

6   Lowell W. Finson, CA Bar#275586
    **FINSON LAW FIRM**
7   126 Westwind Mall
    Marina Del Rey, California 90292
8   Tel: (602) 377-2903 F: (310) 425-3278
9   lowell@finsonlawfirm.com

F I L E D
SUPERIOR COURT OF CALIFORNIA
COUNTY OF SAN BERNARDINO
SAN BERNARDINO DISTRICT

FEB 2 2 2019

BY _____
MELISSA WHITE, DEPUTY

10              **SUPERIOR COURT OF THE STATE OF CALIFORNIA**

11                 **FOR THE COUNTY OF SAN BERNARDINO**

12

13   BRITTANY BILLETTS, an individual; VIVIAN      Case No.:
     AGUIAR, an individual; ANN DELMONICO, an
14   individual; CORNELIA DITTO, an individual;     CIVDS1905706
     LEAH JOHNSON, an individual;
15                                                   **COMPLAINT FOR DAMAGES**

16                                                   (1)   NEGLIGENCE/NEGLIGENCE PER SE
                                                     (2)   STRICT PRODUCTS LIABILITY-
17                                                         FAILURE TO WARN
     Plaintiffs,                                     (3)   STRICT PRODUCTS LIABILITY-
18                                                         MANUFACTURING DEFECT

19        v.                                         **DEMAND FOR JURY TRIAL**

20   MENTOR WORLDWIDE, LLC; NUSIL, LLC;
     NUSIL TECHNOLOGY, LLC; and DOES 1-100,
21   inclusive,

22   Defendants.

23

24        Plaintiffs BRITTANY BILLETTS, an individual; VIVIAN AGUIAR, an individual; ANN

25   DELMONICO, an individual; CORNELIA DITTO, an individual; LEAH JOHNSON, an individual, by

26   and through their attorneys, based on information and belief, and for causes of action against the

27   Defendants, MENTOR WORLDWIDE, LLC; NUSIL TECHNOLOGY, LLC; and DOES 1 through 100,

28   inclusive, (hereinafter collectively referred to as "Defendants") and each of them, hereby allege as follows:

---

PLAINTIFFS' COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL
1

# I. PARTIES

1.    At all times relevant hereto, Plaintiff BRITTANY BILLETTS is and was a citizen and resident of San Bernardino County, California.

2.    At all times relevant hereto, Plaintiff VIVIAN AGUIAR is and was a citizen and resident of Miami-Dade County, Florida.

3.    At all times relevant hereto, Plaintiff ANN DELMONICO is and was a citizen and resident of Newport County, Rhode Island.

4.    At all times relevant hereto, Plaintiff CORNELIA DITTO is and was a citizen and resident of Seminole County, Florida.

5.    At all times relevant hereto, Plaintiff LEAH JOHNSON is and was a citizen and resident of Lee County, Mississippi.

6.    Defendant MENTOR WORLDWIDE, LLC ("MENTOR") is a limited liability company incorporated under the laws of the State of Delaware, with its principal place of business located at 201 Mentor Drive, Santa Barbara, California, 93111, and with its headquarters located at 33 Technology Drive, Irvine, California, 92618.

7.    MENTOR manufactured the Mentor MemoryGel Silicone Implants that are the subject of this complaint.

8.    Defendant NUSIL, LLC is a limited liability company incorporated under the laws of the State of California, with its principal place of business located at 1050 Cindy Lane, Carpinteria, California, 93013.

9.    Defendant NUSIL TECHNOLOGY, LLC is a limited liability company incorporated under the laws of the State of Delaware, with its principal place of business located at 1050 Cindy Lane, Carpinteria, California, 93013.

10.    Defendant NUSIL, LLC and NUSIL TECHNOLOGY, LLC are hereinafter collectively referred to as "NUSIL DEFENDANTS".

11.    The NUSIL DEFENDANTS are silicone raw material suppliers that manufactured, produced, supplied, and shipped to MENTOR the silicone used in the Mentor MemoryGel Silicone Implants.

///

12.     The true names and/or capacities, whether individual, corporate, associate or otherwise of Defendants DOES 1 through 100, inclusive, are unknown to Plaintiffs at this time, who therefore sue said Defendants by such fictitious names.

13.     Plaintiffs are informed and believe, and thereupon allege, that each of the Defendants fictitiously named herein as a DOE is legally responsible, negligently or in some other actionable manner, for the events and happenings hereinafter referred to, and thereby proximately caused the injuries and damages to Plaintiffs as hereinafter alleged.

14.     Plaintiffs will seek leave of court to amend this Complaint to insert the true names and/or capacities of such fictitiously named Defendants when the same have been ascertained.

15.     Hereinafter, the aforementioned Defendants may collectively be referred to as "Defendants."

16.     At all relevant times, each Defendant acted in all aspects as the agent and alter ego of each other.

17.     The combined acts and/or omissions of each Defendant resulted in indivisible injuries to Plaintiff. Each of the above-named Defendants is a joint tortfeasor and/or co-conspirator and is jointly and severally liable to Plaintiff for the negligent acts and omissions alleged herein.   Each of the above-named Defendants directed, authorized or ratified the conduct of each and every other Defendant.

18.     These concerted efforts resulted in significant harm to Plaintiffs. But for the actions of Defendants, individually, jointly, and in concert with one another, Plaintiffs would not have been implanted with Mentor's MemoryGel Silicone Gel Breast Implants and would not have suffered severe injuries.

## II. JURISDICTION AND VENUE

19.     Jurisdiction is proper because the amount in controversy exceeds the jurisdictional minimum of this Court.

20.     Venue and jurisdiction are also proper because the contracts that form the basis of this action were entered into and to be performed in the County of San Bernardino, State of California, and the acts alleged caused damage to Plaintiff Brittany Billetts occurred in the County of San Bernardino.

/ / /

/ / /

/ / /

### III. PLAINTIFF SPECIFIC FACTS

#### As to Plaintiff Brittany Billetts

21.     Plaintiff BRITTANY BILLETTS was implanted with Mentor MemoryGel Silicone Gel Breast Implants on August 15, 2013.

22.     Following implantation and as a direct consequence of the implantation of Mentor MemoryGel Silicone Gel Breast Implants, Ms. BRITTANY BILLETTS developed fatigue, muscle pain and muscle weakness, swelling in the joints, joint pain, sensitivity to light, skin rashes, vision issues, numbness in her extremities, dizziness, nausea, memory loss, shortness of breath, cognitive dysfunction, chest pain, migraines, silicone toxicity, night sweats, and hair loss.

23.     On May 26, 2017, plaintiff BRITTANY BILLETTS was diagnosed with rupture of her right breast implant.

#### As to Plaintiff Vivian Aguiar

24.     Plaintiff VIVIAN AGUIAR was implanted with Mentor MemoryGel Silicone Gel Breast Implants on September 8, 2016.

25.     Following implantation and as a direct consequence of the implantation of Mentor MemoryGel Silicone Gel Breast Implants, Ms. VIVIAN AGUIAR developed a number of illnesses and symptoms, including but not limited to, pain and swelling of the breasts, seromas, and muscle pain.

26.     On February 15, 2018, plaintiff VIVIAN AGUIAR underwent a bilateral explantation of her implants wherein a gel bleed/rupture of her right breast was discovered.

27.     Following her explantation, plaintiff VIVIAN AGUIAR's right breast implant was examined and found to exhibit manufacturing defects including shell material with impaired durability subject to the propagating fracture. These manufacturing defects were found to be of a fundamental kind which affected the material properties of the shell and the gel.

/ / /

/ / /

**As to Plaintiff Ann Delmonico**

28.     Plaintiff ANN DELMONICO was implanted with Mentor MemoryGel Silicone Gel Breast Implants on July 22, 2010.

29.     Following implantation and as a direct consequence of the implantation of Mentor MemoryGel Silicone Gel Breast Implants, Ms. ANN DELMONICO developed a number of illnesses and symptoms, including but not limited to, pain and swelling of the breasts, seromas, swelling in the joints, fatigue, joint pain, muscle pain and muscle weakness, joint stiffness, memory loss, shortness of breath, cognitive dysfunction, migraines, chest pains, chronic sore throats, itching, nausea, dizziness, numbness in her extremities, issues with her vision, skin rashes, sensitivity to light, silicone toxicity, night sweats, and hair loss.

30.     On April 28, 2017 plaintiff ANN DELMONICO underwent a bilateral explantation of her implants wherein a gel bleed/rupture of her right breast was discovered.

31.     Following her explantation, plaintiff ANN DELMONICO's right breast implant was examined and found to exhibit manufacturing defects including partial tears of the anterior capsule. These manufacturing defects were found to be of a fundamental kind which affected the material properties of the shell and the gel.

**As to Plaintiff Cornelia Ditto**

32.     Plaintiff CORNELIA DITTO was implanted with Mentor MemoryGel Silicone Gel Breast Implants on October 9, 2007.

33.     Following implantation and as a direct consequence of the implantation of Mentor MemoryGel Silicone Gel Breast Implants, Ms. CORNELIA DITTO developed a number of illnesses and symptoms, including but not limited to, pain and swelling of the breasts, seromas, fatigue, swelling in the joints, joint pain, muscle pain and muscle weakness, joint stiffness, and migraines.

34.     On October 12, 2017 plaintiff CORNELIA DITTO underwent a bilateral explantation of her implants wherein a gel bleed/rupture of her left breast was discovered.

---

PLAINTIFFS' COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL

5

35.     Following her explantation, plaintiff CORNELIA DITTO's left breast implant was examined and found to exhibit manufacturing defects including shell material with impaired durability subject to the propagating fracture. These manufacturing defects were found to be of a fundamental kind which affected the material properties of the shell and the gel.

<u>As to Plaintiff Leah Johnson</u>

36.     Plaintiff LEAH JOHNSON was implanted with a Mentor MemoryGel Silicone Gel Breast Implant on September 2, 2010.

37.     Following implantation and as a direct consequence of the implantation of Mentor MemoryGel Silicone Gel Breast Implants, Ms. LEAH JOHNSON developed a number of illnesses and symptoms, including but not limited to, fatigue, cognitive dysfunction, muscle pain and muscle weakness, joint pain and soreness, dry skin, dry eyes, easy bruising and slow healing of wounds, shortness of breath, metallic taste in mouth, night sweats, skin rashes, insomnia, swollen and tender lymph nodes in the breast area, numbness in her extremities, chest pains, fevers, chronic neck and back pain, photosensitivity, issues with her vision, migraines, chronic inflammation, and hair loss.

38.     On October 20, 2017, plaintiff LEAH JOHNSON underwent a bilateral explantation of her implants wherein a gel bleed/rupture was discovered.

39.     Following her explantation, plaintiff LEAH JOHNSON's implants were examined and found to exhibit manufacturing defects including internal rupture in the right breast implant and small capsular tears in the left breast implant. These manufacturing defects were found to be of a fundamental kind which affected the material properties of the shell and the gel.

## IV. <u>FACTS RELEVANT TO ALL COUNTS</u>

**A.     FDA Regulation of Silicone Breast Implants**

///

///

40.     In 1976, Congress passed the Medical Device Amendments ("MDA") to the Federal Food, Drug and Cosmetic ("FDCA").   At the time that the MDA was enacted, certain medical devices[1], including breast implants[2], were already being sold in the United States.

41.     Under the MDA, medical devices, such as the subject breast implants, are subject to three classifications and regulated accordingly. Class I devices require the least and most general oversight. 21 U.S.C. § 360c(a)(1)(A). Class II devices are reviewed according to more stringent "special controls," such as performance standards. *Id.* § 360c(a)(1)(B). Finally, Class III devices receive the most oversight and require rigorous premarket review and approval. *Id.* §360c (a)(1)(C)(ii).

42.     The FDA originally classified silicone gel-filled breast implants as Class II devices.  However, because of reports of adverse events, the FDA re-classified silicone gel-filled breast implants as Class III devices.[3]   Accordingly, the FDA required that manufacturers meet certain requirements to allow these medical devices to remain on the market.

43.     Subsequently, on April 10, 1991, the FDA published a final regulation under Section 515(b) of the FDCA requiring that manufacturers of silicone gel-filled breast implants submit pre-market approval applications ("PMAs") with data showing a reasonable assurance of safety and effectiveness of the implants by July 9, 1991.

44.     On August 22, 1991, the FDA determined that the PMAs submitted by the manufacturers of silicone gel-filled breast implants, including Mentor, did not contain sufficient data.

45.     In November of 1991, the FDA convened a panel to consider whether the PMA data regarding silicone gel-filled breast implants was sufficient to establish that they were safe and effective.

---

[1] The term "medical device" includes any "implant [] which is [] intended to affect the structure or any function of the body of man, and which does not achieve its primary intended purposes through chemical action within or on the body of man [] and which is not dependent upon being metabolized for the achievement of its primary intended purposes." 21 U.S.C. § 321.

[2] A breast implant is a prosthesis product used to change the size, shape, and contour of a woman's breast. The silicone implants contain a silicone elastomer shell filled with silicone gel and covered with a patch to seal the implant. On information and belief many implants by Mentor have a label on the implant imprinted by a laser.

[3] A more detailed explanation of the FDA's regulation of breast implants can be accessed at https://www.fda.gov/MedicalDevices/ProductsandMedicalProcedures/ImplantsandProsthetics/BreastImpl ants/ucm064461.htm (Regulatory History of Breast Implants in the U.S.) (Last accessed March 30, 2018).

46.     On January 6, 1992, the FDA called for a voluntary moratorium on the use of silicone gel-filled breast implants until new safety information could be thoroughly reviewed.

47.     Additional information on silicone gel-filled implants was reviewed by the FDA panel on February 18, 1992, including case reports of autoimmune diseases, and evidence that some implants had leaked excessively.

48.     On April 16, 1992 the FDA announced that there was not sufficient data to support approval of the sale of silicone gel-filled breast implants and that it would allow implantation of silicone gel-filled breast implants only under controlled clinical studies for reconstruction after mastectomy or correction of congenital deformities (reconstruction), or replacement of ruptured silicone gel-filled implants due to medical or surgical reasons (revision).  The FDA expressly denied applications to use silicone gel-filled breast implants for breast augmentation.

49.     The FDA further ordered that any silicone gel-filled implants used for reconstruction or revision would be considered to be "investigational devices," and that women who received these implants should be followed through clinical studies.

**B.      Mentor Seeks FDA Approval of its Silicone Gel-filled Implants**

50.     In order to eventually seek pre-market approval for its MemoryGel Silicone gel-filled breast implants, Mentor was required to first provide the FDA with sufficient information regarding the safety and efficacy of that medical device.

51.     As part of this process, Mentor requested that it be allowed to use the medical device for clinical testing pursuant to an investigational device exemption ("IDE"). See, 21 U.S.C. § 360j (g).  Mentor was prohibited from conducting research concerning the device on human subjects without prior approval by the FDA. See, 21 CFR § 812.20.

52.     Investigational devices are subject to complex and comprehensive regulations and detailed procedures intended to ensure that the devices are safe and effective.

/ / /

/ / /

/ / /

53.     In connection with Mentor's IDE, the FDA approved the following studies: "Adjunct Study" for reconstruction and revision patients only (July of 1992); "Core Study" (August of 1992[4]); and, "IDE" study (August 2, 2000).

54.     The FDA also sent a letter to Mentor and other companies seeking approval for the sale of silicone gel-filled implants and discussing the type of information needed for core studies (IDE studies) of silicone gel-filled breast implants on January 11, 1996.

**C.     Mentor Manufacturing Issues prior to FDA approval**

55.     During the time period prior to Mentor's FDA approval, all of Mentor's silicone gel-filled breast implants were manufactured at a facility in Irving, Texas operated by Mentor Texas, Inc. ("Mentor Texas") a wholly owned subsidiary of Mentor.

56.     Based on whistle blower complaints and other information, an investigation was initiated by the United States into the manufacturing process for the silicone gel-filled breast implants made at the Mentor Texas plant.

57.     As a result of the information gathered in that investigation, a complaint was filed on May 6, 1998, in the United State Court for the Northern District of Texas, *United States v. Mentor, et al.*, 3:98-cv-01105-G seeking an injunction to prohibit Mentor and Mentor Texas from manufacturing silicone gel-filled breast implants in violation of the requirements of Federal law.

58.     On that same date, the parties to that case entered into a Consent Decree and Judgment of Permanent Injunction requiring that Mentor and Mentor Texas remedy the deficiencies identified and provide proof that their future manufacturing was being done in compliance with Federal law and regulations.

59.     Specifically, Mentor agreed to manufacture its breast implants in compliance with the FDA's Quality System Regulation, which is designed to ensure that medical devices are consistently high in quality and are safe and effective.

/ / /

---

[4] "In April 1992, the [FDA] moratorium was lifted but only for reconstruction and revision patients. Every patient implanted had to be part of an adjunct study, and had to be offered participation in a registry of gel-filled breast implant patients. In order to be implanted with gel-filled implants for augmentation, women had to be enrolled in a core clinical study." See Exhibit B, Core Gel Study, pg. 3.

60.     The evidence supporting the claims made by the United States included sworn testimony from individuals who had been senior officials at the Mentor Texas facility.

61.     John C. Karjanis, who from 1996 until 1998 was manager of product evaluation at Mentor Texas, testified that basic quality standards for implant manufacturing were never met while he served in that capacity. He further testified that he was instructed by his supervisors to destroy reports detailing the high rupture rates and poor quality of implants manufactured at that facility because the products "are in the customers."

62.     He also testified that implants were sometimes contaminated with fleas and that employees at the Mentor Texas facility would sometimes store defective implant parts above ceiling tiles so managers and inspectors would not realize how often the plant failed to make properly manufacture the implants.

63.     Similarly, Cynthia Fain, the supervisor of the complaint unit testified that Mentor greatly underreported rupture rates for its implants to federal authorities and suppressed a report finding that some implant models had a high failure. Mentor also was cited for other manufacturing deficiencies prior to the date that Plaintiffs received their implants. These include, but are not limited, to a Form 483[5] issued to Mentor on October 16, 1997 indicating that prior to February of 1997 no finished device testing was performed on any of its gel or saline filled mammary devices and that certain post sterilization testing was not done for an unknown time and these materials were used for gel implants.

64.     Upon information and belief, a Mentor chemist of 15 years reported to the FDA that Mentor's implants are more likely to break than the company reported. It has also been reported that the silicone is more likely to leak, even when the implants are intact, and that the materials used in the implants are more dangerous than reported.

65.     Mentor knew of these risks associated with its implants, but covered them up by terminating studies, sponsoring only self-serving research they could control, and by misrepresenting the risks to the users, physicians, and regulatory agencies.

---

[5] An FDA Form 483 is issued when an investigation establishes that a drug, device or cosmetic has been adulterated or is being prepared, packed, or held under conditions whereby it may become adulterated or rendered injurious to health or when an investigator has observed conditions that may constitute violations of the FDCA or related Acts. The purpose of the Form 483 is to notify the company of the objectionable conditions and to allow the company to propose a plan to correct these conditions.

#### D.    Mentor Silicone Implant FDA approval

66.    On December 12, 2003, Mentor submitted a request to the FDA for PMA for its silicone gel-filled breast implants.

67.    On November 17, 2006, the FDA approved Mentor's PMA for its silicone gel-filled breast implants, subject to certain conditions.  One of the conditions was that Mentor was required to conduct six post-approval studies to further characterize the safety and effectiveness of its silicone gel-filled breast implants and to answer long term questions that the clinical trials were not designed to answer.

68.    Specifically, the FDA required Mentor to: (a) Continue and complete the "Core" post-approval study; (b) Conduct a large post-approval study to assess long-term outcomes and identify rare adverse events and follow patients for 10 years; (c) Conduct a device-failure study in concert with their large post-approval study to further identify the modes and causes of failure of explanted devices over the 10-year period; (d) Complete a focus-group study to evaluate how easily patients understand the information in the informed decision brochure about the risks associated with the use of silicone breast implants; (e) Complete an informed decision study to monitor the process of how patient labeling is distributed to women considering silicone gel-filled breast implants; and (f) Complete the "adjunct" study and continue to follow existing participants through their 5-year post-implant evaluations.

69.    Mentor failed to ensure that these mandated studies were preformed properly, in part by not ensuring that the participants were followed after implantation.  Accordingly, the information which the FDA was seeking regarding adverse events and device failures was never gathered.

70.    For example, the "Core" study involved 1008 patients and Mentor was required to continue to follow these patients for the ten years following implantation to assess the long-term clinical performance of the silicone gel-filled implants.  This was required to include 11 follow-up visits, at 6 months post-operation, and annually 1 year to 10 years after surgery.

71.    The FDA also stated that all non-MRI patients should have an MRI at years 6, 8, and 10, and that all patients who were explanted without replacement were to be evaluated through 10 years.

/ / /

/ / /

72.     Mentor was further required to update the patient and physician labeling or its product to reflect the results of the 5 and 10-year Core Study findings and to report to the FDA significant new information regardless of when the information became available.

73.     Although the actual follow-up rates for the "Core" study at 9 years post-implant were only 59 percent, Mentor reported that the follow-up rate at 10 years post-implant was 62 percent.

74.     Furthermore, the FDA requirements specifically mandated evaluation through 10 years, but the core post-approval study report schedule illustrates that reporting was only done for 6 years.

75.     There were also other significant flaws and shortcomings in the information which Mentor provided to the FDA related to this study.

76.     The lack of a sufficient statistical sample, due to the low follow-up rate, as well as the inconsistent data and the failure of Mentor to ensure that the study was completed violated the FDA requirements and significantly limited the information available regarding the long term effects of use of the product.

77.     The manner in which Mentor conducted the large Post-Approval Study (the "Large" study) and reported the information which it did gather were equally flawed.

78.     The purpose for the "Large" study was to address specific issues such as long term local complications experienced by patients, such as connective tissue disease ("CTD"), CTD signs and symptoms, neurological disease, neurological signs and symptoms; offspring, reproductive, and lactation issues; cancer rates, suicide, mammography issues, rupture results, and MRI compliance.

79.     The study data was to be collected through annual patient questionnaires completed over the internet, by mail, or by telephone.

80.     The study also required physician evaluations at years 1, 4-6, 9 and 10 to collect data on complications.

81.     Mentor was required to update their patient and physician labeling to reflect the 5 and 10-year study findings, as well as at any other time if necessary to report significantly new information from the study.

/ / /

/ / /

PLAINTIFFS' COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL
12

Ex. D - 44

82.     As with the other mandated studies, the follow up rate for the "Large" study was so low that the information obtained was not sufficient to allow for the identification of problems and adverse effects from long term use of the product.

83.     By the seventh year of this study, the overall follow-up rate was 20.1% (approximately 8,331 participants out of 41,452), leaving 79.9% of the desired statistics unavailable for evaluation.

84.     This was a study of significant importance required by the FDA for post market approval. The study was designed to address a critical spectrum of health issues for women with breast implants. Mentor did not comply with the required data collection. With nearly an 80% dropout rate, the study failed to collect data to demonstrate that use of the Mentor silicone gel implants was safe.

85.     The inadequate results are even more disconcerting because the data collection was designed to examine reasons for reoperation-previously unevaluated-including MRI results, and rheumatologic or neurological symptoms.

86.     The lack of participation and reliable results from this study show that Mentor has failed to comply with FDA requirements.

87.     Mentor did not follow through with required data collection. The Year 1 follow-up rate of surgeon visit for study participants was 22.8%, leaving nearly 80% unaccounted for.  Similarly, the Year 1, 2, and 3 follow-up rates were 21.4%, 24.3%, and 23.0%, respectively, leaving nearly 80% unaccounted for.  At Year 7, the overall follow-up rate was 20.1%, leaving 79.9% of participants unaccounted for and did not have follow-ups for data collection. No follow-up rates were provided for the 10-year data collection.

88.     These follow-up rates were too low for Mentor to provide meaningful safety information to the FDA and insufficient to allow for the identification of adverse effects or other problems resulting from long term use of the product.

89.     Mentor was also required to conduct a Device Failure Study to ascertain the reasons for, and frequency of, device failure.  Specifically the FDA required that "Mentor must continue preclinical studies to characterize the long-term modes and causes of failure of explanted retrieved devices for the 10-year duration of the large postapproval study.".

///

---

PLAINTIFFS' COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL
13

Ex. D - 45

90.     The study design involved two components: 1) the collection of implant/surgery information and clinical data at the time of explantation, and 2) visual inspection and physical testing of the explanted devices. No study population was stated, and there was no patient follow-up.

91.     Mentor's Device Failure post-approval study failed to contain an adequate sample size to provide meaningful data.

92.     Further, Mentor's Device Failure post-approval study report of summary findings failed to meet the requirements established by the FDA as it did not list results of the data findings (no clinical data and no visual inspection data), did not list safety findings, did not list any recommendations or summary of safety and data or follow-up on the data, and did not list any changes to labeling, all in violation of the FDA's requirements.

93.     Mentor was also required to conduct a Focus Group Study to gather information regarding the adequacy of the format and content of the approved product labeling.

94.     Mentor used an inadequate number of individuals to properly evaluate how patients understood the safety and labeling brochures.

95.     The FDA also required that Mentor conduct as Informed Decision Study to determine the success of the informed decision process provided to women who seek breast implant surgery. Both the physician and the patient were intended to sign designated sections in order to best assure that the patient had obtained the labeling in sufficient time prior to surgery to read it and understand the risks and other information associated with the Mentor device.

96.     Mentor failed to provide sufficient information regarding the methodology used or the results obtained from this study.

97.     The FDA further mandated that Mentor continue the Adjunct Study, which had been approved in 1992, including the requirement that Mentor continue to follow-up on all patients currently enrolled in that study for 5 years. The data from this follow-up was to be reported as part of the annual reports required by the FDA.

/ / /

/ / /

98.     The Adjunct Study was designed to follow-up with patients post-operatively at years 1, 3, and 5 to assess satisfaction and occurrence of local complications. The study was to gather data regarding short-term and local (tissue) implant complications.

99.     The overall patient follow-up rates declined as follows:  Year - 44%; Year 3 - 24.7%' and, Year 5 - 13.8%.  Mentor sought to attribute the poor follow up rates to a lack of patient compliance.  Mentor also admitted that the lack of sufficient data significantly limited interpretation of the available safety results.

100.    In addition to Mentor's failure to follow up on the Post Approval Studies, from the time of the IDE until today, Mentor is solely responsible for designating the cause of an implant rupture, reporting a rupture, linking and/or designating any injuries as related to breast implants, and reporting any related injuries to the FDA and health care providers as required under both California state and federal law. The details regarding this information remains solely in the hands of the Defendants.

101.    On information and belief, Plaintiffs allege that if ruptures had been properly reported, Plaintiffs would have been notified of a rupture rate for Mentor MemoryGel Breast Implants that is significantly higher than reported in the product insert and disclosed to health care providers.

102.    On information and belief, Plaintiffs allege that if the injuries of women who had been implanted with Mentor MemoryGel Breast Implants had been properly reported, Plaintiffs would have been notified of the significant risk associated with the device, such as those suffered by Plaintiffs.

    E.    Silicone Breast Implants

103.    During the 1950s and 1960s many different materials were used for the purpose of augmenting the female breast which included direct injection of silicone oil, vegetable oil, bee's wax, rubber and Terylene wool. These all led to critical health problems in patients and were rejected as appropriate augmentation materials.

104.    In 1961 the first silicone gel prosthesis was developed by American plastic surgeons Thomas Cronin and Frank Gerow and manufactured by the Dow Corning Corporation with the first augmentation mammoplasty being performed in 1962.

105.    "Silicone" refers to a group of polymers based on the element silicon. Silicone polymers may be produced in a variety of forms, including oil, gels, or elastomers (rubber).

---

PLAINTIFFS' COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL

15

106.   On information and belief, the NUSIL Defendants manufactured, supplied and specially designed silicone raw materials for defendant MENTOR which was used in the Mentor MemoryGel Implants for both the elastomer shell and silicone gel, including those implanted in Plaintiffs.

107.   They are a leading manufacturer of silicone compounds for the medical implants, healthcare, aerospace & defense, electronics & engineering and skin care markets for applications requiring precise, predictable materials performance.

108.   On information and belief, the NUSIL Defendants produced kits containing a variety of chemicals to be mixed and cured by MENTOR according to instructions the NUSIL Defendants provided. The process of mixing and curing creates both the silicone elastomer shell and silicone gel that fills the implant.

109.   When a kit is improperly mixed or improperly cured it impacts the cohesiveness of the shell elastomer (causing it to degrade) and gel (turning it liquid). This can cause an early failure (rupture), degradation of the shell and failure in biocompatibility of the shell and/or gel to the user. All silicone gels are cohesive, but the degree of cohesiveness has clinical importance.

110.   On information and belief, the chemicals provided by the NUSIL Defendants contained other chemicals then what is represented and/or disclosed. The presence of these additional and/or different chemicals can impact the biocompatibility of the shell and/or gel to the user as well as an impact the mixing and curing process.

111.   When an elastomer shell is not properly filled it can cause the implant to fold or crease in a woman's body which can also lead to degradation and ultimate rupture of the implant.

## V. CAUSES OF ACTION

### FIRST CAUSE OF ACTION

### NEGLIGENCE AND NEGLIGENCE PER SE

112.   Plaintiffs incorporate by reference all previous and subsequent paragraphs of this Complaint as if fully set forth here and further alleges as follows:

///

///

113.    At all relevant times, Defendants had a duty to Plaintiffs to use reasonable care in formulating, making, creating, labeling, packaging, testing, constructing, assembling, advertising, manufacturing, selling, distributing, marketing, and promoting its MemoryGel Silicone Gel Breast Implants.

114.    Mentor formulated, made, created, labeled, packaged, tested, constructed, assembled, advertised, manufactured, sold, distributed, marketed, and promoted its MemoryGel Silicone Gel Breast Implants, including the products that were implanted into Plaintiffs.

115.    Nusil Defendants formulated, made, created, labeled, packaged, tested, constructed, assembled, advertised, manufactured, sold, distributed, marketed, and promoted its silicone elastomer and gel kits for use in the MemoryGel Silicone Gel Breast Implants, including the products that were implanted into Plaintiffs.

### A.      Negligent Failure to Warn

116.    Defendants had a duty under California law to exercise reasonable care to provide adequate warning about the risks and dangers of Mentor MemoryGel Silicone Gel Breast Implants that were known or knowable to Defendants at the time of distribution.

117.    Defendants were negligent by not using reasonable care to warn about the dangers of which it was aware related to its silicone gel-filled breast implants, including the MemoryGel implants placed in Plaintiffs or facts that this product was likely to become dangerous after being implanted into their bodies.

118.    Mentor knew or reasonably should have known that the its silicone gel-filled breast implants, including the MemoryGel implants placed in Plaintiffs, were dangerous or were likely to be dangerous when used or misused in a reasonably foreseeable manner.

119.    The Nusil Defendants knew or reasonably should have known that its kits were dangerous or were likely to be dangerous when used or misused in a reasonably foreseeable manner.

120.    Defendants breached their duty under federal law, and the parallel state duty, in that they failed to warn the FDA, Plaintiffs and their physicians by not reporting the risk of serious defects and life-altering complications described herein that Defendants knew or should have known were associated with Mentor's MemoryGel Silicone Gel Breast Implants prior to the time of Plaintiffs implantations, including

the actual level of risk and failure to communicate adverse events similar to the injuries suffered by Plaintiffs.

121.    Specifically, Mentor had a duty to report unanticipated adverse device effects (with evaluation) to the FDA, all IRBs, and investigators within 10 working days after notification by the investigator. 21 CFR 812.150(b).  This duty is parallel to the state law duty to exercise reasonable care to provide adequate warning about the risks and dangers associated with their product.

122.    Under both federal and state law, Mentor also had a continuing duty to monitor and report adverse events and risks associated with the use of its products.

123.    The FDCA requires medical device manufacturers like Defendants to maintain and submit information as required by FDA regulation, 21 U.S.C. § 360i, including submitting Adverse Reaction Reports, 21 C.F.R. § 803.50, and establishing internal procedures for reviewing complaints and event reports, 21 C.F.R. § 820.198(a).    Specifically, 21 C.F.R. § 803.50 requires a manufacturer to report information no later than 30 days after it is received, from any source, if that information suggests that the device may have contributed to a serious injury or has malfunctioned and the malfunction would be likely to contribute to a serious injury if it were to recur.

124.    The FDA publishes this information in a public, searchable Internet database called MAUDE (Manufacturer and User Facility Device Experience) and updates the report monthly with "all reports received prior to the update."  The general public, including physicians and patients, may use the MAUDE database to obtain safety data on medical devices.

125.    This duty is parallel to the post-sale duty to warn under California law and applies as Mentor gained knowledge, which it was under a duty to communicate to the FDA and physicians.

126.    Under both federal and state law, Mentor had a duty to exercise reasonable care in adequately warning Plaintiffs and Plaintiffs' treating physicians about the dangers of Mentor MemoryGel silicone breast implants that were known or knowable to Defendants at the time of distribution or which became known thereafter.

///

///

127.    Despite having knowledge and possession of information that showed the use of Mentor MemoryGel silicone breast implants were dangerous and likely to place consumers' health at serious risk, Mentor failed to disclose and warn of the health hazards and risks associated with the product.

128.    Instead, Mentor marketed, advertised, and promoted the product while failing to monitor, warn, or otherwise ensure the safety and efficacy of its users in violation of California law and applicable FDA regulations and requirements.

129.    Mentor failed to report adverse events from the studies it was required to conduct, which would have led to adverse event reports revealing the product's contribution to serious injury.

130.    Had Mentor complied with its obligation to report this newly acquired information, true information about: instances of silicone toxicity; instances of adverse events; instances of adverse events requiring removal; instances of constellations of adverse symptoms; instances of chronic/persistent autoimmune-like complaints and inflammatory issues; rupture rates; and other relevant information would have been provided to the FDA and would have been available to Plaintiffs treating physicians, who would have communicated that information to Plaintiffs.

131.    Mentor was, at all times, responsible for maintaining the labeling of the product, and had the ability under federal law, and the duty under state and federal law, to directly warn healthcare providers and consumers by updating the labeling of Mentor MemoryGel silicone breast implants to reflect newly acquired safety information without advance approval by the FDA.

132.    With pre-market approval for is MemoryGel Silicone Gel-Filled Implants, Mentor had a responsibility to file a "Special PMA Supplement – Changes Being Effected" ("CBE") by which Mentor could unilaterally update the product labeling to reflect newly acquired safety information without advance approval by the FDA. 21 CFR § 814.39(d). These changes include:

        a.      labeling changes that add or strengthen a contraindication, warning, precaution, or information about an adverse reaction for which there is reasonable evidence of a causal association;

        b.      labeling changes that add or strengthen an instruction that is intended to enhance the safe use of the device;

/ / /

c.    labeling changes that ensure it is not misleading, false, or contains unsupported indications; and

d.    changes in quality controls or manufacturing process that add a new specification or test method, or otherwise provide additional assurance of purity, identity, strength, or reliability of the device.

133.    Mentor breached their duties under federal law and state law, including California law, to maintain labeling that: (a) added instructions for use that would enhance the safe use of the device; and (b) added descriptions of adverse events to ensure that the labeling was not false or misleading.

134.    Mentor had the ability and the duty under state law to disclose its knowledge of adverse events to healthcare providers and the public to ensure its labeling and product were not misbranded. Health & Saf. Code, §§ 111440 ("it is unlawful for any person to manufacture, sell, deliver, hold, or offer for sale any drug or device that is misbranded"), 111445 ("it is unlawful for any person to misbrand any drug or device.").

135.    Under parallel federal law, Defendants had the ability to disclose its knowledge of adverse events to healthcare providers and the public to ensure its labeling and product were not misbranded. 21 U.S.C. § 331 ("the following acts and the causing thereof are prohibited: (a) the introduction…of any device that is …misbranded, (b) the …misbranding of any …device…).

136.    Had Defendants timely and adequately reported the adverse events to the FDA, it would have effectively warned physicians of those adverse events both directly and through discussion of those events that would have followed in the literature and at meetings.  Thus, additional information would have been available to the public, including Plaintiffs treating physicians, regarding the dangers of Mentor MemoryGel Silicone Gel Breast Implants that were known or knowable to Defendants at the time of distribution and afterwards.

137.    If Plaintiffs had been adequately warned of the serious risks and adverse events by Defendant Mentor, they would not have agreed to implantation of Mentor MemoryGel Silicone Gel Breast Implants.

138.    Defendants were negligent in their record keeping and did not disclose manufacturing flaws that increased the risk of injury to patients receiving the implant in violation of its duty to establish and maintain procedures for implementing corrective and preventative action.

139.    Defendants also failed to provide proper warnings concerning defects in the device, including the use of improper and non-conforming component parts and materials, in violation of California law and its duty under 21 CFR § 812.5(a) to describe "all relevant contradictions, hazards, adverse effects, interfering substances or devices, warnings and precautions."

140.    As a proximate and legal result of Mentor's failure to comply with its obligations under applicable Federal regulations, Mentor breached its duty of care and caused Plaintiffs to suffer severe physical injuries, severe emotional distress, mental anguish, economic loss, and other injuries for which they are entitled to compensatory and other damages in an amount to be proven at trial.

**B.    Negligent Manufacturing**

141.    Mentor had a duty under Federal law, and a parallel duty under California law, to exercise reasonable care in developing, manufacturing, testing, inspecting and selling their product to ensure that it was safe and further that it was made in conformity with the manufacturing and design specifications mandated by the FDA as part of Mentor's PMA.

142.    Mentor was negligent under California law, in the development, manufacture, testing, inspection and sale of their MemoryGel Silicone Gel Breast Implants by: (a) manufacturing MemoryGel Silicone Gel Breast Implants that differed from the specifications agreed to by the FDA; manufacturing MemoryGel Silicone Gel Breast Implants using materials and components which differed from those approved by the FDA; failing to follow good manufacturing practices during the manufacture of their MemoryGel Silicone Gel Breast Implants; failing to properly meet the applicable standard of care by not complying with applicable federal regulations and failing to adhere to the manufacturing protocols approved by the FDA; carelessly and negligently selling and distributing its MemoryGel Silicone Gel Breast Implants in violation of the terms of the IDE and applicable federal law; negligently incorporating components and/or materials into its MemoryGel Silicone Gel Breast Implants that could not stand up to normal usage and/or which differed from those which were commercially reasonable and/or failing to use the components and/or materials approved by the FDA; failing to exercise reasonable care in inspecting and testing of the product; and, failing to exercise reasonable care in its manufacturing, quality control and quality assurance processes.

143.   Mentor had a duty under California law to exercise ordinary care in the manufacture of its MemoryGel Silicone Gel Breast Implants consistent with FDA specifications, the Mentor MemoryGel Silicone Gel Breast Implants IDE, and/or conditions of approval.

144.   At all relevant times, Mentor was required to comply with the FDA's Quality System Regulations, the requirements under the PMA.

145.   Mentor's MemoryGel Silicone Gel Breast Implants contained a manufacturing defect when it left Mentor's possession, in that Mentor's manufacturing process did not conform to FDA's Quality System Regulations and design control requirements under 21 CFR 820.30.

146.   Upon information and belief, prior to the date that the subject implants were manufactured Mentor has received several Form 483 notifications and otherwise was aware that its manufacturing process was deficient and that the implants being produced did not comply with applicable Federal requirements.

147.   Mentor failed to exercise ordinary care in the manufacture, sale, testing, quality assurance, quality control, and/or distribution of its MemoryGel Silicone Gel Breast Implants.

148.   Mentor failed to adequately inspect, test, and validate the materials and components used in the manufacture and assembly of its MemoryGel Silicone Gel Breast Implants.

149.   Mentor failed to adequately inspect, test, and validate its MemoryGel Silicone Gel Breast Implants after completion of assembly.

150.   Mentor failed to comply with the requirements imposed by the FDA and other applicable Federal requirements for the manufacture of its MemoryGel Silicone Gel Breast Implants.

151.   Because Mentor failed to follow specifications, regulations, and required by the FDA, Plaintiffs' MemoryGel Silicone Gel Breast Implants were defective and were further vulnerable to degradation, deterioration, rupture and leakage.

152.   Upon information and belief, when the MemoryGel Silicone Gel Breast Implants placed into Plaintiffs were manufactured, Mentor had the technological capability to manufacture its MemoryGel Silicone Gel Breast Implants in a reasonably safe manner.

153.   Mentor was negligent in its record keeping and did not disclose manufacturing flaws that increased the risk of injury to patients receiving the implant in violation of its duty to establish and maintain

Ex. D - 54

1    procedures for implementing corrective and preventative action.  This violated both California law and

2    the requirements under 21 CFR § 800.100(a)(6)(7).

3    154.     Mentor also failed to provide proper warnings concerning defects in the device, including the use

4    of improper and non-conforming component parts and materials, in violation of California law and its

5    duty under 21 CFR § 812.5(a) to describe "all relevant contradictions, hazards, adverse effects, interfering

6    substances or devices, warnings and precautions."

7    155.     Upon information and belief, Plaintiffs were implanted with Mentor MemoryGel Silicone Gel

8    Breast Implants with manufacturing defects, manufactured with nonconforming materials and uncertified

9    components, in violation of the FDA requirements, resulting in product failure and serious injury to them.

10    156.     The injuries Plaintiffs suffered are expected to result from the manufacturing defects identified

11    therein.  Plaintiffs and their treating physicians were unaware that the product was defective at the time of

12    implant and for years thereafter.

13    157.     Plaintiffs are within the class of persons the statutes and regulations referred to herein were

14    designed to protect, and Plaintiffs injuries are of the type of harm these statutes and regulations are

15    designed to prevent.

16    158.     Mentor's violations of these statutes and regulations proximately caused Plaintiffs injuries alleged

17    herein.

18

19    159.     As a proximate and legal result of Mentor's failure to exercise reasonable care and the resulting

20    defective condition of its MemoryGel Silicone Gel Breast Implants implanted into Plaintiffs, they suffered

21    injuries and will continue to suffer injuries in the future including severe physical injuries, severe

22    emotional distress, mental anguish, economic loss, future follow-up medical care, medical treatment, and

23    procedures, and other injuries for which she is entitled to compensatory and other damages in an amount

24    to be proven at trial.

25    160.     WHEREFORE, Plaintiff prays for judgment against Defendants as hereinafter set forth.

26

27    / / /

28    / / /

## SECOND CAUSE OF ACTION

### STRICT PRODUCTS LIABILITY – FAILURE TO WARN

161.    Plaintiffs incorporate by reference all previous and subsequent paragraphs of this Complaint as if fully set forth herein and further allege as follows:

162.    At all times relevant herein, Mentor was engaged in the business of designing, developing, manufacturing, testing, packaging, promoting, marketing, distributing, labeling, and/or selling Mentor MemoryGel Silicone Gel Breast Implants.

163.    At all times relevant herein, Mentor intended for the MemoryGel Silicone Gel Breast Implants to be surgically implanted into the bodies of members of the general public, including Plaintiffs, and knew or should have known that the product would be surgically implanted into members of the general public, including Plaintiffs.

164.    Defendants failed to warn Plaintiffs and their physicians of the risk of serious defects and life altering complications described herein rendering the device defective and unreasonably dangerous.

165.    Mentor also failed to revise the product labeling or otherwise communicate the true rate of occurrence of adverse events to the FDA, the IRB or to physicians based upon the adverse event information available to it through, among other things, the studies which it was required to conduct and the reports of adverse events and effects which it received.

166.    Plaintiffs' Mentor MemoryGel Silicone Gel Breast Implants were defective at the time of sale and distribution and at the time they left the possession of Mentor in that Mentor failed to adequately warn of the risks that the product was vulnerable to degradation, deterioration, ruptures, and leakage, and other injuries associated with Mentor MemoryGel Silicone Gel Breast Implants.

167.    The MemoryGel Silicone Gel Breast Implants were defective and unreasonably dangerous when they left the possession of Mentor in that they contained warnings insufficient to alert physicians and consumers, including Plaintiffs, of the dangerous risks and complications associated with the MemoryGel Silicone Gel Breast Implants, including but not limited to, their propensity to cause injury, through leakage of the silicone gel into the tissues of the user's body, thereby introducing toxic metals and chemicals into

those tissues, resulting in serious, dangerous and harmful side effects and complications  all to the detriment of the health and well-being of the users of their product.

168.   Defendants knew, or should have known, the gel contained in the implants contained metals and toxic chemicals in such quantities that would be extremely harmful to users of their product if the gel were allowed to escape its shell and "bleed" into the user's body.

169.   Mentor also knew, or should have known, that there was a significant risk of rupture or seepage of the gel through the shell and into the tissues of the user's body.

170.   Mentor failed to adequately warn physicians and patients implanted with the product, including Plaintiffs, of these potential serious and harmful risks.

171.   Mentor failed to provide follow-through post-approval studies required by the FDA's necessary in order to market and sell the product, and thus failed to report to, and warn, the FDA and the IRB of the risks described above.

172.   The accurate rate of occurrence for these and other injuries associated with Mentor MemoryGel Silicone Gel Breast Implants were not readily recognizable to the ordinary consumer, including Plaintiffs and Plaintiffs' treating physicians, as a result of Mentor's conduct.

173.   Mentor MemoryGel Silicone Gel Breast Implants were defective and unreasonably dangerous due to inadequate warnings and/or instruction because Mentor knew or should have known that the products created a serious risk of degradation, deterioration, ruptures, and leakage, and other injuries that could, and did, harm consumers, including Plaintiffs, and Mentor failed to adequately warn consumers of said risks - including Plaintiffs and Plaintiffs' treating physicians - in accordance with Federal requirements and California law.

174.   Mentor's MemoryGel Silicone Gel Breast Implants were defective and unreasonably dangerous due to inadequate warnings and instructions because Mentor knew or should have known that Mentor MemoryGel Silicone Gel Breast Implants created, among other things, a higher than expected risk for adverse events, and Mentor failed to adequately warn of those risks, to monitor those risks, report them, test for them, and update its labeling and the information provided to the FDA and IRB regarding such risks when the information became available.

175.    Mentor failed to keep required records and did not disclose manufacturing flaws that increased the risk of injury to patients receiving the implant in violation of its duty to establish and maintain procedures for implementing corrective and preventative action.    This violated both California law and the requirements under 21 CFR § 800.100(a)(6)(7).

176.    Mentor also failed to provide proper warnings concerning defects in the device, including the use of improper and non-conforming component parts and materials, in violation of California law and its duty under 21 CFR § 812.5(a) to describe "all relevant contradictions, hazards, adverse effects, interfering substances or devices, warnings and precautions."

177.    At all relevant times, Plaintiffs Mentor MemoryGel Silicone Gel Breast Implants were used and implanted into them as intended by Mentor and in a manner reasonably foreseeable to Mentor.

178.    Mentor's MemoryGel Silicone Gel Breast were expected to, and did, reach Plaintiffs and Plaintiffs' implanting physician without substantial change in the condition in which they were sold.

179.    Despite the fact that Defendants knew, or should have known, that the use of Mentor MemoryGel Silicone Gel Breast Implants were unreasonably dangerous and likely to place users at serious risks to their health, Defendants failed to monitor and warn of the defects, health hazards, and risks associated with Mentor MemoryGel Silicone Gel Breast Implants.

180.    Plaintiffs Mentor MemoryGel Silicone Gel Breast Implants were also defective at the time of sale and distribution, and at the time the devices left the possession of Mentor, in that the devices differed from Mentor's intended result and design specifications as approved by the FDA.

181.    Upon information and belief, Plaintiffs were implanted with Mentor MemoryGel Silicone Gel Breast Implants with manufacturing defects, manufactured with nonconforming materials and uncertified components, in violation of the specifications and requirements approved and mandated by the FDA, resulting in product failure and serious injury to Plaintiffs.

182.    The injuries Plaintiffs suffered are expected to result from the manufacturing defects identified therein and by the FDA. Plaintiffs and their treating physicians were unaware that the product was defective at the time of implant and for years thereafter.

///

183.    Mentor violated Federal regulations and California law, by placing the Mentor MemoryGel Silicone Gel Breast Implants into the stream of commerce in a defective and unreasonably dangerous condition.

184.    Mentor was, at all times, responsible for maintaining the labeling of the product, and had the ability under federal law, and the duty under state and federal law, to directly warn healthcare providers and consumers by updating the labeling of Mentor MemoryGel silicone breast implants to reflect newly acquired safety information without advance approval by the FDA.

185.    During the IDE process, Mentor was under a duty to advise the FDA, IRB and study investigators of all significant new information, including the duty to monitor, evaluate and report all unanticipated adverse device effects and to terminate the investigation, or portions of it, if that effect presents an unreasonable risk to subjects. See, 21 CFR 812.46.

186.    Mentor was specifically required to report all unanticipated adverse device effects (with evaluation) to FDA, all IRBs, and investigators within 10 working days after notification by the investigator. See, 21 CFR 812.150(b).

187.    California imposes a parallel duty to warn and advise product users.

188.    Once Mentor applied for pre-market approval for is MemoryGel Silicone Gel-Filled Implants, it had additional duties and responsibilities.  This included the responsibility to file a "Special PMA Supplement – Changes Being Effected" ("CBE") by which Mentor could unilaterally update the product labeling to reflect newly acquired safety information without advance approval by the FDA. 21 CFR § 814.39(d). These changes include:

        a.      labeling changes that add or strengthen a contraindication, warning, precaution, or information about an adverse reaction for which there is reasonable evidence of a causal association;

        b.      labeling changes that add or strengthen an instruction that is intended to enhance the safe use of the device;

        c.      labeling changes that ensure it is not misleading, false, or contains unsupported indications; and

///

d.      changes in quality controls or manufacturing process that add a new specification or test method, or otherwise provide additional assurance of purity, identity, strength, or reliability of the device.

189.    Mentor breached their duties under federal law and state law, including California law, to maintain labeling that: (a) added instructions for use that would enhance the safe use of the device; and (b) added descriptions of adverse events to ensure that the labeling was not false or misleading.

190.    The FDCA requires medical device manufacturers like Defendants to maintain and submit information as required by FDA regulation, 21 U.S.C. § 360i, including submitting Adverse Reaction Reports, 21 CFR § 803.50, and establishing internal procedures for reviewing complaints and event reports, 21 CFR § 820.198(a).

191.    Specifically, 21 CFR § 803.50 requires a manufacturer to report information no later than 30 days after it is received, from any source, if that information suggests that the device may have contributed to a serious injury, or has malfunctioned and the malfunction would be likely to contribute to a serious injury if it were to recur.

192.    The FDA publishes this information in a public, searchable Internet database called MAUDE (Manufacturer and User Facility Device Experience) and updates the report monthly with "all reports received prior to the update." The general public, including physicians and patients, may use the MAUDE database to obtain safety data on medical devices.

193.    Despite the fact that evidence existed that Mentor MemoryGel Silicone Gel Breast Implants were dangerous and likely to place users at serious risk to their health, Defendants failed to disclose and warn of the health hazards and risks associated with Mentor MemoryGel Silicone Gel Breast Implants.

194.    Mentor MemoryGel Silicone Gel Breast Implants had a manufacturing defect when they left Mentor's possession in that Mentor's manufacturing process did not comply with the FDA's Quality System Regulations, the requirements under the IDE and design control requirements under 21 CFR 820.30.

195.    The defects inherent in Mentor MemoryGel Silicone Gel Breast Implants were not readily recognizable to the ordinary consumer, including Plaintiff and/or Plaintiff's implanting physician.

///

196.   Plaintiffs could not, in the exercise of reasonable care, have discovered the defects herein mentioned and perceived their true danger.

197.   Plaintiffs and/or Plaintiffs' implanting physician reasonably relied upon the skill, superior knowledge, and judgment of Mentor, including Defendant Mentor, when they consented to the implantation procedure using Mentor MemoryGel Silicone Gel Breast Implants.

198.   At all relevant times, Plaintiffs' Mentor MemoryGel Silicone Gel Breast Implants were used and implanted as intended by Mentor and in a manner reasonably foreseeable to Mentor.

199.   Had Plaintiffs and/or Plaintiffs' physician received adequate warnings regarding the risks the risks of Mentor MemoryGel Silicone Gel Breast Implants, they would not have used them.

200.   Had Mentor complied with its continuing duty to report adverse events and effects, to properly and truthfully report the findings from the studies it was required to conduct and to otherwise provide full, complete and accurate information to the FDA and the IRB, that information would have been available to Plaintiffs' treating physicians and they would have been better able to recognize at an earlier date that the symptoms and complications which Plaintiffs was experiencing were related to their Mentor MemoryGel Silicone Breast Implants.  Had that occurred, Plaintiffs would have been able to undergo the explantation surgery at an earlier date and would have been less severely damaged and injured.

201.   Mentor's MemoryGel Silicone Gel Breast Implants were expected to, and did, reach Plaintiffs and Plaintiffs' implanting physician without substantial change in the condition in which they were sold.

202.   Mentor knew that its MemoryGel Silicone Gel Breast Implants would be used by the ordinary purchaser or user without inspection for defects and without knowledge of the hazards involved in such use.

203.   At all times relevant to this action, the dangerous propensities of Mentor MemoryGel Silicone Gel Breast Implants were known to Mentor or were reasonably and scientifically knowable to them, through appropriate research and testing by known methods, at the time they distributed, supplied, or sold the device, and not known to ordinary physicians who would be expected to implant Mentor MemoryGel Silicone Gel Breast Implants for their patients.

/ / /

204.   Mentor was required to provide adequate warnings to consumers and the medical community under federal and California law, but failed to do so in a timely, truthful, accurate and responsible manner.

205.   Had Mentor timely and adequately reported adverse events to the FDA and IRB, there would have been effective warnings to physicians, including Plaintiffs' treating physicians, of those adverse events both directly and through discussion of those events that would have followed in the literature and at meetings.   Thus, additional information would have been available to the public, including Plaintiffs and/or Plaintiffs' treating physicians, regarding the dangers of Mentor MemoryGel Silicone Gel Breast Implants that were known or knowable to Mentor at the time of distribution.

206.   Had Mentor complied with its continuing duty to report adverse events and effects, to properly and truthfully report the findings from the studies it was required to conduct and to otherwise provide full, complete and accurate information to the FDA and the IRB, that information would have been available to Plaintiffs' treating physicians and they would have been better able to recognize at an earlier date that the symptoms and complications which Plaintiffs were experiencing were related to her Mentor MemoryGel Silicone Breast Implants.   Had that occurred, Plaintiffs would have been able to undergo the explantation surgery at an earlier date and would have been less severely damaged and injured.

207.   Because Mentor failed to follow specifications, regulations, and required the FDA and applicable Federal regulations and requirements, the Mentor MemoryGel Silicone Gel Breast Implants implanted in Plaintiffs were vulnerable to degradation, deterioration, ruptures, and leakage.

208.   Mentor's MemoryGel Silicone Gel Breast Implants were manufactured, distributed, tested, sold, marketed, promoted, advertised, and represented defectively by Defendants, and this was a substantial contributing factor in bringing about Plaintiffs' injuries, which would not have occurred but for the use of Mentor MemoryGel Silicone Gel Breast Implants.

209.   The defective warnings and failures to provide truthful, accurate and complete information as required under the IDE and other applicable Federal regulations and requirements were a substantial contributing factor in bringing about the injuries to Plaintiffs that would not have occurred but for the use of Mentor MemoryGel Silicone Gel Breast Implants.

///

---

PLAINTIFFS' COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL
30

210.    As a proximate result and/or substantial factor of Mentor MemoryGel Silicone Gel Breast Implants defective condition at the time they were sold, Plaintiffs have suffered and will continue to suffer severe physical injuries, severe emotional distress, mental anguish, economic loss, future medical care and treatment, and other injuries for which she is entitled to compensatory and other damages in an amount to be proven at trial.

211.    WHEREFORE, Plaintiffs prays for judgment against Defendants as set forth herein.

### THIRD CAUSE OF ACTION

### STRICT PRODUCTS LIABILITY – MANUFACTURING DEFECT

212.    Plaintiffs incorporate by reference all previous and subsequent paragraphs of this Complaint as if fully set forth here and further alleges as follows:

213.    At all times relevant herein,  Mentor was engaged in the business of designing,  developing, manufacturing, testing,  packaging, promoting, marketing, distributing, labeling, and/or selling Mentor MemoryGel  Silicone Gel Breast Implants.

214.    At all times relevant herein, Mentor intended for the MemoryGel Silicone Gel Breast Implants to be surgically implanted into the bodies of members of the general public, including Plaintiffs, and  knew or should  have  known  that  the  product  would  be surgically implanted into members of the general public..

215.    Mentor manufactured, tested, marketed, promoted, advertised, distributed, and sold the Mentor MemoryGel Silicone Gel Breast Implants that were implanted into Plaintiffs.

216.    At all times relevant, Mentor placed Mentor MemoryGel Silicone Gel Breast Implants into the stream of commerce and did so in a manner in which the Mentor MemoryGel Silicone Gel Breast Implants were defective in their manufacturing process did not comply with the FDA's Quality System Regulations and design control requirements under 21 CFR 820.30.

217.    Mentor violated Federal regulations and requirements and California law by placing the Mentor MemoryGel Silicone Gel Breast Implants into the stream of commerce in a defective and unreasonably dangerous condition.

218.    Mentor failed to keep required records and did not disclose manufacturing flaws that increased the risk of injury to patients receiving the implant in violation of its duty to establish and maintain procedures for implementing corrective and preventative action.   This violated both California law and the requirements the IDE approval process under 21 CFR § 800.100(a)(6)(7).

219.    Mentor also failed to provide proper warnings concerning defects in the device, including the use of improper and non-conforming component parts and materials, in violation of California law and its duty to describe all relevant contradictions, hazards, adverse effects, interfering substances or devices, warnings and precautions.

220.    Mentor's MemoryGel Silicone Gel Breast Implants implanted during Plaintiffs' surgery contained a manufacturing defect. The rupture, leakage, and bleeding of silicone of the Mentor MemoryGel Silicone Gel Breast Implants implanted into Plaintiffs, due to porous or weak containment in the Implant shell, is inconsistent with specifications and conditions of the FDA's Quality System Regulations and design control requirements under 21 CFR 820.30, and therefore constitutes a manufacturing defect.

221.    Mentor knew that the defects in its product were such that they would not be discovered through reasonable inspection by the users of the product, including Plaintiffs and Plaintiffs' implanting physician.

222.    Mentor knew that its MemoryGel Silicone Gel Breast Implants would be used by the ordinary purchaser or user without inspection for defects and without knowledge of the hazards involved in such use.

223.    Plaintiffs and her implanting physicians, foreseeable users and ultimate consumers of the Mentor's product, were unaware of these defects when Plaintiffs consented to have the product implanted in their bodies.

224.    As a direct and legal result of the manufacturing defects contained in Plaintiffs' MemoryGel Silicone Gel Breast Implants, Plaintiffs were injured in their health and well-being as described herein.

225.    As a proximate result and/or substantial factor of Mentor MemoryGel Silicone Gel Breast Implants defective condition at the time they were sold, Plaintiffs suffered and will continue to suffer severe physical injuries, severe emotional distress, mental anguish, economic loss, future

medical care and treatment, and other injuries for which she is entitled to compensatory and other damages in an amount to be proven at trial.

226.    WHEREFORE, Plaintiffs prays for judgment against Defendants as hereinafter set forth.

## RELIEF REQUESTED

227.    WHEREFORE Plaintiffs pray for judgment against Defendants and, as appropriate to each cause of action alleged and as appropriate to the standing of Plaintiffs, as follows:

    (A)    Economic and non-economic damages in an amount as provided by law and to be supported by evidence at trial;

    (B)    For compensatory damages according to proof;

    (C)    For prejudgment interest and the costs of suit; and

    (D)    For such other and further relief as this Court may deem just and proper.


Dated:  February 22, 2019                    LENZE LAWYERS, PLC.



                    By:    _____
                                    JENNIFER A. LENZE
                                    Attorney for Plaintiffs

## DEMAND FOR JURY TRIAL

Plaintiffs hereby demand individual trials by jury as to all claims so triable in this action.

Dated:  February 22, 2019                          LENZE LAWYERS, PLC.


                                          By:   _____
                                                JENNIFER A. LENZE

                                                Attorney for Plaintiffs

CM-010

| ATTORNEY OR PARTY WITHOUT ATTORNEY *(Name, State Bar number, and address)*: | FOR COURT USE ONLY |
|---|---|
| Jennifer A. Lenze (CA # 246858) Lowell W. Finson (CA Bar# 275586)<br>LENZE LAWYERS, PLC / FINSON LAW FIRM LLC<br>1300 Highland Ave, Suite 207<br>Manhattan Beach, CA 90266<br>TELEPHONE NO.: (310) 322-8800   FAX NO.: (310) 322-8811<br>ATTORNEY FOR *(Name)*: Plaintiffs, BRITTANY BILLETTS, et al. | **F I L E D**<br>SUPERIOR COURT OF CALIFORNIA<br>COUNTY OF SAN BERNARDINO<br>SAN BERNARDINO DISTRICT<br><br>FEB 2 2 2019<br><br>BY _____ *Mll White* _____<br>MELISSA WHITE, DEPUTY |

| SUPERIOR COURT OF CALIFORNIA, COUNTY OF   San Bernardino | |
|---|---|
| STREET ADDRESS: 247 West Third Street | |
| MAILING ADDRESS: | |
| CITY AND ZIP CODE: San Bernardino, CA 92415-0210 | |
| BRANCH NAME: San Bernardino District – Civil Division | |

| CASE NAME:<br>BRITTANY BILLETTS, et al v. MENTOR WORLDWIDE, LLC., et al. | |
|---|---|

| CIVIL CASE COVER SHEET | Complex Case Designation | CASE NUMBER:<br>CIVDS1905706 |
|---|---|---|
| [✓] Unlimited (Amount demanded exceeds $25,000) [ ] Limited (Amount demanded is $25,000 or less) | [ ] Counter [ ] Joinder<br>Filed with first appearance by defendant<br>(Cal. Rules of Court, rule 3.402) | JUDGE:<br><br>DEPT: |

*Items 1–6 below must be completed (see instructions on page 2).*

1. Check one box below for the case type that best describes this case:

**Auto Tort**
- [ ] Auto (22)
- [ ] Uninsured motorist (46)

**Other PI/PD/WD (Personal Injury/Property Damage/Wrongful Death) Tort**
- [ ] Asbestos (04)
- [✓] Product liability (24)
- [ ] Medical malpractice (45)
- [ ] Other PI/PD/WD (23)

**Non-PI/PD/WD (Other) Tort**
- [ ] Business tort/unfair business practice (07)
- [ ] Civil rights (08)
- [ ] Defamation (13)
- [ ] Fraud (16)
- [ ] Intellectual property (19)
- [ ] Professional negligence (25)
- [ ] Other non-PI/PD/WD tort (35)

**Employment**
- [ ] Wrongful termination (36)
- [ ] Other employment (15)

**Contract**
- [ ] Breach of contract/warranty (06)
- [ ] Rule 3.740 collections (09)
- [ ] Other collections (09)
- [ ] Insurance coverage (18)
- [ ] Other contract (37)

**Real Property**
- [ ] Eminent domain/Inverse condemnation (14)
- [ ] Wrongful eviction (33)
- [ ] Other real property (26)

**Unlawful Detainer**
- [ ] Commercial (31)
- [ ] Residential (32)
- [ ] Drugs (38)

**Judicial Review**
- [ ] Asset forfeiture (05)
- [ ] Petition re: arbitration award (11)
- [ ] Writ of mandate (02)
- [ ] Other judicial review (39)

**Provisionally Complex Civil Litigation (Cal. Rules of Court, rules 3.400–3.403)**
- [ ] Antitrust/Trade regulation (03)
- [ ] Construction defect (10)
- [ ] Mass tort (40)
- [ ] Securities litigation (28)
- [ ] Environmental/Toxic tort (30)
- [ ] Insurance coverage claims arising from the above listed provisionally complex case types (41)

**Enforcement of Judgment**
- [ ] Enforcement of judgment (20)

**Miscellaneous Civil Complaint**
- [ ] RICO (27)
- [ ] Other complaint *(not specified above)* (42)

**Miscellaneous Civil Petition**
- [ ] Partnership and corporate governance (21)
- [ ] Other petition *(not specified above)* (43)

2. This case [✓] is [ ] is not complex under rule 3.400 of the California Rules of Court. If the case is complex, mark the factors requiring exceptional judicial management:
   a. [ ] Large number of separately represented parties
   b. [✓] Extensive motion practice raising difficult or novel issues that will be time-consuming to resolve
   c. [✓] Substantial amount of documentary evidence
   d. [✓] Large number of witnesses
   e. [ ] Coordination with related actions pending in one or more courts in other counties, states, or countries, or in a federal court
   f. [ ] Substantial postjudgment judicial supervision

3. Remedies sought *(check all that apply)*: a. [✓] monetary   b. [ ] nonmonetary; declaratory or injunctive relief   c. [✓] punitive
4. Number of causes of action *(specify)*: 3
5. This case [ ] is [✓] is not a class action suit.
6. If there are any known related cases, file and serve a notice of related case. *(You may use form CM-015.)*

Date: 2/22/2019

Jennifer A. Lenze
_____ (TYPE OR PRINT NAME)                    (SIGNATURE OF PARTY OR ATTORNEY FOR PARTY)

**NOTICE**
- Plaintiff must file this cover sheet with the first paper filed in the action or proceeding (except small claims cases or cases filed under the Probate Code, Family Code, or Welfare and Institutions Code). (Cal. Rules of Court, rule 3.220.) Failure to file may result in sanctions.
- File this cover sheet in addition to any cover sheet required by local court rule.
- If this case is complex under rule 3.400 et seq. of the California Rules of Court, you must serve a copy of this cover sheet on all other parties to the action or proceeding.
- Unless this is a collections case under rule 3.740 or a complex case, this cover sheet will be used for statistical purposes only.

Page 1 of 2

Ex. D - 67

## SUPERIOR COURT OF CALIFORNIA, COUNTY OF SAN BERNARDINO

BRITTANY BILLETTS, et al.

CASE NO.: _____ CIVDS1905570 c

vs.

**CERTIFICATE OF ASSIGNMENT**

MENTOR WORLDWIDE, LLC, et al.

A civil action or proceeding presented for filing must be accompanied by this Certificate. If the ground is the residence of a party, name and residence shall be stated.

The undersigned declares that the above-entitled matter is filed for proceedings in the
SAN BERNARDINO _____ District of the Superior Court under Rule 404 of this court for the
checked reason:
- [x] General
- [ ] Collection

| | **Nature of Action** | **Ground** |
|---|---|---|
| [ ] | 1. Adoption | Petitioner resides within the district |
| [ ] | 2. Conservator | Petitioner or conservatee resides within the district. |
| [ ] | 3. Contract | Performance in the district is expressly provided for. |
| [ ] | 4. Equity | The cause of action arose within the district. |
| [ ] | 5. Eminent Domain | The property is located within the district. |
| [ ] | 6. Family Law | Plaintiff, defendant, petitioner or respondent resides within the district. |
| [ ] | 7. Guardianship | Petitioner or ward resides within the district or has property within the district. |
| [ ] | 8. Harassment | Plaintiff, defendant, petitioner or respondent resides within the district. |
| [ ] | 9. Mandate | The defendant functions wholly within the district. |
| [ ] | 10. Name Change | The petitioner resides within the district. |
| [x] | 11. Personal Injury | The injury occurred within the district. |
| [ ] | 12. Personal Property | The property is located within the district. |
| [ ] | 13. Probate | Decedent resided or resides within the district or had property within the district. |
| [ ] | 14. Prohibition | The defendant functions wholly within the district. |
| [ ] | 15. Review | The defendant functions wholly within the district. |
| [ ] | 16. Title to Real Property | The property is located within the district. |
| [ ] | 17. Transferred Action | The lower court is located within the district. |
| [ ] | 18. Unlawful Detainer | The property is located within the district. |
| [ ] | 19. Domestic Violence | The petitioner, defendant, plaintiff or respondent resides within the district. |
| [x] | 20. Other  PRODUCTS LIABILITY | _____ |
| [ ] | 21. THIS FILING WOULD   NORMALLY FALL WITHIN JURISDICTION OF SUPERIOR COURT | |

The address of the accident, performance, party, detention, place of business, or other factor which qualifies this case for filing in the above-designed district is:

Brittany Billetts, Plaintiff _____ 1847 North Calaveras Ave
NAME – INDICATE TITLE OR OTHER QUALIFYING FACTOR          ADDRESS

Ontario _____ CA _____ 91764
CITY                                                      STATE           ZIP CODE

I declare, under penalty of perjury, that the foregoing is true and correct and that this declaration was executed
on  February 22, 2019 _____ at  Manhattan Beach _____, California

_____
Signature of Attorney/Party

## CERTIFICATE OF ASSIGNMENT

13-16503-360,
Rev 06-2014 Mandatory

SUPERIOR COURT OF CALIFORNIA, COUNTY OF SAN BERNARDINO


San Bernardino District - Civil
247 West Third Street

San Bernardino, CA. 924150210
-----------------------------------------------------------------------
-----------------------------------------------------------------------
                                     CASE NO: CIVDS1905706
   LENZE LAWYERS, PLC
   1300 HIGHLAND AVE
   SUITE 207
   MANHATTAN BEACH CA 90266
                                     NOTICE OF TRIAL SETTING CONFERENCE


IN RE: BILLETTS-V-MENTOR WORLDWIDE

THIS CASE HAS BEEN ASSIGNED TO: DONNA GUNNELL GARZA IN DEPARTMENT S24
FOR ALL PURPOSES.

Notice is hereby given that the above-entitled case has been set for
Trial Setting Conference at the court located at 247 WEST THIRD STREET
SAN BERNARDINO, CA  92415-0210.

          HEARING DATE: 08/22/19 at  8:30 in Dept. S24


DATE: 02/22/19  Nancy Eberhardt, Court Executive Officer
                                     By: MELISSA WHITE
-----------------------------------------------------------------------
-----------------------------------------------------------------------
               CERTIFICATE OF SERVICE

I am a Deputy Clerk of the Superior Court for the County of San
Bernardino at the above listed address. I am not a party to this
action and on the date and place shown below, I served a copy of the
above listed notice:
( ) Enclosed in a sealed envelope mailed to the interested party
addressed above, for collection and mailing this date, following
standard Court practices.
( ) Enclosed in a sealed envelope, first class postage prepaid in the
U.S. mail at the location shown above, mailed to the interested party
and addressed as shown above, or as shown on the attached listing.
(X) A copy of this notice was given to the filing party at the counter
( ) A copy of this notice was placed in the bin located at this office
and identified as the location for the above law firm's collection of
file stamped documents.

Date of Mailing: 02/22/19
I declare under penalty of perjury that the foregoing is true and
correct. Executed on 02/22/19 at San Bernardino, CA

                         BY: MELISSA WHITE


                                                          Ex. D - 69

# EXHIBIT B

 **DEPARTMENT OF HEALTH & HUMAN SERVICES**          Public Health Service

Food and Drug Administration
9200 Corporate Boulevard
Rockville MD 20850

Kristine Foss
Vice President, Clinical and Regulatory Affairs
Mentor Corporation                                    NOV 1 7 2006
201 Mentor Drive
Santa Barbara, California 93111

Re:   P030053
      Mentor MemoryGel™ Silicone Gel-Filled Breast Implants (Moderate Profile Style 7000,
      High Profile Style 4000, and Moderate Plus Profile Style 8000)
      Filed: December 12, 2003
      Amended: January 16, 20, and 26, February 24, August 31, 2004; January 4 and 18,
      March 3, April 1, July 13, August 16 and 22, 2005; June 30 and October 3, 2006
      Procode: FTR

Dear Ms. Foss:

The Center for Devices and Radiological Health (CDRH) of the Food and Drug Administration
(FDA) has completed its review of your premarket approval application (PMA) for the Mentor
MemoryGel™ Silicone Gel-Filled Breast Implants. This device is indicated for breast
augmentation for women at least 22 years old and for breast reconstruction for women of any
age. Breast augmentation includes primary breast augmentation to increase the breast size, as
well as revision surgery to correct or improve the result of a primary breast augmentation
surgery. Breast reconstruction includes primary reconstruction to replace breast tissue that has
been removed due to cancer or trauma or that has failed to develop properly due to a severe
breast abnormality. Breast reconstruction also includes revision surgery to correct or improve
the result of a primary breast reconstruction surgery.

We are pleased to inform you that the PMA is approved. You may begin commercial
distribution of the device in accordance with the conditions described below and in the
"Conditions of Approval" (enclosed).

The sale, distribution, and use of this device are restricted to prescription use in accordance with
21 CFR 801.109 within the meaning of section 520(e) of the Federal Food, Drug, and Cosmetic
Act (the act) under the authority of section 515(d)(1)(B)(ii) of the act. FDA has also determined
that, to ensure the safe and effective use of the device, the device is further restricted within the
meaning of section 520(e) under the authority of section 515(d)(1)(B)(ii), (1) insofar as the
labeling specify the requirements that apply to the training of practitioners who may use the
device as approved in this order and (2) insofar as the sale, distribution, and use must not violate
sections 502(q) and (r) of the act. More specifically, completion of your physician training
program is required as a condition of access to your product. FDA will, however, allow a 90-day

Ex. D - 71

Page 2 – Ms. Kristine Foss

transition period for all current Core Study and Adjunct Study investigators, after which these physicians must also have completed the training program in order to have access to the Mentor product.

In addition to the postapproval requirements outlined in the enclosure, you have agreed to the conditions of approval described in items 1 through 6 below.

1.   Core Postapproval Study

You must continue your Core Study until all patients have completed their 10-year evaluation in order to assess the long-term clinical performance of your product. Data are to be collected via annual physician follow-up evaluations. The primary changes to the protocol from premarket to postapproval are that all non-MRI patients will have a MRI at years 6, 8, and 10 and that all patients who were explanted without replacement will be evaluated through 10 years, as per the protocol. You must also update your patient and physician labeling to reflect 5 and 10-year Core Study findings, as soon as these data are available, as well as any other timepoint deemed necessary by FDA if significantly new information from this study becomes available.

2.   Large Postapproval Study

You must conduct the 10-year large postapproval study, as per the protocol that was submitted to FDA on September 26, 2006. This study, which will begin patient enrollment within 90 days of PMA approval, will be a separate study from the Core Study and will include 41,900 Mentor silicone gel patients and 1,000 saline-filled breast implant patients as the control group. The purpose of this study is to address specific issues for which the Core Study was not designed to fully answer, as well as to provide a real-world assessment of some endpoints. The endpoints include long-term local complications, connective tissue disease (CTD), CTD signs and symptoms, neurological disease, neurological signs and symptoms, offspring issues, reproductive issues, lactation issues, cancer, suicide, mammography issues, and MRI compliance and rupture results. Data are to be collected via annual patient questionnaires, either completed via the web, mail, or telephone. There will also be physician evaluations at years 1, 4-6, and 9-10 to collect local complication data. You must update your patient and physician labeling to reflect 5 and 10-year large postapproval study findings, as soon as these data are available, as well as any other timepoint deemed necessary by FDA if significantly new information from this study becomes available.

On a quarterly basis, you must submit a report to FDA that includes: (1) the number enrolled by implant group (silicone versus saline); (2) the number enrolled by indication (primary augmentation, revision-augmentation, primary reconstruction, revision-reconstruction) and implant group; (3) the number enrolled by race/ethnicity and implant group; (4) the enrollment rate versus the stated goals; and (5) the follow-up rates versus the stated goals. FDA will inform you when quarterly reports are no longer necessary.

Page 3 – Ms. Kristine Foss

Every 6 months for the first 2 years and then annually, thereafter, you are to submit a progress report that includes: (1) the status of patient enrollment as it compares to the stated goals; (2) the status of the race/ethnicity distribution as it compares to the stated goals; (3) detailed patient and device accounting; (4) a summary of findings for all study endpoints; and (5) the reasons why eligible patients were not enrolled into the study.

3.    Device Failure Studies

You must continue preclinical studies to further characterize the long-term modes and causes of failure of explanted retrieved devices for the 10-year duration of the large postapproval study. In addition, you must perform additional studies to address the following specific issues:

- further evaluation of iatrogenic failures to address issues raised by the April 2005 Panel
- the characterization of when surgical instrument damage occurs
- further evaluation and characterization of failures due to localized shell stress
- any correlation between surgical factors (e.g., incision size) and device rupture.

You must also update your patient and physician labeling to reflect any relevant findings.

4.    Focus Group Study

You must complete a focus group study of the augmentation and reconstruction patient labeling. This will involve an independent group obtaining responses from patients on the format and content of the approved labeling. Upon completion of the focus group study, you must provide a supplement with a report of the focus group study findings and revised patient and physician labeling based on those findings.

5.    Informed Decision Process

As part of your formal informed decision process, you must distribute your approved patient labeling. Both the physician and the patient are intended to sign designated sections in order to best assure that a patient has obtained the labeling in an adequate enough time prior to surgery to read it and has understood the risks and other information associated with the Mentor device. You must administer your approved survey to a random selection of 50 physicians on an annual basis to determine the success of this process and provide a summary of the survey findings to FDA. FDA will inform you when a survey summary is no longer necessary. In addition, you are to provide training on this process as part of your physician training program.

Page 4 – Ms. Kristine Foss

6.    Mentor Adjunct Study

You must cease new enrollment into the Mentor Adjunct Study (P910037 and P910038) and continue follow-up of all currently-enrolled Mentor Adjunct Study patients through their 5-year evaluations.  You are to report these data as part of annual reports for P030053.

Expiration dating for this device has been established and approved at 5 years.

CDRH does not evaluate information related to contract liability warranties, however you should be aware that any such warranty statements must be truthful, accurate, and not misleading, and must be consistent with applicable Federal and State laws.

CDRH will notify the public of its decision to approve your PMA by making available a summary of the safety and effectiveness data upon which the approval is based.  The information can be found on the FDA CDRH Internet HomePage located at http://www.fda.gov/cdrh/pmapage.html.  Written requests for this information can also be made to the Dockets Management Branch, (HFA-305), Food and Drug Administration, 5630 Fishers Lane, Rm. 1061, Rockville, MD  20852.  The written request should include the PMA number or docket number.  Within 30 days from the date that this information is placed on the Internet, any interested person may seek review of this decision by requesting an opportunity for administrative review, either through a hearing or review by an independent advisory committee, under section 515(g) of the Federal Food, Drug, and Cosmetic Act (the act).

Failure to comply with any postapproval requirement constitutes a ground for withdrawal of approval of a PMA.  Commercial distribution of a device that is not in compliance with these conditions is a violation of the act.

You are reminded that, as soon as possible and before commercial distribution of your device, you must submit an amendment to this PMA submission with copies of all approved labeling in final printed form.  The labeling will not routinely be reviewed by FDA staff when PMA applicants include with their submission of the final printed labeling a cover letter stating that the final printed labeling is identical to the labeling approved in draft form.  If the final printed labeling is not identical, any changes from the final draft labeling should be highlighted and explained in the amendment.

All required documents should be submitted in triplicate, unless otherwise specified, to the address below and should reference the above PMA number to facilitate processing.

PMA Document Mail Center (HFZ-401)
Center for Devices and Radiological Health
Food and Drug Administration
9200 Corporate Blvd.
Rockville, Maryland  20850

Page 5 – Ms. Kristine Foss

If you have any questions concerning this approval order, please contact Mr. Stephen Rhodes at
(240) 276-3638.

Sincerely yours,

Donna-Bea Tillman, Ph.D., M.P.A.
Director
Office of Device Evaluation
Center for Devices and Radiological Health

Enclosure

# EXHIBIT C

# SUMMARY OF SAFETY AND EFFECTIVENESS DATA

## I.  GENERAL INFORMATION

| | |
|---|---|
| Device Generic Name: | Silicone Gel-Filled Breast Implants |
| Device Trade Name: | Mentor MemoryGel™ Silicone Gel-Filled Breast Implants |
| Applicant's Name and Address: | Mentor Corporation<br>201 Mentor Drive<br>Santa Barbara, California  93111 |
| Premarket Approval Application (PMA) Number: | P030053 |
| Date of Panel Recommendation: | April 13, 2005 |
| Date of Notice of Approval to Applicant: | November 17, 2006 |

## II.  INDICATIONS FOR USE

The Mentor MemoryGel Silicone Gel -Filled Breast Implant are indicated for females for the following uses (procedures):

- **Breast augmentation for women at least 22 years old.**  Breast augmentation includes primary breast augmentation to increase the breast size, as well as revision surgery to correct or improve the result of a primary breast augmentation surgery.

- **Breast reconstruction.**  Breast reconstruction includes primary reconstruction to replace breast tissue that has been removed due to cancer or trauma or that has failed to develop properly due to a severe breast abnormality.  Breast reconstruction also includes revision surgery to correct or improve the result of a primary breast reconstruction surgery.

## III.  CONTRAINDICATIONS

*Breast implant surgery should not be performed in:*
- Women with active infection anywhere in their body.
- Women with existing cancer or pre-cancer of their breast who have not received adequate treatment for those conditions.
- Women who are currently pregnant or nursing.

## IV.  WARNINGS AND PRECAUTIONS

The warnings and precautions can be found in the Mentor MemoryGel Silicone Gel-Filled Breast Implants physician labeling.

## V.   DEVICE DESCRIPTION

Each Mentor MemoryGel Silicone Gel -Filled Breast Implant consists of a single-lumen, round silicone elastomer shell, with a patch on the posterior side, which is filled with MemoryGel, Mentor's proprietary silicone gel.  The implants are available in a range of diameters, profiles (projections), and sizes, as well as in smooth and textured (Siltex) shell surfaces.  The implants are provided dry-heat sterilized with a 5-year shelf life from the date of sterilization.  Table 1 below shows the Mentor styles that are approved.  Table 2 shows the general device materials for the shell, patch, and gel components.

### Table 1:  Approved Mentor MemoryGel Silicone Gel-Filled Breast Implants

| Catalog Number | Description | Size Range |
|---|---|---|
| 350-7100BC/7800BC | Smooth, Round, Moderate Profile | 100-800cc |
| 354-1007/8007 | Textured, Round, Moderate Profile | 100-800cc |
| 350-1001BC/8001BC | Smooth, Round, Moderate Plus Profile | 100-800cc |
| 354-1001/8001 | Textured, Round, Moderate Plus Profile | 100-800cc |
| 350-1254BC/8004BC | Smooth, Round, High Profile | 125-800cc |
| 354-4125/4800 | Textured, Round, High Profile | 125-800cc |

### Table 2:  Device Materials

| Component | Raw Material |
|---|---|
| Shell, inner/outer layers | Dimethyl Silicone Elastomer Dispersion |
| Shell, barrier layer | Diphenyl Silicone Elastomer Dispersion |
| Shell textured layer | MED 4750 Silicone Elastomer |
| Patch assembly | MED 4750 Silicone Elastomer |
| Gel | Silicone Gel:  Base and Crosslinker; platinum cure |

## VI.   ALTERNATIVE PRACTICES OR PROCEDURES

Alternative treatments include, but are not limited to, saline-filled breast implants, external prostheses, autogenous tissue grafts; tissue flaps (e.g., transverse rectus abdominis muscle, latissimus dorsi muscle, gluteal muscle), or no treatment.

## VII.   REGULATORY AND MARKETING HISTORY

Silicone gel-filled breast implants are preamendments devices.  Mentor began marketing silicone gel-filled breast implants in the U.S. in 1984.  In April 1991, FDA published a final 515(b) regulation calling for silicone gel-filled breast implant PMAs within 90 days (56 FR 14620).  In April 1992, FDA determined that there were insufficient data to approve any of the PMAs submitted, and, therefore, Mentor's silicone gel breast implants were no longer marketed in the U.S.  However, the FDA also determined that access to silicone gel-filled breast implants for reconstruction and revision patients should continue through adjunct clinical studies.

The Mentor Adjunct Study, which was started in 1992, was designed to address the public health need of reconstruction and revision patients.  Local complications and satisfaction data were collected at 1, 3, and 5-year timepoints.  However, with the approval of the subject PMA P030053, the public health need no longer exists and, while patient follow-up

continues through 5 years for those Adjunct Study patients currently enrolled, no new patients will be enrolled into the Mentor Adjunct Study.

In August 2000, Mentor received FDA approval and began their Core Study for their silicone gel-filled breast implant product. The Core Study is the primary clinical data set in this PMA.

Outside of the U.S., over 750,000 MemoryGel implants have been distributed worldwide from 1992 through 2005. The Mentor MemoryGel implants have not been withdrawn from any foreign market for any reason relating to the safety and effectiveness of the device.

## VIII. POTENTIAL ADVERSE EFFECTS OF THE DEVICE ON HEALTH

Based on those reported in literature and/or the Mentor Core Study, potential adverse events that may occur with breast implant surgery include reoperation (additional surgeries), implant removal with or without replacement, implant rupture, capsular contracture, wrinkling, asymmetry, implant displacement, implant palpability/visibility, scarring, ptosis, pain, changes in nipple and breast sensation, infection (including Toxic Shock Syndrome), hematoma, seroma, breast feeding difficulties, calcium deposits, extrusion, necrosis, delayed wound healing, breast tissue atrophy/chest wall deformity, and lymphadenopathy.

There have also been reports in the literature of other conditions in women with silicone gel-filled breast implants, including connective tissue disease (CTD), CTD signs and symptoms, neurological disease, neurological signs and symptoms, cancer, suicide, and potential effects on offspring. Many of these conditions have been studied to evaluate their potential association with breast implants, but no cause and effect relationship has been established between breast implants and these conditions.

Refer to Section X below for a summary of the adverse event data from the Mentor Core Study.

## IX. SUMMARY OF PRECLINICAL STUDIES

The preclinical studies are divided into five sections: chemistry; toxicology; mechanical; modes and causes of rupture; and shelf life.

### A. Chemistry Data

Chemical testing was performed on the major components (shell and gel) of Mentor's product to address the biological safety of the materials used in the Mentor product.

### 1. Extent of Crosslinking

**Shell** - Three Siltex Round Moderate Profile Gel-Filled (100 cc) devices were subjected to an additional thermal cure step consisting of 240 minutes at 164°C. The device shells were then subjected to exhaustive extraction conditions (M/V 1/200) before and after the additional thermal cure step. The crosslink chain density ($\rho_e N_{AV}$) was calculated to be $7.9\times10^{19}$ chains/cm$^3$ by the Sol Fraction Method (equilibrium swell ratio). The three devices tested showed similar results, indicating that the crosslink density is the same across lots.

The results also demonstrated that the curing reaction was complete because there was no change in these results after additional cure step.

**Gel -** The experiments were repeated with the gel component under the same conditions as described for the shell. The crosslink chain density ($\rho_c N_{AV}$) was calculated to be $1.46 \times 10^{17}$ chains/cm$^3$. The three devices tested showed similar results, indicating the crosslink density is the same across lots.

2.      Volatiles

**Shell -** Shell samples were cut into 2mm x 2mm pieces, and the volatiles were analyzed by headspace purge/trap connector coupled with GC/MS (gas chromatography – mass spectrometry). Shells from unfilled devices (not exposed to gel) and from filled devices (exposed to gel) were tested. The shells not exposed to gel contained <11.1 µg/g of volatiles, of which the notable compounds were isopropanol (<1 ppm), xylenes (<0.08 ppm), methoxytrimethylsilane (3 ppm), dodecane (3 ppm), and undecane (1.4 ppm). The shells exposed to gel contained <10.2 µg/g of volatiles.

**Gel -** The analysis on the gel was performed with the same equipment as for the shell component, using a small sample of gel. The gel filler contained <2.8 µg/g of volatiles. The notable compounds were D4 (0.5 ppm), D5 (1.6 ppm), and undecane (<0.3 ppm).

**Whole Device -** The analysis on the whole device was based upon the weight averaged calculation of the analyses performed on the individual shell and gel components.

The results are presented in Table 3 below.

**Table 3.  Volatile Results**

| Compound | Shell Not Exposed to Gel (ppm) | Shell Exposed to Gel (ppm) | Gel Filler (ppm) | Whole Device (ppm) |
|---|---|---|---|---|
| D3 | ND | 0.19 | 0.18 | 0.18 |
| D4 | <0.06 | 0.23 | 0.49 | 0.46 |
| D5 | 0.28 | 0.79 | 1.60 | 1.47 |
| Methoxytrimethylsilane | 3.13 | 3.34 | ND | 0.43 |
| Dimethoxydimethylsilane | ND | 0.20 | ND | 0.03 |
| Methoxytriethoxysilane | 0.04 | ND | ND | ND |
| Tetramethyldiethyldisiloxane | ND | ND | 0.05 | 0.04 |
| Acetone | 1.02 | 1.38 | ND | 0.18 |
| Isopropanol | <1.06 | 2.03 | ND | 0.26 |
| 2-Pentanone | 0.05 | ND | ND | ND |
| Methyl Butanoate | 0.04 | ND | 0.09 | 0.01 |
| Ethylbenzene | <0.01 | ND | ND | ND |
| m- & p-xylene | 0.06 | ND | <0.09 | 0.08 |
| 4-Methyl-3-penten-2-one | 0.07 | 0.08 | ND | 0.01 |
| o-xylene | <0.02 | ND | ND | ND |
| Alpha-Pinene | <0.02 | ND | ND | ND |
| Cyclohexanone | <0.56 | ND | ND | ND |
| 1-Ethyl-2-methylbenzene | 0.02 | 0.06 | ND | 0.01 |
| Decane | 0.09 | ND | ND | ND |
| Benzaldehyde | 0.04 | 0.08 | ND | 0.01 |

| Compound | Shell Not Exposed to Gel (ppm) | Shell Exposed to Gel (ppm) | Gel Filler (ppm) | Whole Device (ppm) |
|---|---|---|---|---|
| 1,3,5-Trimethylbenzene | 0.04 | 0.04 | ND | 0.01 |
| Limonene | 0.02 | 0.05 | ND | 0.01 |
| Undecane | 1.39 | <0.45 | <0.34 | 0.35 |
| Acetophenone | 0.03 | 0.06 | ND | 0.01 |
| Dodecane | 3.00 | <0.55 | ND | 0.07 |
| Total Volatiles | <11.07 | <10.16 | <2.84 | 3.67 |

Data preceded with a "<" symbol means that the level of the individual component, if present, was below the method detection limit indicated.
ND=Not detected.

3.    Extractables

Siltex Round Moderate Profile Gel-Filled (100cc) devices were used for this testing.  The components were extracted (exhaustive) with different solvents.  Methylene chloride was eventually chosen to be the best solvent for extraction.  The residue obtained was subjected to different analyses as described below.

**Gravimetric Analysis** - Shells not exposed to gel gave 1.86% by weight of extractable residue.  Shells exposed to gel gave 10.43% by weight of extractable residue.  The gel gave 82.74% by weight of extractable residue.  The whole device gave 72.96% by weight of extractable residue.

**FTIR Analysis** - Fourier Transform Infra Red (FTIR) spectroscopic analyses on the shell and the gel, as well as the extractable residues, showed that the extractable materials are polysiloxanes.  Mentor stated that no phenyl groups were detected because of their low concentrations.

**Gel Permeation Chromatography** - With regard to the shell exposed to gel, the extractable residue on GPC analysis gave five peaks:  (1) a larger molecular weight ($M_w$) peak at about 17,400 Daltons for polydimethylsiloxane and (2) an additional four peaks of 770, 550, 260, and 170 Daltons.  The larger molecular weight peak represented a methyl substituted polysiloxane polymer with a polydispersity of 1.8.  Its origin was determined to be from the gel.

With regard to the shell not exposed to gel, the extractable residue contained phenyl polymer, oligomer and monomeric species with a molecular weight ($M_w$) range of 170 - 61,000 Daltons.  The phenyl substituted siloxanes concentrations ranged from 32 to 620 ppm.  The extract also yielded two peaks of dimethyl siloxane species, one with a molecular weight of 341,000 Daltons, and a second one with a molecular weight of 4,820 Daltons.  The high molecular weight species represented less than 10% of the total peak area.

With regard to the gel, the extractable residue on GPC analysis gave only one peak with a polydispersity of 2.4 ($M_w$ = 53,900 and $M_n$ = 22,300; $M_w / M_n$ = 2.4).

**Semi-Volatile Qualitative and Quantitative Analyses** - With regard to the shell extractables, a part of the residue from the extraction of the finished device shell was subjected to GC/MS analyses.  The analysis showed that it contained no detectable amounts of D4 and, at most, a total of 34 ppm of D5 – D10.  It also contained a total of approximately 220 ppm of linear dimethyl siloxanes.  The total amount of vinyl-modified cyclic siloxanes was <52 ppm, and the total amount of phenyl-modified cyclic siloxanes was <68 ppm.

With regard to the gel extractables, extraction residue from the filler on GC/MS analysis was shown to contain 0.5 ppm of D4 and approximately 3800 ppm of D4-D21.  Linear dimethylsiloxanes were determined to be 377 ppm.  Vinyl modified siloxanes were 123 ppm, while no phenyl-modified cyclic siloxanes were detected in the gel.

The GC/MS analyses (qualitative and quantitative) results for the semi-volatiles, including that for the whole device, are listed in Table 4 below.

**Table 4.  Semi-Volatile Data**

| Compound | Shell Not Exposed to Gel (μg/g) | Gel Filler (μg/g) | Shell Exposed to Gel (μg/g) | Whole Device (μg/g) |
|---|---|---|---|---|
| **Cyclic Dimethyl Siloxanes** | | | | |
| $D_4$ | ND | 0.5 | ND | 0.5 |
| $D_5$ | ND | 2.5 | <2.5 | <2.5 |
| $D_6$ | ND | 4.9 | <4.2 | <4.8 |
| $D_7$ | ND | 9.0 | <4.2 | <8.4 |
| $D_8$ | <7.8 | 8.5 | <7.6 | <8.4 |
| $D_9$ | <7.8 | 8.4 | <7.6 | <8.3 |
| $D_{10}$ | <7.8 | 11.5 | <7.6 | <10.92 |
| $D_{11}$ | <12.2 | 23.3 | <12.9 | <21.86 |
| $D_{12}$ | 22.2 | 35.3 | 17.6 | 32.92 |
| $D_{13}$ | 48.5 | 51.0 | 27.8 | 47.85 |
| $D_{14}$ | 148.3 | 118.7 | 77.6 | 113.11 |
| $D_{15}$ | 201.3 | 181.5 | 114.7 | 172.4 |
| $D_{16}$ | 207.0 | 217.8 | 114.6 | 203.8 |
| $D_{17}$ | 530.3 | 616.4 | 383.7 | 584.9 |
| $D_{18}$ | 387.8 | 560.7 | 356.0 | 533.0 |
| $D_{19}$ | 272.88 | 450.9 | 292.2 | 429.4 |
| $D_{20}$ | 521.62 | 657.8 | 303.9 | 609.9 |
| $D_{21}$ | 325.69 | 845.6 | 328.0 | 775.5 |
| **Linear Dimethyl Siloxanes** | | | | |
| $MD_7M$ | ND | <1.5 | ND | <1.3 |
| $MD_8M$ | ND | 1.7 | ND | 1.5 |
| $MD_9M$ | ND | 3.2 | ND | 2.8 |
| $MD_{10}M$ | ND | 7.2 | NA | 6.2 |
| $MD_{11}M$ | ND | 13.5 | <11.2 | <13.2 |
| $MD_{12}M$ | ND | 37.2 | 20.1 | 34.8 |
| $MD_{13}M$ | ND | 54.6 | 29.3 | 51.2 |
| $MD_{14}M$ | ND | 66.1 | 40.2 | 62.6 |
| $MD_{15}M$ | ND | 70.0 | 41.5 | 66.2 |
| $MD_{16}M$ | ND | 57.2 | 40.0 | 54.9 |
| $MD_{17}M$ | ND | 64.9 | 38.1 | 61.3 |

| Compound | Shell Not Exposed to Gel (µg/g) | Gel Filler (µg/g) | Shell Exposed to Gel (µg/g) | Whole Device (µg/g) |
|---|---|---|---|---|
| **Vinyl-Modified Cyclic Dimethylsiloxanes** | | | | |
| $D^{vi}D_{14}$ | ND | 6.8 | ND | 5.9 |
| $D^{vi}D_{15}$ | ND | 10.1 | NA | 8.8 |
| $D^{vi}D_{16}$ | ND | 14.0 | <16.7 | <14.4 |
| $D^{vi}D_{17}$ | ND | 26.1 | ND | 22.6 |
| $D^{vi}D_{18}$ | ND | 40.6 | NA | 35.1 |
| $D^{vi}D_{19}$ | ND | 25.0 | <35.1 | <26.4 |
| **Phenyl-Modified Cyclic Dimethylsiloxanes** | | | | |
| $D_{10}D^{Ph}$ | <8.9 | ND | ND | ND |
| $D_{11}D^{Ph}$ | <8.9 | ND | ND | ND |
| $D_{12}D^{Ph}$ | <8.9 | ND | ND | ND |
| $D_2D^{Ph}{}_2$ (1) | 48.4 | ND | 14.4 | 2.0 |
| $D_2D^{Ph}{}_2$ (2) | 37.1 | ND | <9.9 | <1.3 |
| $D_3D^{Ph}{}_2$ (1) | 58.9 | 21.9 | <9.9 | <20.2 |
| $D_3D^{Ph}{}_2$ (2) | 78.6 | 19.8 | 13.6 | 19.0 |
| $D_4D^{Ph}{}_2$ (1) | 21.4 | ND | <9.9 | <1.3 |
| $D_4D^{Ph}{}_2$ (2) | 23.1 | ND | <9.9 | <1.3 |
| $D_5D^{Ph}{}_2$ (1) | <8.9 | ND | ND | ND |
| $D_5D^{Ph}{}_2$ (3) | <8.9 | ND | ND | ND |
| $D_5D^{Ph}{}_2$ (2) | <8.9 | ND | ND | ND |
| **Miscellaneous Siloxanes** | | | | |
| Siloxane | ND | 4.2 | 1.8 | 3.9 |
| **Residues of Solvents and Plasticizers** | | | | |
| o-Xylene | ND | <0.4 | ND | <0.4 |
| Di(Ethylhexyl) Phthalate | <11.2 | ND | ND | ND |
| **Total (µg/g)** | <3055.8 | <4350.1 | <2403.8 | <4086.7 |

ND = Not Detected, S/N <3.0.   NA = Not Applicable.   vi = vinyl; ph = phenyl.
Data preceded with a "<" symbol meaning a less than method detection limit value was measured in the sample or individual component.

The concentrations of the oligosiloxanes present in the device are well below the No Observed Adverse Effect Level (NOAEL) based on extrapolation of the available toxicology data on D4 and D5.

4.     Heavy Metal Analysis

Both the shell and the gel components were extracted with aqueous (buffer) and organic solvents and analyzed by Inductively Coupled Plasma/Mass spectroscopy) (ICPM) for numerous metals.  The metal concentrations obtained from the extracted residues are shown in Table 5 below for the device, as a whole.

**Table 5:  Heavy Metal Concentrations**

| Metal Name | Concentration (ppm) |
|---|---|
| Antimony | 0.014 |
| Arsenic | 0.123 |
| Barium | 0.001 |
| Beryllium | 0.006 |
| Cadmium | 0.002 |
| Chromium | 0.028 |
| Cobalt | 0.052 |
| Copper | 0.025 |
| Lead | 0.011 |
| Magnesium | 0.391 |
| Mercury | 0.004 |
| Molybdenum | 0.001 |
| Nickel | 0.050 |
| Platinum | 0.299 |
| Selenium | 0.069 |
| Silver | 0.001 |
| Tin | 0.004 |
| Titanium | 0.033 |
| Vanadium | 0.310 |
| Zinc | 0.034 |

In addition, platinum metal analyses were conducted on the unextracted shell and the gel components.  The platinum concentration was found to be 8.8 ppm for the unextracted shell and 4.8 ppm for the unextracted gel.

As a note, platinum is a metal used as a catalyst in the manufacture of the shell and gel components of silicone breast implants.  The small amounts of platinum remaining in the product following manufacturing may enter the body, either by diffusing through the intact shell (i.e., through gel bleed) or through an implant rupture.  Based on our review of the gel bleed testing, the published literature on this topic, as well as the biocompatibility testing and clinical data on the device, FDA concluded that the platinum contained in breast implants is in the zero oxidation state, which has the lowest toxicity and, thus, does not pose a significant risk to women with silicone breast implants.

FDA has posted a Backgrounder on its website, which provides a brief summary of some of the key scientific studies on platinum and silicone gel-filled breast implants (http://www.fda.gov/cdrh/breastimplants/).

5.      Silica Filler

X-ray diffraction studies on the elastomer shell confirmed that the silica used as reinforcing filler material is in the amorphous form.

### B.     Toxicology Data

Mentor provided both pharmacokinetic and biocompatibility testing to address the biological safety of the materials used in the Mentor product.

#### Pharmacokinetics

Mentor cited a number of experiments in which [14]C-labeled polydimethylsiloxanes were injected subcutaneously in animals. Most of the radioactivity (94-99.97%) remained at the injection sites. In one experiment, less than 0.02% was found to have migrated to different tissues. Raposo do Amaral, et al.[1] injected rats with 2ml of silicone gel at two different sites and followed the animals for various time periods up to 450 days. Silicone was not detected in the heart spleen, liver, stomach, or gonads, but it could be detected locally surrounding the tissue capsules at the implantation sites. No silicone was found in the regional lymph nodes.

With regard to the migration of the low molecular weight mixtures of cyclic siloxanes (e.g., D4, D5, D6), Kala, et al. [2] injected a concentrated distillate of cyclic siloxanes in the suprascapular area in mice. At 1 month, the highest cyclosiloxane levels were detected in the mesenteric lymph nodes, ovaries, and uterus, but all organs examined contained some cyclosiloxanes. The high dose used far exceeded the dose from implants. The survival of the mice for one year at these levels of cyclosiloxane exposure indicates a high level of safety.

Anderson, et al.[3] studied the distribution of D4 in rats using radiolabeled D4 administered by inhalation at 700 ppm. The radioactivity was widely distributed in rat tissues, but only 5-6% of the dose was retained in the tissues. Based on these results, the authors proposed that there is high pulmonary and hepatic clearance of D4. Another model of the same data predicted some accumulation in the fat depots.[4]

#### Biocompatibility Testing

The biocompatibility testing below was conducted on the major device components (shell, gel, and patch), as described in ISO 10993.[5] This testing demonstrated the biocompatibility of the materials in the Mentor implants.

#### 1.     Cytotoxicity

Cytotoxicity testing was conducted on the dimethyl and diphenyl elastomer dispersions, the MED 4750 elastomer, the silicone gel, and the dispersion coating. In addition, a complete (100 ml) gel device was tested. The studies used mouse fibroblast L929 cells. Most materials were tested by both the agarose overlay method in which the device or material is placed directly on an agar overlay of the cells, and by the USP elution method, in which the device or material is extracted into minimal medium and the extract is placed onto a lawn of cells. In both cases, the cells were observed for lysis and changes in cell morphology or cell death. The results showed that the test articles were non-cytotoxic.

#### 2.     Short Term Irritation and Implantation

The test articles tested for irritation and/or implantation included the dimethyl and diphenyl elastomer dispersions, the MED 4750 elastomer, the silicone gel, the dispersion coating, and

the laser-marked patches. Each was extracted into saline and cottonseed oil (CSO) and injected subcutaneously in rabbits. The injection sites were observed for edema and erythema. There was no significant reaction to any of these materials.

A 100ml textured gel implant was tested using $60cm^2$ per 20ml of saline or CSO for extraction. Extracts of the complete implants showed no significant irritation (erythema or edema).

Groups of one of the laser-marked patches in the CSO (cottonseed oil) group showed moderate irritation. Because the reactivity to the CSO extracts is usually higher than the reaction to the saline extracts, this may have added to the effect.

The studied showed that none of the device materials causes significant irritation.

3.     Acute Systemic Toxicity

The test articles evaluated for acute systemic toxicity included the dimethyl and diphenyl elastomer dispersions, the MED 4750 elastomer, silicone gel, dispersion coating, a textured gel-filled device, a smooth device, and laser-marked patches. Extracts for testing were prepared by using $60cm^2$ per 20ml of solvent of each device components for extraction into saline and cottonseed oil. The saline extracts were injected into mice intravenously at 50 ml/kg, and the oil extracts were injected intraperitoneally at the same dose. The animals were observed for toxic signs. No toxicity was observed.

4.     Hemocompatibility

Hemocompatibility testing was conducted by measuring the extent of red cell lysis produced by direct contact with, and/or extracts of, the following device components: dimethyl and diphenyl elastomer dispersions, the MED 4750 elastomer, and silicone gel. Suspensions of rabbit red cells were freshly prepared. A sample of rabbit red cells were added to each of the following tubes: a negative control tube with 10ml of saline; a positive control with 10ml of water; and 2g of test materials extracted in 10ml of saline. The tubes were incubated at 37°C for 1 hour, centrifuged, and the absorbance at 545nm was measured. The percent hemolysis is the absorbance of the sample times 100 divided by the absorbance of the positive control. No significant hemolysis was seen with any of these device components.

5.     Pyrogenicity

Rabbit pyrogen studies using a complete textured device were conducted by measuring rabbit temperature increases following intravenous administration of device extracts in New Zealand White Rabbits. The test article was a complete 100ml textured device extracted into $60cm^2$ per 20ml of sterile non-pyrogenic saline. The rabbit temperature rise was within acceptable limits. The test materials were, therefore, considered non-pyrogenic. The smooth device was tested in the same way. The results showed that the test articles were non-pyrogenic.

6.    Immunotoxicity

Immunotoxicity tests were conducted by implanting disks punched from smooth or textured shells subcutaneously in B6C3F1 mice. Three shell doses were used: $14mm^2$; $28mm^2$; and $57mm^2$. The patch was tested only at $28mm^2$. Cyclophosphamide was the positive control at 25mg/kg IP. The animals were regularly observed for any toxic signs for 28 days.

In tests involving the smooth shells, the parameters evaluated were body weights, spleen and thymus weights, hematology, including RBCs, hemoglobin, hematocrit, MCV, MCH, MCHC, a differential count of leukocytes. In the spleen, IgM antibody forming cells to sheep erythrocytes, splenic T-cells, $CD4^+$, $CD8^+$, and B-cells were all enumerated. For total T-cell enumeration, a Thy $1.2^+$ monoclonal antibody was used. All of the observations were normal except for an increase in T-cells in the spleen, as determined by the Thy $1.2^+$ marker and a decrease in spleen weights in the animals exposed to the shell and patch. An additional test was conducted to determine the cause of the increased Thy $1.2^+$ responsive cells without increases in the counted T-cells. The result was that the Thy $1.2^+$ marker is non-specific and also binds to "non-immune cells." The non-immune cells type was likely to have been fibroblasts that also bind the Thy $1.2^+$ antibody. Thus, there were no immunological abnormalities in the first experiment.

In a second test, the smooth shell was implanted in mice for 10 days. There were no effects on body weight, spleen or thymus weight, or thymus histopathology. The implants did not alter the response of the spleen cell proliferation response to T-cell mitogens (Con A or Phytohemagglutinin) nor was the response to allogeneic spleen cells from DBA/2 mice altered. This testing, combined with the first set of testing, showed that the smooth shell did not alter the immune response.

In another set of experiments, the textured shell was tested. The protocols are very similar to the smooth shell experiments. The testing was designed to test the effects of the device implantation on immune system function. None of the implants significantly affected the immune system in these mice. There were no changes in spleen weight, thymus weight, hematology (RBCs, Hb, HCT, MCV, MCH, MCHC, or leukocyte numbers or differentials. There were no differences in the ability to produce antibodies to T-dependent sheep erythrocyte antigens. There were no differences in the number of spleen cells, and no effects on the T-helper or T- suppressor populations. In conclusion, there were no significant effects of the test articles on the immunological response.

7.    Sensitization

Sensitization testing was performed on the dimethyl and diphenyl elastomer dispersions, the MED-4750 elastomer, the dispersion coating, and the laser engraved patches. Variations of the Guinea Pig Maximization test method were used. CSO and saline extracts of device components were injected intradermally and, a week later, petrolatum with sodium laurel sulfate (SLS) was rubbed into the site. A day later, the petrolatum was removed, and test article on filter paper was applied and removed after 48 hours. Induction was tested two weeks later using a Hill Top chamber. Dermal reactions were observed 1, 2, 3, and 4 days. No significant sensitization was observed for any of the materials tested.

8.   <u>Reproductive Toxicity and Teratogenicity</u>

Mentor conducted a two-generation study in rats to assess the teratogenic and reproductive toxicity potential of Mentor's shell. In order to exaggerate the dose of potentially extractable materials, the elastomeric test material was pulverized prior to implantation, thus significantly increasing the exposed surface area. The findings of this study indicated that, compared to the controls, pulverized patched and/or valved silicone elastomer shells did not cause reproductive or teratogenic effects when implanted subcutaneously in female rats in two consecutive generations. Mentor also has conducted an extended one-generation study of Mentor silicone gel administered by subcutaneous injection in rats. There were no effects on maternal growth, estrous cycling, fertility, fecundity, pregnancy, delivery, or lactation. In addition, there were no effects on F1 offspring survival, growth, acquisition of developmental landmarks, learning and memory, functional observational battery, hormone-mediated endpoints, systemic or reproductive organ weights, or organ histopathology.

9.   <u>Genotoxicity</u>

Mentor addressed genotoxicity testing using the *Salmonella* Reverse Mutation Assay (Ames Test), Unscheduled DNA Synthesis, the Chromosome Aberration Assay in CHO cells, and the mouse micronucleus assay). The tests were all done with and without S9 activation.

The Ames Test (*Salmonella* Assay) was used to test the dimethyl and diphenyl elastomer dispersions, the MED 4750 elastomer, the dispersion coat, shell, and extracts of the complete implant. There were no significant genotoxic effects.

In a second set of data, Mentor used unscheduled DNA synthesis to test a 275ml smooth device. The entire device was extracted into saline and into ethanol. The test article was extracted using 0.2g test article per ml of extraction medium. Neither extract stimulated unscheduled DNA synthesis.

In a third set of data, Chromosome Aberration Assays were conducted in CHO Cells. Saline and alcohol extracts of a 275ml smooth device were tested. The test article was chopped into small pieces for extraction at 50°C for 72 hours with shaking. Colcemid was added 2 hours prior to harvest to inhibit cell growth. The test was performed with and without S9 activation. No increases of chromosome aberrations over the control were seen.

A fourth set of data were obtained using an in-vivo mouse micronucleus test. The test article was a 300ml textured device. The device was cut into small pieces through all layers and extracted into saline and corn oil at a ratio of 1g of device per 5ml of extraction solvent. The positive control was cyclophosphamide, 2.5 mg/ml. The device extracts did not increase the micronucleated cells in the marrow of injected animals. There was no evidence of genotoxicity.

10.   <u>Carcinogenicity</u>

Because of the negative mutagenicity testing and a negative mouse micronucleus test, additional carcinogenicity testing was not requested by FDA. Nevertheless, Mentor provided some carcinogenicity tests that were performed using a silicone gel manufactured by Dow Corning that is equivalent to the gel used in the Mentor product.

In the first set of data, Mentor performed carcinogenicity testing in albino rats using various silicone gels manufactured by Dow Corning. Each of the Dow Corning silicone gels was implanted in 50 male and 50 female rats. There were also sham-operated and no-treatment control groups. Solid state tumors were seen in all of the implantation groups. The tumors were all mesenchymal tumors, primarily fibrosarcomas. The sham-operated and untreated controls did not have tumors. All other pathology was comparable across the treated groups.

In the second set of data, Mentor performed a lifetime implant study with Dow Corning gel in rats. This experiment utilized varying levels of test material as well as the polyethylene controls. There was no increase of non-mesenchymal tumors. It is unlikely that the silicone gel contains a chemical carcinogen because there was no increase of non-mesenchymal tumors across the 3 dose levels tested. That is, tumors other than solid state tumors were not increased by the device implants.

## C.    Mechanical Data

This section includes a summary of the fatigue, gel bleed, and gel cohesion testing that Mentor provided in support of establishing the safety of their product.

### 1.    Fatigue Testing

Smooth Round Moderate Profile (100cc), Siltex Round Moderate Profile (100cc), and Siltex Round High Profile (125cc) were chosen for fatigue testing as representative of Mentor's product line. All implants tested were final, sterilized versions with the minimum allowable radial shell thickness. The test set-up consisted of a uniaxial test fixture of parallel plates in a test chamber containing circulating physiologic saline solution at 37°C. The applied cyclic loads ranged from 20-100 lbs. Testing was performed at 1 Hz for all higher loads and at 5 Hz for the lower loads, which was justified by comparative fatigue testing at 1 Hz and 5 Hz for 40 and 80 lbs. A minimum of three implants for each style was tested for most load levels. Runout was defined as 10 million cycles. The resulting endurance load levels were 20-30 lbs. As expected, based on the test set-up, all fatigue failure modes were radial tears. FDA believes that these data demonstrated that the Mentor product can withstand large static loading and in-vivo cyclic loading. See Section XI below for more details.

### 2.    Gel Bleed Testing

Mentor provided testing to identity the gel bleed constituents (including the platinum species (or other catalysts)), the rate that the gel constituents bleed out, and how that rate changes over time. Mentor's test method, which was designed to mimic in-vivo exposure to silicone gel-filled breast implants, involved the incubation of smooth silicone gel-filled breast implants in porcine serum at 37°C. At specific timepoints, samples of the solution were withdrawn for analysis for low molecular weight (LMW) silicones and platinum. The results indicated that the diffusion of measured constituents ceased by 60 days and that only the LMW silicones D4, D5, and D6, and platinum, bled into the serum in measurable quantities. In total, 4.7µg of these three LMW silicones was detected. Platinum levels measured at 4.1µg by 60 days, by which time an equilibrium level was reached and no more platinum diffused through the device shell. Over 99% of the LMW silicones and platinum stayed in the implant.

With regard to the health consequences of gel bleed, the literature has reported small quantities of LMW silicone compounds, as well as platinum (in zero oxidation state), have been found to diffuse ("bleed") through an intact implant shell.[6,7] The evidence is mixed as to whether there are any clinical consequences associated with gel bleed. For instance, studies on implants implanted for a long duration have suggested that such bleed may be a contributing factor in the development of capsular contracture and lymphadenopathy.[8] However, evidence against gel bleed being a significant contributing factor to capsular contracture and other local complications is provided by the fact that there are similar or lower complication rates for silicone gel-filled breast implants than for saline-filled breast implants. Saline-filled breast implants do not contain silicone gel and, therefore, gel bleed is not an issue for those products. Furthermore, toxicology testing has indicated that the silicone material used in the Mentor implants does not cause toxic reactions in test animals. It should also be noted that studies reported in the literature have demonstrated that the low concentration of platinum contained in breast implants is in the zero oxidation (most biocompatible) state.[9,10,11,12] The literature finding has been confirmed by two separate studies sponsored by Mentor. The overall body of available evidence supports that the extremely low level of gel bleed for Mentor's product is of no clinical consequence.

3.  Gel Cohesion Testing

Gel cohesivity and penetration testing assess the cohesive and cure characteristics of silicone gel, respectively. Gel cohesivity testing was performed as per ASTM F703 (cone/pendant method) using gel from final finished product. The majority of the 100 samples showed no measurable pendant length, while a few samples showed an average pendant length of 0.1 cm, which meets the ASTM F703 specification of <4.5 cm. Gel penetration testing was performed as per a Mentor test method involving measurement of the penetration of a plunger into in-process gel in a jar. All samples passed Mentor's internal penetration specification.

D.  Modes and Causes of Rupture

Mentor provided numerous test reports and other information to characterize modes and causes of failure of their device for a range of in-vivo times, such as failure analyses of retrieved devices (i.e., retrieval study), physical property testing, assessment of manufacturing processes and surgical techniques that may impact rupture, and a review of the explant literature.

The primary set of modes and causes of rupture data was a retrieval study that involved 274 explanted, single-lumen Adjunct and Core Study devices that were determined to have failed upon laboratory observation (intact devices were excluded from this dataset). The samples analyzed were explanted anywhere from time 0 (damaged during the implantation procedure and, thus, not implanted) up to 10 years after implantation. For these 274 explants, the failure modes were surgical instrument damage (n=119); localized shell stress from the implantation procedure (n=98); fold flaw (n=20); opening at the shell/patch junction (n=23); shell/patch delamination (n=11); and opening within the patch (n=3). FDA determined that these data are adequate to characterize the modes and causes of rupture through approximately 10 years. See Section XI below for more details.

### D.      Shelf Life Data

Mentor's shelf life testing was performed on both the smooth and textured devices (gel cohesion, tension set, shell/patch joint strength, ultimate elongation, and break force) and the package (thermoform dye penetration and peel seal strength). Real-time testing was the primary set of data used to establish the shelf life of the Mentor product. All device and package testing met the acceptance criteria set in the protocol. Accordingly, the data supported a 5-year shelf life for the Mentor product.

## X.      SUMMARY OF THE MENTOR CORE STUDY

The Mentor Core Study is the primary set of clinical data. These data are summarized below.

### A.      Study Design

The Mentor Core Study is a 10-year study to assess safety and effectiveness in 1,007 augmentation, reconstruction, and revision (revision-augmentation and revision-reconstruction) patients. Patient medical histories and baseline clinical data were collected preoperatively. Patient follow-up is at 6 months, 1 year, 2 years, and annually through 10 years. Rupture is assessed for patients who have scheduled MRIs at years 1, 2, 4, 6, 8, and 10 years to screen for silent rupture (i.e., MRI cohort) and those who are not assessed for rupture by scheduled MRIs (i.e., non-MRI cohort).

Safety assessments include complication rates, reasons for reoperation, and reasons for implant removal. Effectiveness assessments include circumferential chest size change and bra cup size change (typically only augmentation patients), patient satisfaction, and quality of life (QoL). QoL is comprised of measures of self-esteem, body image, and general health outcome. The results through 3 years are currently being reported, and the study remains ongoing. Mentor will periodically update labeling as more information becomes available.

### B.      Patient Accounting and Baseline Demographic Profile

The Mentor Core Study consists of 1,007 patients, including 551 primary augmentation patients, 146 revision-augmentation patients, 251 primary reconstruction patients, and 59 revision-reconstruction patients. Three-year data are available for 88% of the eligible primary augmentation patients, 87% of the eligible revision-augmentation patients, 82% of the eligible primary reconstruction patients, and 86% of the revision-reconstruction patients.

Demographic information for the Core Study with regard to race is as follows: 90% of the Core Study patients were Caucasian; 2% were Asian; 2% were African American; and 6% were other. The mean age at surgery was 34 years for primary augmentation patients, 42 for revision-augmentation patients, 45 years for primary reconstruction patients, and 51 years for revision-reconstruction patients. Approximately 61% of the Core Study patients were married. Approximately 82% had some college education.

With respect to surgical baseline factors, for primary augmentation patients, the most frequently used devices were smooth implants (70%), the most common incision site was inframammary (59%), and the most frequent site of placement was submuscular (66%). For

revision-augmentation patients, the most frequently used devices were smooth implants (68%), the most common incision site was inframammary (71%), and the most frequent site of placement was submuscular (63%). For primary reconstruction patients, the most frequently used devices were textured implants (58%), the most common incision site was the mastectomy scar (56%), and the most frequent site of placement was submuscular (87%). For revision-reconstruction patients, the most frequently used devices were smooth implants (63%), the most common incision site was mastectomy scar (50%), and the most frequent site of placement was submuscular (83%).

## C.   Complication Rates

Table 6 below shows the 3-year, by-patient, cumulative Kaplan-Meier (KM) risk rates of first occurrence (95% confidence interval) of complications.

**Table 6:  KM Risk Rates through 3 Years**

| KM Rates through 3 Years[1] | | Primary Augmentation[2] N=551 | Revision-Augmentation[3] N=146 | Primary Reconstruction[4] N=251 | Revision-Reconstruction[5] N=59 |
|---|---|---|---|---|---|
| Any complication (including reoperation) | | 36.6% (32.1, 40.2) | 50.1% (41.9, 58.3) | 49.4% (42.9, 55.8) | 47.5% (34.8, 60.3) |
| Any reoperation | | 15.4% (12.3, 18.4) | 28.0% (20.4, 35.6) | 27.0% (21.4, 32.6) | 29.1% (17.4, 40.7) |
| Implant removal with or without replacement | | 4.9% (3.1, 6.7) | 13.4% (7.5, 19.3) | 12.7% (8.5, 16.9) | 13.7% (4.9, 22.6) |
| Asymmetry | | 0.5% (0.0, 1.2) | 0 | 6.7% (3.4, 10.0) | 8.9% (1.4, 16.3) |
| Breast mass | | 3.1% (1.6, 4.6) | 6.6% (2.4, 10.7) | 3.6% (1.1, 6.0) | 7.0% (0.4, 13.7) |
| Breast pain | | 1.7% (0.6, 2.8) | 1.5% (0.0, 3.4) | 2.2% (0.3, 4.2) | 3.5% (0.0, 8.2) |
| Breast sensation changes | | 2.2% (1.0, 3.4) | 2.1% (0.0, 4.5) | 1.0% (0.0, 2.5) | 1.9% (0.0, 5.7) |
| Capsular contracture III/IV | | 8.1% (5.8, 10.4) | 18.9% (12.5, 25.4) | 8.3% (4.7, 11.9) | 16.3% (5.0, 27.6) |
| Delayed wound healing | | 0 | 2.1% (0.0, 4.4) | 0.4% (0.0, 1.2) | 1.7% (0.0, 5.0) |
| Granuloma | | 0.2% (0.0, 0.5) | 0.8% (0.0, 2.5) | 0 | 5.1% (0.0, 10.7) |
| Hematoma | | 2.6% (1.2, 3.9) | 2.8% (0.09, 5.4) | 1.3% (0.0, 2.8) | 3.5% (0.0, 8.2) |
| Implant extrusion | | 0 | 1.4% (0.0, 3.3) | 1.2% (0.0, 2.6) | 1.7% (0.0, 5.0) |
| Implant malposition/ displacement | | 0.4% (0.0, 0.9) | 1.4% (0.0, 3.3) | 1.7% (0.05, 3.3) | 8.5% (1.4, 15.7) |
| Implant palpability/visibility | | 0 | 0.7% (0.0, 2.1) | 0 | 0 |
| Implant rupture | MRI cohort | 0.5% (0.0, 1.6) | 7.7% (0.4, 15.0) | 0.9% (0.0, 2.5) | 0 |
| | Non-MRI cohort | 0 | 0 | 0 | 0 |
| Infection | | 1.5% (0.5, 2.5) | 1.4% (0.0, 3.4) | 5.7% (2.8, 8.6) | 0 |
| Inflammation | | 0.7% (0.02, 1.4) | 1.4% (0.0, 3.3) | 0 | 1.7% (0.0, 5.1) |
| Lactation difficulties | | 0.2% (0.0, 0.6) | 0.8% (0.0, 2.2) | 0 | 0 |
| Lymphadenopathy | | 0 | 0 | 0.9% (0.0, 2.6) | 0 |
| Metastatic disease | | 0 | 0 | 1.8% (0.05, 3.6) | 0 |
| Miscarriage | | 1.5% (0.5, 2.6) | 0.9% (0.0, 2.5) | 0.9% (0.0, 2.0) | 0 |
| Necrosis | | 0.2% (0.0, 0.6) | 0 | 0.9% (0.0, 2.3) | 0 |
| New diagnosis of breast cancer | | 0 | 0 | 0.5% (0.0, 1.4) | 1.7% (0.0, 5.1) |
| New diagnosis of rheumatic disease | | 0.6% (0.0, 1.2) | 0.8% (0.0, 2.5) | 0.4% (0.0, 1.3) | 3.5% (0.0, 8.1) |
| Nipple complications | | 10.4% (7.8, 12.9) | 10.5% (5.5, 15.5) | 3.3% (0.8, 5.7) | 1.7% (0.0, 5.0) |
| Ptosis | | 2.3% (1.0, 3.6) | 1.5% (0.0, 3.6) | 6.9% (2.7, 11.2) | 3.4% (0.0, 8.0) |
| Rash | | 0.7% (0.02, 1.4) | 0 | 1.0% (0.0, 2.3) | 0 |
| Recurrent breast disease | | 0 | 0 | 1.7% (0.05, 3.4) | 1.7% (0.0, 5.0) |
| Scarring/Hypertrophic Scarring | | 6.7% (4.6, 8.8) | 8.4% (3.9, 13.0) | 6.8% (3.6, 10.0) | 3.6% (0.0, 8.4) |
| Seroma | | 0.9% (0.1, 1.7) | 2.1% (0.0, 4.4) | 4.9% (2.2, 7.5) | 1.7% (0.0, 5.0) |
| Trauma | | 1.3% (0.2, 2.3) | 0.9% (0.0, 2.5) | 0.4% (0.0, 1.2) | 1.7% (0.0, 5.0) |
| Wrinkling | | 0.7% (0.02, 1.5) | 2.1% (0.0 4.5) | 2.6% (0.5, 4.6) | 7.0% (0.4, 13.6) |

| KM Rates through 3 Years[1] | Primary Augmentation[2] N=551 | Revision-Augmentation[3] N=146 | Primary Reconstruction[4] N=251 | Revision-Reconstruction[5] N=59 |
|---|---|---|---|---|
| Deep vein thrombosis | 0.2% (0.0, 0.6) | 0 | 0.4% (0.0, 1.2) | 0 |
| Muscle spasm | 0 | 0.7% (0.0, 2.1) | 0.4% (0.0, 1.2) | 0 |
| Placement damage | 0.7% (0.02, 1.4)[6] | 0 | 0 | 0 |
| Anaphlyaxis | 0.2% (0.0, 0.6) | 0 | 0 | 0 |
| Biopsy pending | 0.2% (0.0, 0.6) | 0 | 0 | 0 |
| Bruising | 0.4% (0.0, 0.9) | 0 | 0 | 0 |
| Position dissatisfaction | 0.2% (0.0, 0.5) | 0 | 0 | 0 |
| Positive antinuclear antibodies for lupus | 0.3% (0.0., 0.9) | 0 | 0 | 0 |
| Suture reaction | 0.5% (0.0, 1.2) | 0 | 0 | 0 |
| Stitch abscess | 0 | 0 | 0.6% (0.0, 1.6) | 0 |
| Tight benilli suture | 0 | 0 | 0.4% (0.0, 1.3) | 0 |
| Redness | 0 | 0 | 0.6% (0.0, 1.6) | 0 |
| Back/neck pain related to large implants | 0 | 0.7% (0.0, 2.1) | 0 | 0 |
| Ectopic pregnancy | 0 | 0.7% (0.0, 2.2) | 0 | 0 |
| False positive for rupture on mammogram | 0 | 0.8% (0.0, 2.5) | 0 | 0 |
| Capsular tear with no pain or implant malposition | 0 | 0 | 0 | 1.7% (0.0, 5.0) |
| Numbness in both hands at night | 0 | 0 | 0 | 1.8% (0.0, 5.3) |

[1] Excludes mild occurrences of asymmetry, breast pain, calcification, implant malposition/displacement, nipple sensation changes, breast sensation changes, nipple complications, and wrinkling. Also excludes planned second stage surgeries.
[2] 197 primary augmentation patients experienced at least one complication or reoperation.
[3] 119 primary reconstruction patients experienced at least one complication or reoperation.
[4] 72 revision-augmentation patients experienced at least one complication or reoperation
[5] 28 revision-reconstruction patients experienced at least one complication or reoperation.
[6] Breast implants were damaged during insertion and removed while the patient was still on the operating table.

D.    **Main Reasons for Reoperation**

Table 7 below shows the main reasons for reoperations, stratified by indication, through 3 years.  The rates are based on the total number of reoperations for that indication.

**Table 7:  Main Reasons for Reoperations through 3 Years**

| Reasons for Reoperation through 3 Years[1] | Primary Augmentation N=109 Reops in 83 Patients | Revision-Augmentation N=58 Reops in 39 Patients | Primary Reconstruction N=79 Reops in 66 Patients | Revision-Reconstruction N=24 Reops in 17 Patients |
|---|---|---|---|---|
| Asymmetry | 5  (4.6%) | 1  (1.7%) | 16  (20.3%) | 1  (4.2%) |
| Biopsy | 6  (5.5%) | 6  (10.3%) | 11  (13.9%) | 7  (29.2%) |
| Breast cancer | 0 | 0 | 3  (3.8%) | 1  (4.2%) |
| Breast pain | 1  (0.9%) | 0 | 1  (1.3%) | 0 |
| Capsular contracture II | 7  (6.4%) | 5  (8.6%) | 2  (2.5%) | 0 |
| Capsular contracture III/IV | 33  (30.3%) | 18  (31.0%) | 8  (10.1%) | 3  (12.5%) |
| Capsule/pocket tear | 1  (0.9%) | 0 | 0 | 1  (4.2%) |
| Delayed wound healing | 2  (1.8%) | 5  (8.6%) | 1  (1.3%) | 0 |
| Follicular cyst/palpable nodule | 0 | 0 | 0 | 2  (8.3%) |
| Hematoma/seroma | 12  (11.0%) | 5  (8.6%) | 3  (3.8%) | 1  (4.2%) |
| Implant extrusion | 1  (0.9%) | 2  (3.4%) | 2  (2.5%) | 1  (4.2%) |
| Implant malposition | 2  (1.8%) | 2  (3.4%) | 9  (11.4%) | 2  (8.3%) |
| Implant palpability/visibility | 0 | 0 | 1  (1.3%) | 0 |
| Implant rupture (suspected)[2] | 1  (0.9%) | 1  (1.7%) | 0 | 1  (4.2%) |
| Infection | 3  (2.8%) | 1  (1.7%) | 4  (5.1%) | 0 |
| Muscle spasm | 0 | 0 | 1  (1.3%) | 0 |
| Necrosis | 1  (0.9%) | 0 | 0 | 0 |
| Nipple complications (unplanned) | 0 | 0 | 2  (2.5%) | 1  (4.2%) |
| Patient request for style/size change | 16  (14.7%) | 7  (12.1%) | 9  (11.4%) | 1  (4.2%) |
| Ptosis | 4  (3.7%) | 1  (1.7%) | 3  (3.8%) | 1  (4.2%) |
| Scarring/hypertrophic scarring | 12  (11.0%) | 3  (5.2%) | 3  (3.8%) | 0 |
| Wrinkling | 2  (1.8%) | 1  (1.7%) | 0 | 1  (4.2%) |

[1]The reoperation rate excludes planned secondary surgeries.  If more than one reason for a given reoperation was reported, the following hierarchy was used to determine a primary reason for that reoperation:  rupture/deflation; infection; capsular contracture; necrosis/extrusion; hematoma/seroma; delayed wound healing; breast pain; implant malposition; wrinkling; palpability/visibility; asymmetry; ptosis; scarring; nipple complications; device injury/iatrogenic; breast cancer mass; biopsy; and patient request for style/size change.
[2]The implant was removed and found to be intact.

E.    **Main Reasons for Implant Removal**

Table 8 below shows the main reasons for removal, stratified by indication, through 3 years.
The rates are based on the total number of explantations for that indication.

**Table 8:  Main Reasons for Implant Removal through 3 Years**

| Reasons for Implant Removal through 3 Years | Primary Augmentation N=45 Explants in 26 Patients | Revision-Augmentation N=30 Explants in 18 Patients | Primary Reconstruction N=41 Explants in 31 Patients | Revision-Reconstruction N=11 Explants in 8 Patients |
|---|---|---|---|---|
| Abnormal mammogram | 0 | 1  (3.3%) | 0 | 0 |
| Asymmetry | 0 | 1  (3.3%) | 10  (24.4%) | 2  (18.2%) |
| Breast pain | 2  (4.4%) | 0 | 0 | 0 |
| Capsular contracture II | 0 | 0 | 1  (2.4%) | 0 |
| Capsular contracture III/IV | 5  (11.1%) | 10  (33.3%) | 4  (9.8%) | 3  (27.3%) |
| Contralateral explantation | 1  (2.2%) | 0 | 0 | 0 |
| Hematoma | 0 | 0 | 1  (2.4%) | 0 |
| Implant extrusion | 0 | 1  (3.3%) | 2  (4.9%) | 1  (9.1%) |
| Implant malposition | 0 | 0 | 3  (7.3%) | 0 |
| Implant rupture (suspected) | 1  (2.2%)[1] | 1  (3.3%)[1] | 0 | 0 |
| Infection | 2  (4.4%) | 1  (3.3%) | 2  (4.9%) | 0 |
| Lack of projection | 0 | 0 | 1  (2.4%) | 0 |
| Muscle spasm | 0 | 0 | 1  (2.4%) | 0 |
| Necrosis | 2  (4.4%) | 0 | 0 | 0 |
| Patient request for style/size change | 31  (68.9%) | 14  (46.7%) | 15  (36.6%) | 2  (18.2%) |
| Pocket tear | 0 | 0 | 0 | 1  (9.1%) |
| Recurrent breast cancer | 0 | 0 | 1  (2.4%) | 0 |
| Scarring/hypertrophic scarring | 0 | 1  (3.3%) | 0 | 0 |
| Symmastia | 0 | 0 | 0 | 2  (18.2%) |
| Wrinkling | 1  (2.2%) | 0 | 0 | 0 |

[1] The implant was removed and found to be intact.

F.    **Other Clinical Safety Outcomes**

Below is a summary of clinical findings from the Mentor Core Study with regard to
connective tissue disease (CTD), CTD signs and symptoms, cancer, lactation complications,
reproduction complications, and suicide.  These issues, along with others, will be further
evaluated beyond 3 years as part of a Mentor postapproval study of a large number of
patients followed through 10 years.

**CTD Diagnoses**

Three primary augmentation patients and one revision-augmentation patient in the Mentor
Core Study were reported to have a new diagnosis of CTD according to a rheumatologist.
These diagnoses were Hashimoto's Thyroiditis at 2 years, two cases of rheumatoid arthritis
at 2 and 3 years, and hypothyroidism at 2 years.  One primary reconstruction patient and two
revision-reconstruction patients in the Mentor Core Study were reported to have a new
diagnosis of CTD according to a rheumatologist.  These diagnoses were two cases of
fibromyalgia, both at 1 year, and pyoderma gangrenosum at 1 year.  It cannot be concluded
that these CTD diagnoses were or were not caused by the implants because there was no
comparison group of similar women without implants.

## CTD Signs and Symptoms

Data on over 100 self-reported signs and symptoms, including about 50 self-reported rheumatological symptoms, were collected. Compared to before having the implants, statistically significant increases were found for fatigue, exhaustion, joint swelling, joint pain, numbness of hands, frequent muscle cramps, and the combined categories of fatigue, pain, and fibromyalgia-like symptoms in primary augmentation patients and for joint pain in revision-augmentation and primary reconstruction patients. These increases were not found to be related to simply getting older over time. No statistically significant increases were found for any individual signs and symptoms in the revision-reconstruction patients.

The Mentor Core Study was not designed to evaluate cause and effect associations because there is no comparison group of women without implants, and because other contributing factors, such as medications and lifestyle/exercise, were not studied. Therefore, it cannot be determined whether the increases were due to the implants or not, based on the Core Study. However, patients should be aware that they may experience an increase in these symptoms after receiving breast implants.

## Cancer

There were no primary augmentation patients with new diagnoses of breast cancer through 3 years in the Mentor Core Study. As previous breast cancer was an exclusion criteria for primary augmentation patients, there were no reports of breast cancer reoccurrence in this indication. There were no reports of new diagnoses or reoccurrence in revision-augmentation patients. For primary reconstruction patients, 1 (0.5%) patient had a new diagnosis of breast cancer and 4 (1.7%) patients had a reoccurrence of breast cancer. For revision-reconstruction, 1 (1.7%) patient had a new diagnosis of breast cancer and 1 (1.7%) patient had a recurrence of breast cancer. There were no reports of other cancers, such as brain, respiratory, or cervical/vulvar, in any indication.

## Lactation Complications

Two (8%) of the 25 primary augmentation patients who attempted to breast feed following breast implantation in the Mentor Core Study through 3 years experienced difficulty with breast feeding. For the 7 revision-augmentation patients who attempted to breast feed, 1 (14%) had difficulty breast feeding. For primary reconstruction patients, of the 3 women who attempted to breastfeed, none experienced lactation difficulties. None of the revision-reconstruction patients attempted to breast feed.

## Reproduction Complications

Eight (1.5%) of the primary augmentation patients in the Mentor Core Study reported a miscarriage through 3 years. For primary reconstruction patients, 2 (0.9%) patients reported a miscarriage. There were no reports of miscarriage in revision-augmentation or revision-reconstruction patients.

## Suicide

There were no reports of suicide in the primary augmentation, revision-augmentation, primary reconstruction, and revision-reconstruction indications in the Mentor Core Study through 3 years.

### G.    Effectiveness Outcomes for Core Study

Effectiveness was assessed by cup/circumferential chest size measurements, patient satisfaction, and QoL.  Mentor's patient satisfaction was based on a single question of "Would the patient have this breast surgery again?"  The QoL measures were the Rosenberg Self Esteem Scale, the Body Esteem Scale, the Tennessee Self Concept Scale (TSCS), the SF-36, and the Functional Living Index of Cancer.

### Primary Augmentation Patients
For primary augmentation patients, 370 (67%) out of the original 551 patients were included in the analysis of cup size at 3 years.  Of these 370 patients, 359 (97%) experienced at least one cup size increase; the average increase in circumferential chest size was 2.8 inches.

At 3 years, 456 (83%) of the 551 patients enrolled completed the patient satisfaction question.  Of these 456 patients, 445 (98%) stated to their surgeon that they would have the breast implant surgery again.

With regard to QoL measures through 3 years, an increase in self esteem was noted for 45% of patients after primary breast augmentation on the Rosenberg Self Esteem Scale.  There was no change on the overall score of the Body Esteem Scale, but the Sexual Attractiveness Subscale and the Chest Score of the Body Esteem Scale increased.  There was no change in the SF-36 after primary augmentation.  There was no change in the overall score for the TSCS.

### Revision-Augmentation Patients
For revision-augmentation patients, 116 (79%) out of the original 146 patients were included in the analysis at 3 years.  For these 116 patients, the average increase in circumferential chest size was 2.4 inches.

At 3 years, 118 (81%) of the 146 patients enrolled answered the patient satisfaction question.  Of these 118 patients, 111 (94%) stated to their surgeon that they would have the breast implant surgery again.

With regard to QoL measures through 3 years, no change in self esteem was noted following revision-augmentation surgery on the Rosenberg Self Esteem Scale.  No changes were noted in the Body Esteem scale.  There were no changes in SF-36.  There was no change in the overall TSCS score.

### Primary Reconstruction Patients
For primary reconstruction patients, 183 (73%) out of the original 251 patients were included in the analysis of circumferential chest size at 3 years.  Of these 183 patients, the average increase in circumferential chest size was 1.3 inches.

At 3 years, 189 (75%) of the 251 patients enrolled answered the patient satisfaction question.  Of these 189 patients, 185 (98%) stated to their surgeon that they would have the breast implant surgery again.

With regard to QoL measures through 3 years for primary reconstruction patients, a significant improvement in functioning was observed as measured by the Functional Living

Ex. D - 97

Index of Cancer. No change was observed on Rosenberg Self Esteem Scale. There was no change in the overall score for the TSCS. There was no change on the overall score of the Body Esteem Scale. The Sexual Attractiveness Subscale of the Body Esteem Scale significantly improved. There was no change in any of the ten SF-36 scales.

**Revision-Reconstruction Patients**
For revision-reconstruction patients, 45 (76%) out of the original 59 patients were included in the analysis of circumferential chest size at 3 years. Of these patients, the average increase in circumferential chest size was 0.9 inches.

At 3 years, 48 (81%) of the 59 patients enrolled answered the patient satisfaction question. Of these 48 patients, 47 (98%) stated to their surgeon that they would have the breast implant surgery again.

With regard to the QoL measures through 3 years for revision-reconstruction patients, no change was observed on the Rosenberg Self Esteem Scale or in the Tennessee Self Concept Scale. For the Body Esteem Scale, two of six scales worsened over time, but, after adjusting for the aging effect, none of the changes were significant. The Sexual Attractiveness Subscale of the Body Esteem Scale significantly improved over time. Although some of the SF-36 scales showed decreases over time, after adjusting for the aging effect, changes in seven of ten SF-36 scales were not statistically significant.

## XI.   RUPTURE RATE AND CONSEQUENCES OF RUPTURE

To assess the rupture rate and consequences of rupture[*], FDA performed an extensive review of all available clinical and preclinical data. The clinical data included the Mentor Core Study, the Sharpe/Collis Study, the Mentor Adjunct Study, and the published literature. The preclinical data related to rupture included the retrieval study and fatigue testing. The FDA determined that, when the totality of the rupture data is considered, Mentor provided sufficient valid scientific evidence to support a reasonable assurance of safety and effectiveness of their product. These major data sources for rupture are briefly discussed below.

### A.   Mentor Core Study

While Section X above provided the rupture rates, this section include additional details regarding rupture in the Mentor Core Study. Mentor's Core Study included rupture rate data from the MRI cohort (original sample size of 420 who had scheduled MRIs to screen for silent rupture) at years 1 and 2 and from the non-MRI cohort (original sample size of 587) at years 1, 2, and 3. All reported ruptures were from patients in the MRI cohort. The rupture rates were 0.5% for primary augmentation, 7.7% for revision-augmentation, 0.9% for primary reconstruction, and 0% for revision-reconstruction through 3 years. There were a total of 8 ruptured/suspected ruptured implants in 6 patients through 3 years. Two of the implants were explanted and confirmed to be ruptured; the remaining 6 were considered

---

[*] Consequences of rupture include intracapsular rupture (when the gel remains within the scar tissue capsule surrounding the implant), extracapsular gel (when the gel moves outside the capsule but remains within the breast tissue), migrated gel (when the gel moves beyond the breast), and clinical consequences.

ruptured based on MRI evaluation.  Of the 8 ruptured/suspected ruptured implants, 4 showed intracapsular gel and 4 showed extracapsular gel.  There were no cases of migrated gel.

In summary, the Mentor Core Study, which was the primary source of rupture rate data for the Mentor product, provided compelling data demonstrating low rates of rupture through 3 years.

### B.      Sharpe/Collis Study

Mentor submitted the Sharpe/Collis Study, a European study, to provide information characterizing the rupture rate over a longer period of time than had been evaluated in the Core Study, as well as to provide supplemental information on the consequences of rupture. Silent rupture data were collected via a single MRI on 101 augmentation patients.  The average age of the implants was approximately 9 years.  Silent rupture was found in approximately 10% of these augmentation patients, which includes one patient for which the device was not explanted to confirm rupture.  All ruptures were intracapsular (in other words, there were no cases of extracapsular rupture or migrated gel).

FDA acknowledges that the Sharpe/Collis Study is of limited value in providing a precise estimate of the long-term rupture rate.  However, using the same framework discussed by the April 2005 Panel in assessing rupture, we determined that this study, which involved the specific devices for which approval was sought, provided valuable information to help characterize the long-term rupture rate and consequences of rupture.  The study showed a relatively low rate of rupture at an average of 9 years for the women in the study.  As with the Mentor Core Study, the low rates of rupture limited our ability to assess the consequences of rupture.  However, the data we do have suggest that, when rupture does occur, gel migration is unlikely.

### C.      Mentor Adjunct Study

Although the Adjunct Study was neither designed nor intended to be the main set of clinical data to support the PMA, it provided important data assessing local complications associated with the devices.  The studies showed that the local complications reported for women with ruptured implants were similar to those reported for women with intact implants.

### D.      Literature

Although the studies from the scientific literature were not device-specific, they collectively reported a large number of ruptures and, for that reason, provided important information about the consequences of rupture.  Below is a summary of the key literature related to the consequences of rupture.

Studies of Danish women evaluated with MRI involving a variety of manufacturers and implant models showed that about three-fourths of implant ruptures are intracapsular and the remaining one-fourth is extracapsular.[13]  Additional studies of Danish women indicate that over a 2-year period, about 10% of the implants with intracapsular rupture progressed to extracapsular rupture as detected by MRI.[14]  This means that for women with silicone gel rupture within the scar tissue capsule detected via MRI after 2 years, 1 in 10 of these women had progression of the gel outside the scar tissue capsule.

Approximately half of the women whose ruptures had progressed from intracapsular to extracapsular reported that they experienced trauma to the affected breast during this time period or had undergone mammography. In the other half, no cause was given. In the women with extracapsular rupture, after 2 years, the amount of silicone seepage outside the scar tissue capsule increased for about 14% of the women. This means that for 100 women with silicone gel rupture outside the scar tissue capsule, the amount of gel outside the scar tissue capsule increased for 14 women 2 years later. This type of information pertains to a variety of silicone implants from a variety of manufacturers and implant models, and it is not specific to Mentor's implants.

Below is a summary of information related to the health consequences of implant rupture, which have not been fully established. These reports were in women who had implants from a variety of manufacturers and implant models.

- Local breast complications reported in the published literature that were associated with rupture include breast hardness, a change in breast shape or size, and breast pain. These symptoms are not specific to rupture, as they also are experienced by women who have capsular contracture.

- There have been rare reports of gel movement to nearby tissues such as the chest wall, armpit, or upper abdominal wall, and to more distant locations down the arm or into the groin. This has led to nerve damage, granuloma formation, and/or breakdown of tissues in direct contact with the gel in a few cases. There have been reports of silicone presence in the liver of patients with silicone breast implants. Movement of silicone gel materials to lymph nodes in the axilla also has been reported, even in women without evidence of rupture, leading to lymphadenopathy.

- Concerns have been raised over whether ruptured implants are associated with the development of connective tissue or rheumatic diseases and/or symptoms such as fatigue and fibromyalgia.[15,16,17,18] A number of epidemiology studies have evaluated large populations of women with breast implants from a variety of manufacturers and implant models.""[19,20,21,22,23,24] However, other than one small study, these studies do not distinguish whether the women had ruptured or intact implants. These studies do not, taken together, support an association of breast implants with a typical, diagnosed rheumatic disease.

E.    **Retrieval Study and Fatigue Testing**

As described in Section IX, Part D, above, the current retrieval study data showed that, through approximately 10 years, devices are not rupturing from pure cyclic fatigue (e.g., normal wear and tear). Rather, the data showed that the majority of device ruptures were surgically related and, thus, should be minimized by adequate physician training. Given, as discussed below, that failure from pure cyclic fatigue is not expected for several decades, the data show that there should not be an unexpected increase in failure rate through approximately 10 years due to design or materials defects.

Mentor used the raw data from their fatigue testing in a mathematical model that adjusted for the load/stress from walking, jogging, running, lying face down, and shell wrinkling.

The results from this model demonstrated that the devices can withstand lengthy cyclic loading for decades without failure due to inherent design or material flaws.

These data provide important information to help characterize the longer-term rupture rate of the Mentor product.  Furthermore, as a condition of approval, FDA is requiring Mentor to continue their preclinical studies to continue to evaluate the modes and causes of rupture.  These studies include, but are not limited to, long-term types of rupture, how localized stress occurs, the timing of instrument damage, and the correlation between surgical factors and device rupture.  Any pertinent information will be added to the labeling.  In addition, as another condition of approval, Mentor is required to limit access of their device to physicians who are trained on the implantation of their device.  This is required in order to better assure that rupture rates due to surgical implantation factors are reduced.  Depending on the findings of the postapproval modes and causes of rupture studies, FDA may require further physician training and/or device modifications.

## XII.   SUMMARY OF OTHER CLINICAL INFORMATION

The literature was also used to assess:
- connective tissue disease, signs, and symptoms
- cancer and benign breast disease
- neurological disease, signs and symptoms
- interference of device with mammographic detection of tumors or rupture
- ability to lactate
- offspring issues (safety of milk for breastfeeding and second generation effects)
- potential health consequences of gel bleed
- suicide risk.

The literature does not support a link between breast implants and any of the clinical concerns listed above.  Refer to the patient labeling for a summary of the key literature related to the bulleted topics above.

## XIII.   PANEL RECOMMENDATION

At an advisory meeting held on April 11-13, 2005, the General and Plastic Surgery Advisory Panel recommended, in a 7 to 2 vote, that Mentor's PMA for the Mentor MemoryGel™ Silicone Gel-Filled Breast Implants be approved subject to the following conditions:

- continuation of Core Study and update Panel in 5 years
  - amend Core Study to include patients who had their device(s) removed; re-consent them and add connective tissue disease signs and symptoms
  - add independent monitoring committee to Core Study

- continuation of Adjunct Study and update Panel in 5 years

- voluntary registry – suggested including MRI data (including MRI screening method and frequency), connective tissue disease data, children of mothers with breast implants, pregnancy data, and mammography data)

- educational component that is required for access to device (detailed, simulated implantation or hands-on to demonstrate proficiency; board-certified or board-eligible)

- informed decision process

- modified labeling:
  - specify MRI scan at year 5 and every 2 years, thereafter
  - recommend removal if silent rupture detected
  - add statement reminding patients not to neglect regular mammography screening

- all postmarket commitments cited by Mentor at the April 2005 Panel meeting (except those specifically discussed in more detail by Panel). Proposed commitments cited were: continuation of Core Study to 10 years with data provided annually; a patient registry; a focus group study to assess patient labeling; continued commitment to formal, signed informed consents; physician training; and continued commitment to physician and patient education

- mandatory tracking.

## XIV.  CDRH DECISION

CDRH concurred with the Panel recommendation of April 2005, and issued a letter to Mentor on July 28, 2005, advising that its PMA was approvable subject to Mentor addressing issues related to postapproval conditions and labeling. The issues identified by FDA included revising the indications for use to limit augmentation to women who were at least 22 years old, providing additional Adjunct Study information on potential health consequences from rupture, stratifying the revision data into revision-augmentation and revision-reconstruction indications, establishing the recommendation for the method and frequency of screening for silent rupture, modifying the physician labeling, modifying the patient labeling, developing a patient informed decision process, revising the Core postapproval study protocol, revising the physician training program, and addressing the registry issue. Mentor submitted a response to the approvable letter in August 2005, after which FDA continued to develop the postapproval plans and labeling with the sponsor.

As part of the development of the final conditions of approval for this PMA, FDA considered not only the Panel input, but also the available clinical data, issues that should be further evaluated, and our experience with postapproval studies for saline-filled breast implants.

FDA followed the April 2005 Panel's recommendation regarding:

- continuation of the Core Study; however, the study has been modified to require MRIs every 2 years on all patients and to collect data on patients who had their device(s) removed

- continued follow-up of currently-enrolled Adjunct Study patients through 5 years with no new enrollment

- focus group study of patient labeling
- informed decision process
- modified labeling [prior to approval, Mentor was required to modify their labeling: (1) to include a statement that MRI scans should be performed at 3 years and every 2 years, thereafter; (2) to recommend implant removal if silent rupture is detected; and (3) to remind patients about regular mammography screening]
- mandatory tracking
- a physician training program that includes a certification of participation prior to having access to their product
- FDA will update the Panel on the status of the conditions of approval at years 5 and 10, as well as any other time deemed necessary by FDA if significantly new information from the postapproval studies become available.

In addition, FDA addressed the remaining conditions of approval recommended by the April 2005 Panel as follows:

- in lieu of a voluntary registry, FDA is requiring a large postapproval study (see below for details)
- an independent monitoring committee was not considered necessary for completion of the Core Study.

FDA issued an approval order on November 17, 2006. The final conditions of approval cited in the approval order are described below.

1. Mentor must continue their Core Study until all patients have completed their 10-year evaluation in order to assess the long-term clinical performance of their product. Data are to be collected via annual physician follow-up evaluations. The primary changes to the protocol from premarket to postapproval are that all non-MRI patients will have a MRI at years 6, 8, and 10 and that all patients who were explanted without replacement will be evaluated through 10 years, as per the protocol. Mentor must also update their patient and physician labeling to reflect 5 and 10-year Core Study findings, as well as any other timepoint deemed necessary by FDA if significantly new information from this study becomes available.

2. Mentor must conduct the 10-year large postapproval study, as per the protocol that was submitted to FDA on September 26, 2006. This study, which will begin patient enrollment within 90 days of PMA approval, will be a separate study from the Core Study and will include 41,900 Mentor silicone gel patients and 1,000 saline-filled breast implant patients as the control group. The purpose of this study is to address specific issues for which the Core Study was not designed to fully answer, as well as to provide a real-world assessment of some endpoints. The endpoints include long-term local complications, connective tissue disease (CTD), CTD signs and symptoms, neurological disease, neurological signs and symptoms, offspring issues, reproductive issues, lactation issues, cancer, suicide, mammography issues, and MRI compliance and rupture results. Data are to be collected via annual patient questionnaires, either completed via the web, mail, or telephone. There will also be physician evaluations at years 1, 4-6, and 9-10 to collect local complication data.

Mentor must update their patient and physician labeling to reflect 5 and 10-year large postapproval study findings, as well as any other timepoint deemed necessary by FDA if significantly new information from this study becomes available.

On a quarterly basis, Mentor must submit a report to FDA that includes: (1) the number enrolled by implant group (silicone versus saline); (2) the number enrolled by indication (primary augmentation, revision-augmentation, primary reconstruction, revision-reconstruction) and implant group; (3) the number enrolled by race/ethnicity and implant group; (4) the enrollment rate compared to the stated goals; and (5) the follow-up rates compared to the stated goals. The quarterly reports must continue to be submitted until FDA determines that they are no longer necessary.

Every 6 months for the first 2 years and then annually, thereafter, Mentor must submit a progress report that includes: (1) the status of patient enrollment as it compares to the stated goals; (2) the status of the race/ethnicity distribution as it compares to the stated goals; (3) detailed patient and device accounting; (4) a summary of findings for all study endpoints; and (5) the reasons why eligible patients were not enrolled into the study.

3. Mentor must continue preclinical studies to characterize the long-term modes and causes of failure of explanted retrieved devices for the 10-year duration of the large postapproval study. In addition, Mentor must perform additional studies to address the following specific issues:

   - further evaluation of iatrogenic failures to address issues raised by the April 2005 Panel
   - the characterization of when surgical instrument damage occurs
   - further evaluation and characterization of failures due to localized shell stress
   - any correlation between surgical factors (e.g., incision size) and device rupture.

   Mentor must also update their patient and physician labeling to reflect any relevant findings.

4. Mentor must complete a focus group study of the augmentation and reconstruction patient labeling. This will involve an independent group obtaining responses from patients on the format and content of the approved labeling. Upon completion of the focus group study, Mentor must provide a supplement with a report of the focus group study findings and revised patient and physician labeling based on those findings.

5. As part of their formal informed decision process, Mentor must distribute their approved patient labeling. Both the physician and the patient are intended to sign designated sections in order to best assure that a patient has obtained the labeling in an adequate enough time prior to surgery to read it and has understood the risks and other information associated with the Mentor device. Mentor administer their approved survey to a random selection of 50 physicians on an annual basis to determine the success of this process and provide a summary of the survey findings

to FDA.  FDA will inform Mentor when a survey summary is no longer necessary. In addition, Mentor is to provide training on this process as part of their physician training program.

6. The Mentor Adjunct Study (P910037 and P910038) was designed to serve a public health need for reconstruction and revision patients.  Because the public health need does not exist upon approval of this PMA P030053, Mentor is required to:  (1) cease new patient enrollment into the Mentor Adjunct Study and (2) continue the follow-up of all currently-enrolled Mentor Adjunct Study patients through 5 years.  These data are to be reported as part of the PMA annual reports for P030053.

A separate mandatory tracking order was issued on November 17, 2006.

In addition, completion of their physician training program is required as a condition of access to their product.  FDA will, however, allow a 90-day transition period for all current Core Study and Adjunct Study investigators, after which these physicians must also have completed the training program in order to have access to the Mentor product.

The sponsor's manufacturing facility was inspected and was found to be in compliance with the Quality System Regulation (21 CFR 820).

## XV.  APPROVAL SPECIFICATIONS

Directions for use:  See the labeling.

Hazards to Health from Use of the Device:  See Indications, Contraindications, Warnings, Precautions, and Adverse Events in the labeling.

Postapproval Requirements and Restrictions:  See approval order.

## XVI.  REFERENCES

[1] Raposo do Amaral, C.M., et al., *Aesthetic Plastic Surgery*. 1993. 17, 335-338.
[2] Kala, S.V., et al., Low Molecular Weight Silicones are Widely Distributed after a Single Subcutaneous Injection in Mice. *A. J. Path.* 1998; 152, 645-649.
[3] Anderson, A.E. et al., *Toxicol Sci.* 2001; 60, 214-231.
[4] Luu, H.M. and Hutter, J.C. *Environ. Health Perspect.* 2001; 109, 1095-1101.  "Rebuttal and Critical Review of Andersen et al.'s D4 PBPK Model." *Environ. Health Perspect.* 2002; 110, p.A442.
[5] ISO 10993 – Part 1, "Biological evaluation of medical devices – Part 1:  Evaluation and testing," International Organization for Standardization (ISO).
[6] Flassbeck, D.B., et al. 2003.  Determination of siloxanes, silicon, and platinum in tissues of women with silicone gel-filled implants.   375(3):356-62 (for example, data from Patients B & C).
[7] Bondurant, S., V.L. Ernster and R. Herdman, Eds. 2000.  Safety of silicone breast implants. Committee on the Safety of Silicone Breast Implants, Division of Health Promotion and Disease Prevention, Institute of Medicine.  Washington, D.C.: National Academy Press.
[8] Katzin, W.E., et al. 2005.  Pathology of lymph nodes from patients with breast implants: a histologic and spectroscopic evaluation.  Am J Surg Pathol.29(4):506-11.

[9] Stein, J., et al. 1999. In situ determination of the active catalyst in hydrosilylation reactions using highly reactive Pt(0) catalyst precursors. J. Am. Chem. Soc. 121(15):3693-703.

[10] Chandra, G., et al. 1987. A convenient and novel route to bis(alkyne)platinum(0) and other platinum(0) complexes from Speier's hydrosilylation catalyst. Organometallics. 6:191-2.

[11] Lappert, M.F. and Scott, F.P.A. 1995. The reaction pathway from Speier's to Karstedt's hydrosilylation catalyst. J. Organomet. Chem. 492(2):C11-C13.

[12] Lewis, L.N., et al. 1995. Mechanism of formation of platinum(0) complexes containing silicon-vinyl ligands. Organometallics. 14:2202-13.

[13] Hölmich, L.R., et al. 2001. Prevalence of silicone breast implant rupture among Danish women. Plast. Reconstr. Surg. 108(4):848-858.

[14] Hölmich, L.R., et al. 2004. Untreated silicone breast implant rupture. Plast. Reconstr. Surg. 114:204-214.

[15] Berner, I., M., et al. 2002. Comparative examination of complaints of patients with breast-cancer with and without silicone implants. Eur. J Obstet. Gynecol. Reprod. Biol. 102:61-66.

[16] Brown, S.L., et al. 2001. Silicone gel breast implant rupture, extracapsular silicone, and health status in a population of women. J. Rheumatol. 28:996-1003.

[17] Hölmich, L.R., et al. 2003. Self-reported diseases and symptoms by rupture status among unselected Danish women with cosmetic silicone breast implants. Plast. Reconstr. Surg. 111:723-732.

[18] Wolfe, F. and J. Anderson. 1999. Silicone filled breast implants and the risk of fibromyalgia and rheumatoid arthritis. J. Rheumatol. 26:2025-2028.

[19] Brinton, L.A., et al. 2004. Risk of connective tissue disorders among breast implant patients. Am. J. Epidemiol. 160(7):619-27.

[20] Janowsky, E.C., et al. 2000. Meta-Analyses of the Relation Between Silicone Breast Implants and the Risk of Connective-Tissue Diseases. N. Engl. J. Med. 342(11):781-90.

[21] Lipworth, L.R.E., et al. 2004. Silicone breast implants and connective tissue disease: An updated review of the epidemiologic evidence. Ann. Plast. Surg. 52:598-601.

[22] Tugwell, P., et al. 2001. Do silicone breast implants cause rheumatologic disorders? A systematic review for a court-appointed national science panel. Arthritis Rheum. (11):2477-84.

[23] Weisman, M.H., et al. 1988. Connective-tissue disease following breast augmentation: A preliminary test of the human adjuvant tissue hypothesis. Plast. Reconstr. Surg. 82(4):626-30.

[24] Williams, H.J., et al. 1997. Breast implants in patients with differentiated and undifferentiated connective tissue disease. Arthritis and Rheumatism 40(3):437-40.

# EXHIBIT D

update on AHRQ's current research, programs, and initiatives. The Chair will officially welcome new members to the Council. The official agenda will be available on AHRQ's Web site at *www.ahrq.gov* no later than April 9, 2007.

Dated: March 26, 2007.

**Carolyn M. Clancy,**
*Director.*

[FR Doc. 07–1642 Filed 3–29–07; 5:05 pm]

**BILLING CODE 4160-90-M**

---

**DEPARTMENT OF HEALTH AND HUMAN SERVICES**

**Centers for Disease Control and Prevention**

**[60Day-07–06AC]**

**Proposed Data Collections Submitted for Public Comment and Recommendations**

In compliance with the requirement of Section 3506(c)(2)(A) of the Paperwork Reduction Act of 1995 for opportunity for public comment on proposed data collection projects, the Centers for Disease Control and Prevention (CDC) will publish periodic summaries of proposed projects. To request more information on the proposed projects or to obtain a copy of the data collection plans and instruments, call 404–639–5960 and

send comments to Joan F. Karr, CDC Acting Reports Clearance Officer, 1600 Clifton Road, MS–D74, Atlanta, GA 30333 or send an e-mail to *omb@cdc.gov*.

Comments are invited on: (a) Whether the proposed collection of information is necessary for the proper performance of the functions of the agency, including whether the information shall have practical utility; (b) the accuracy of the agency's estimate of the burden of the proposed collection of information; (c) ways to enhance the quality, utility, and clarity of the information to be collected; and (d) ways to minimize the burden of the collection of information on respondents, including through the use of automated collection techniques or other forms of information technology. Written comments should be received within 60 days of this notice.

**Proposed Project**

Low Back Exposure Assessment Tool for Mining—NEW—National Institute for Occupational Safety and Health (NIOSH), Centers for Disease Control and Prevention (CDC).

*Background and Brief Description*

The Federal Mine Safety & Health Act of 1977, Section 501, enables CDC/ NIOSH to carry out research relevant to the health and safety of workers in the mining industry. Mining has one of the

highest incidence rates for back pain of any industry, and back injuries are consistently the leading cause of lost work days in the industry. The objective of this project is to develop a self-administered, paper and pencil risk assessment tool for the development of low back disorders specifically directed towards use in the mining industry. Many current methods of assessing the risk of low back disorders do not address stressors that are relatively unique to the mining environment, including the restricted vertical spaces in many coal mines that require workers to adopt stooping or kneeling postures for extended periods of their workday.

The low back exposure assessment tool for mining will assess various occupational exposures associated with development of back disorders in the literature (postural demands, lifting, whole body vibration exposure, individual and psychosocial values), as well as specific mining stressors and will develop a score that will be used to assess the degree of risk for the job and the individual. The tool will be useful in both prioritizing jobs that need interventions to reduce low back disorder risk, and in evaluating the effectiveness of interventions through tool administration before and after the implementation of an intervention. There will be no cost to the respondents other than their time.

*Estimated Annualized Burden Hours:*

| Respondents | Number of respondents | Number of responses per respondent | Average burden per response (in hours) | Total burden hours |
|---|---|---|---|---|
| Surface and Underground Miners ............................................................. | 320 miners ....... | 1 | 15/60 | 80 |

Dated: March 27, 2007.

**Joan F. Karr,**
*Acting Reports Clearance Officer, Centers for Disease Control and Prevention.*

[FR Doc. E7–6139 Filed 4–2–07; 8:45 am]

**BILLING CODE 4163-18-P**

---

**DEPARTMENT OF HEALTH AND HUMAN SERVICES**

**Food and Drug Administration**

**[Docket Nos. 2006M–0411, 2006M–0512, 2006M–0412, 2006M–0396, 2006M–0460, 2006M–0456, 2006M–0459, 2006M–0455, 2006M–0457, 2006M–0473, 2006M–0490, 2006M–0492, 2006M–0529, 2006M–0530 and 2006M–0531]**

**Medical Devices; Availability of Safety and Effectiveness Summaries for Premarket Approval Applications**

**AGENCY:** Food and Drug Administration, HHS.

**ACTION:** Notice.

**SUMMARY:** The Food and Drug Administration (FDA) is publishing a list of premarket approval applications (PMAs) that have been approved. This list is intended to inform the public of

the availability of safety and effectiveness summaries of approved PMAs through the Internet and the agency's Division of Dockets Management.

**ADDRESSES:** Submit written requests for copies of summaries of safety and effectiveness to the Division of Dockets Management (HFA–305), Food and Drug Administration, 5630 Fishers Lane, rm. 1061, Rockville, MD 20852. Please cite the appropriate docket number as listed in table 1 of this document when submitting a written request. See the **SUPPLEMENTARY INFORMATION** section for electronic access to the summaries of safety and effectiveness.

**FOR FURTHER INFORMATION CONTACT:** Thinh Nguyen, Center for Devices and Radiological Health (HFZ–402), Food and Drug Administration, 9200

15886          Federal Register / Vol. 72, No. 63 / Tuesday, April 3, 2007 / Notices

Corporate Blvd., Rockville, MD 20850, 301–594–2186, ext. 152.

**SUPPLEMENTARY INFORMATION:**

**I. Background**

In the Federal Register of January 30, 1998 (63 FR 4571), FDA published a final rule that revised 21 CFR 814.44(d) and 814.45(d) to discontinue individual publication of PMA approvals and denials in the Federal Register. Instead, the agency now posts this information on the Internet on FDA's Web site at *http://www.fda.gov*. FDA believes that this procedure expedites public notification of these actions because announcements can be placed on the Internet more quickly than they can be published in the Federal Register, and FDA believes that the Internet is accessible to more people than the Federal Register.

In accordance with section 515(d)(4) and (e)(2) of the Federal Food, Drug, and Cosmetic Act (the act) (21 U.S.C. 360e(d)(4) and (e)(2)), notification of an order approving, denying, or withdrawing approval of a PMA will continue to include a notice of opportunity to request review of the order under section 515(g) of the act. The 30-day period for requesting reconsideration of an FDA action under § 10.33(b) (21 CFR 10.33(b)) for notices announcing approval of a PMA begins on the day the notice is placed on the Internet. Section 10.33(b) provides that FDA may, for good cause, extend this 30-day period. Reconsideration of a denial or withdrawal of approval of a PMA may be sought only by the applicant; in these cases, the 30-day period will begin when the applicant is notified by FDA in writing of its decision.

The regulations provide that FDA publish a quarterly list of available safety and effectiveness summaries of PMA approvals and denials that were announced during that quarter. The following is a list of approved PMAs for which summaries of safety and effectiveness were placed on the Internet from October 1, 2006, through December 31, 2006. There were no denial actions during this period. The list provides the manufacturer's name, the product's generic name or the trade name, and the approval date.

TABLE 1.—LIST OF SAFETY AND EFFECTIVENESS SUMMARIES FOR APPROVED PMAs MADE AVAILABLE FROM OCTOBER 1, 2006, THROUGH DECEMBER 31, 2006.

| PMA No./Docket No. | Applicant | Trade Name | Approval Date |
|---|---|---|---|
| P040027/2006M–0411 | W.L. Gore & Associates | GORE VIATORR TIPS | December 6, 2004 |
| P040023/2006M–0512 | DePuy Orthopedics, Inc. | DURALOC OPTION CERAMIC HIP SYSTEM | May 3, 2005 |
| P030047/2006M–0412 | Cordis Corp. | CORDIS PRECISE NITINOL STENT | September 22, 2006 |
| P050038/2006M–0396 | Medafor, Inc. | ARISTA AH ABSORBABLE HEMOSTATIC, NON-COLLAGEN BASED | September 26, 2006 |
| P970053(S9)/2006M–0460 | Nidek, Inc. | NIDEK EC–5000 EXCIMER LASER | October 11, 2006 |
| P050022/2006M–0456 | Siemens Medical Solutions USA, Inc. | SYNGO LUNG COMPUTER ASSISTED DETECTION (CAD) SYSTEM | October 18, 2006 |
| P050025/2006M–0459 | Endotex Interventional Systems, Inc. | ENDOTEX NEXSTENT CAROTID STENT & DELIVERY SYSTERM; AND ENDOTEX NEXSTENT CAROTID STENT & MONORAIL DELIVERY SYSTERM | October 27, 2006 |
| P020012/2006M–0455 | Artes Medical USA, Inc. | ARTEFILL | October 27, 2006 |
| P040050/2006M–0457 | Uroplasty, Inc. | MACROPLASTIQUE IMPLANTS | October 30, 2006 |
| P050031/2006M–0473 | Paragon Vision Sciences | PARAGON Z CRT | November 16, 2006 |
| P020056/2006M–0490 | Allergan | INAMED SILICONE-FILLED BREAST IMPLANTS | November 17, 2006 |
| P030053/2006M–0492 | Mentor Corp. | MENTOR MEMORYGEL SILICONE GEL-FILLED BREAST IMPLANTS | November 17, 2006 |
| P060010/2006M–0529 | AbbeyMoor Medical, Inc. | THE SPANNER TEMPORARY PROSTATIC STENT | December 14, 2006 |
| P040025/2006M–0530 | Olympic Medical | OLYMPIC COOL-CAP | December 20, 2006 |
| P050033/2006M–0531 | Anika Therapeutics, Inc. | COSMETIC TISSUE AUGMENTATION PRODUCT | December 20, 2006 |

**II. Electronic Access**

Persons with access to the Internet may obtain the documents at *http://www.fda.gov/cdrh/pmapage.html*.

Dated: March 22, 2007.
**Linda S. Kahan,**
*Deputy Director, Center for Devices and Radiological Health.*
[FR Doc. E7–6166 Filed 4–2–07; 8:45 am]
**BILLING CODE 4160–01–S**

**DEPARTMENT OF HEALTH AND HUMAN SERVICES**

**Food and Drug Administration**

**Oncologic Drugs Advisory Committee; Notice of Meeting**

**AGENCY:** Food and Drug Administration, HHS.

# EXHIBIT E

Mize v. Mentor Worldwide LLC, 2018 WL 1364257 (2018)

2018 WL 1364257 (Cal.Super.) (Trial Order)
Superior Court of California.
Dept. 309
Los Angeles County

Rexina MIZE et al,
v.
MENTOR WORLDWIDE LLC et al.

No. BC649083.
March 13, 2018.

**Trial Order**

Carolyn B. Kuhl, Judge.

**NATURE OF PROCEEDINGS:**

**\*1** RULING ON SUBMITTED MATTER OF MARCH 12, 2018;

The Court, having taken the Demurrer of Defendant, Mentor Worldwide LCC, to Plaintiffs' Second Amended Complaint under submission on March 12, 2018, now issues the following ruling:
DEFENDANT MENTOR WORLDWIDE LLC'S DEMURRER TO THE SECOND AMENDED COMPLAINT

COURT'S RULING: Defendant's request that the court take judicial notice of an excerpt from the Federal Register and two FDA documents available on the FDA website is granted. Defendant's "Notice of Supplemental Authority" is stricken. The demurrer is sustained with 21 days leave to amend.

Defendant Mentor demurs on grounds of preemption and also argues that events occurring after Plaintiff Mize had breast augmentation surgery using its Mentor MemoryGel silicone breast implants could not have been a cause of her injury as alleged in this case.

Before turning to the preemption analysis, it is important to focus on the causation issue. Plaintiff Mize had her surgery in September 2000. Prior to her surgery, the FDA had approved Mentor's Core Study for its silicone gel-filled breast implants for a limited number of breast augmentation, reconstruction and revision surgeries.

Plaintiff alleges that Mentor failed to report adverse events from studies commissioned as part of the product's Premarket Approval Application (PMA) (which was approved in November 2006), failed to update the product's labeling using the Changes Being Effected (CBE) regulation, and failed to manufacture the device in accordance with current good manufacturing practices (cGMPs) of the FDA.

Insofar as the alleged failings of Mentor occurred subsequent to the surgery which placed Defendant's device in Plaintiff's body in 2000, there is no nexus to the injury allegedly suffered by Plaintiff. No study subsequent to September 2000 could have informed Plaintiff in deciding to have the surgery. No failure to update labeling subsequent to September 2000 could have affected the doctor's duty to inform Plaintiff of potential risks of the surgery prior to performing the surgery. No failure in manufacturing that did not affect the device placed in Plaintiff's body could cause her injury. (See Rosburg v. Minn. Mining & Mfg. Co. (1986) 181 Cal.App.3d 726, 734-35 ("Plaintiff does not explain how a warning in 1978 or 1979 would have prevented an injury to her when the implant had already been place in her body in 1976. It would have been too late for the physician to decide not to use the product and no post-implant method of averting deflation [of the device implanted in

Ex. D - 111

Mize v. Mentor Worldwide LLC, 2018 WL 1364257 (2018)

plaintiff's breasts] is suggested. There is no requirement that a manufacturer must give a warning which could not possibly be effective in lessening the plaintiff's risk of harm.")) Plaintiff does not allege that Mentor had a duty under the Food, Drug, and Cosmetic Act or FDA regulations to recall the device or to give a warning to persons who already had the device in their bodies.

Plaintiff alleges that if she had been adequately warned of the risks of the implants she would not have agreed to implantation of the Mentor MemoryGel Silicone Gel Breast Implants. (Second Amended Complaint paragraph 175.) But she does not allege that any actions taken by Mentor after the implantation surgery caused her harm. At oral argument Plaintiff's counsel asserted that if Mentor had reported adverse incidents after Ms. Mize had the breast implant surgery she would have taken particular steps to lessen her pain or injury. But such allegations are absent from the Second Amended Complaint. If such allegations are added by way of a subsequent amendment to the complaint, Plaintiff also must rely only on acts by Mentor that violated FDA requirements in order to avoid preemption.

*2 Plaintiff alleges that Mentor failed to adequately inspect, test and validate the materials and components of the Mentor MemoryGel Silicone Gel Breast Implants, and that Mentor failed to adequately inspect, test and validate the implants after completion of assembly before delivery for implantation into Plaintiff. (Id. paragraphs 203-204.) Plaintiff also alleges that the implants were defective at the time of sale and that Plaintiff was implanted with a device that was manufactured from nonconforming materials and uncertified components. (Id. paragraphs 225-226.) However, Plaintiff does not allege the respect(s) in which Mentor's inspection, testing and validation of the product or the product itself as implanted in Plaintiff violated FDA requirements. "[T]o survive both express and implied preemption, a state law cause of action 'must be premised on conduct that both (1) violates the FDCA and (2) would give rise to a recovery under state law even in the absence of the FDCA.'" (Coleman v. Medtronic, Inc. (2014) 223 Cal.App.4th 413, 427 (citation omitted).) Plaintiff must allege facts that constitute a violation of the Food Drug and Cosmetic Act in addition to alleging how that violation caused injury to Plaintiff. The current operative complaint does not do so.

Defendant asserts that the court should not grant further leave to amend. However, this court has not been adequately educated by the parties of the prior rulings of the federal district court and how they should have shaped the drafting of the Second Amended Complaint such that the Plaintiff should not be excused from failing to meet the requirements of an adequate pleading. Indeed, the parties have not even created an adequate record in this court by requesting judicial notice of the Second Amended Complaint as filed in the federal proceeding. As explained to the parties at oral argument, this court does not have access to the federal court Pacer system. Leave to amend is granted and Plaintiff shall file an amended complaint within 21 days of today's date.

The court strikes the document entitled "Notice of Supplemental Authority" filed on March 6, 2018 because it does not merely cite or provide supplemental authority but also included supplemental argument on the Demurrer. Defendant Mentor did not seek leave to provide additional argument.

A Further Status Conference is set on July 11, 2018, at 10:00 a.m. in Department 12, Los Angeles Superior Court at United States Courthouse, 312 N. Spring St., Los Angeles, California 90012.

The parties shall file a joint status report five days prior to the Conference.

The Clerk shall give notice by posting of this Minute Order on www.CaseAnywhere.com.

## CERTIFICATE OF ELECTRONIC SERVICE CODE OF CIVIL PROCEDURE 1010.6

I, the below named Executive Officer/Clerk of the above entitled court, do hereby certify that I am not a party to the cause herein, and that on this date _____ served one copy of the 03/13/18 Minute Order entered herein, on 03/13/18, upon each party or counsel of record in the above entitled action, by electronically serving the document on Case Anywhere at www.CaseAnywhere.com on 03/13/18 from my place of business, Central Civil West Courthouse, 600 South Commonwealth Avenue, Los Angeles, California 90005 in accordance, with standard court practices.

Ex. D - 112

Mize v. Mentor Worldwide LLC, 2018 WL 1364257 (2018)

Dated: March 13, 218

Sherri R. Carter, Executive Officer/Clerk

By: <<signature>>, Deputy Clerk

J. Manrique

---

**End of Document**                                          © 2019 Thomson Reuters. No claim to original U.S. Government Works.

# EXHIBIT F

2018 WL 5085716 (Cal.Super.) (Trial Order)
Superior Court of California.
Los Angeles County

Rexina MIZE et al,
v.
MENTOR WORLDWIDE LLC et al.

Nos. BC649083, BC711663.
October 1, 2018.

**Trial Order**

Carolyn B. Kuhl, Judge.

**\*1 DEPT.** SS12

L. M'GREENE

DEPUTY CLERK

ELECTRONIC RECORDING MONITOR

**NATURE OF PROCEEDINGS:**

**RULING ON SUBMITTED MATTER**

Defendant Mentor Worldwide LLC's Demurrer to the Third Amended Complaint previously taken under submission on 9/21/18, the Court rules as follows:

Court's Ruling: The Demurrer is sustained without leave to amend.

The issue is whether Plaintiff Mize's Third Amended Complaint addresses the defects that this court held required it to sustain Mentor's Demurrer to the Second Amended Complaint. On review of the Third Amended Complaint, and comparison to the allegations of the Second Amended Complaint, Plaintiff has failed to avoid the defects previously identified in the court's ruling of March 12, 2018. Therefore the demurrer is sustained without leave to amend. Because the Plaintiff has had multiple opportunities to amend and there appears to be no asserted basis on which a subsequent amended complaint could overcome the fatal shortcomings of the current Third Amended Complaint, the court sustains the demurrer without leave to amend.

Plaintiff's Claims Based on Manufacturing Defect

As noted in the court's ruling on Mentor's Demurrer to the Second Amended Complaint, Plaintiff had her surgery in September 2000. Therefore, no defect in manufacturing subsequent to that date could have affected the device that was placed in her body. Plaintiff's Third Amended Complaint alleges the specifics of deficient and faulty manufacturing practices that preceded the filing of an action brought by the United States against Mentor in 1998, resulting in a Consent Decree of Permanent Injunction against Mentor filed in May 1998. The court takes judicial notice of this Consent Decree (Exhibit 7 to

Mize v. Mentor Worldwide LLC, 2018 WL 5085716 (2018)
_____

Defendant's Request for Judicial Notice). The Consent Decree required validation and subsequent inspection and testing of Mentor's manufacturing processes for silicone gel-filled breast implants. The Federal District Court for the Northern District of Texas retained jurisdiction to modify or grant additional relief. The Consent Decree provides that "[i]f defendants maintain a state of continuous compliance with the terms of this Decree for a period of sixty months from the date defendants satisfy all the requirements of … this Decree, should defendants petition the Court to dissolve this Decree, the government will not oppose." This court also takes judicial notice of the fact that the Federal District Court dissolved the consent decree on motion by Mentor in August 2003 (Exhibit 9 to Defendant's Request for Judicial Notice).

The specific allegations of manufacturing defects cited in the Third Amended Complaint at paragraphs 53-56 are allegations that supported the claims of the United States in obtaining the 1998 Consent Decree. While the pleadings of which this court takes judicial notice pertaining to the litigation in the Northern District of Texas are not evidence that Mentor did not defectively manufacture silicone breast implants after 1998, the pleadings are evidence of a promised change of practices under government supervision beginning in 1998. Plaintiff does not allege that her breast implant was manufactured in or prior to 1998 even though Plaintiff alleges that she has the lot number of the device that was implanted in her in 2000. Furthermore, insofar as the device was manufactured after the 1998 Consent Decree, the Plaintiff alleges no facts (on the basis of information or belief or otherwise) as to why the device was defectively manufactured, what FDA requirement was violated or how the Consent Decree was violated.

**\*2** The Third Amended Complaint details the requirement that Mentor submit to the FDA detailed information to obtain an Informational Device Exemption (IDE), but the Third Amended Complaint does not allege in what respect Mentor failed to comply with the IDE prior to Plaintiff's surgery or how such failure affected the manufacture of the device implanted in her. Moreover, a claim premised on failure to comply with the IDE would be impliedly preempted under Buckman Co. v. Plaintiffs' Legal Comm. (2001) 531 U.S. 341, because such claim would hinge entirely on conduct that allegedly violated federal law. (See Coleman v. Medtronic, Inc. (2014) 223 Cal.App.4th 413, 427.)

Under California procedural law, the requirements for specificity in pleading facts supporting a claim (other than fraud) are very low. However, where facts of which a court must take judicial notice appear to constrain or contradict a pleading, a plaintiff must explain how the complaint may succeed in the face of such facts. Plaintiff's complaint here fails to do so. Plaintiff fails to assert that the device implanted in Plaintiff was subject to manufacturing defects that preceded 1998 as detailed in the allegations (on which Plaintiff relies) supporting the Northern District of California litigation, or to explain what defect occurring or persisting after the FDA intervention evidenced by the Consent Decree affected the device that was placed in her body.

Plaintiff's Claims Based on Failure to Warn

As explained in this court's ruling sustaining the Demurrer to the Second Amended Complaint, no warning based on events occurring subsequent to the surgery which placed Mentor's device in Plaintiff's body in 2000 could have caused her to refrain from deciding to have that surgery. Plaintiff now has alleged, however, that if Mentor had reported additional adverse incidents subsequent to 2000, and if the FDA had the made such incidents public, and if Plaintiff's doctors had been aware of such reports, Plaintiff's doctors might have provided an earlier diagnosis leading to earlier surgery to remove the implants and Plaintiff's damages from the implanted devices might have been lessened

The problem with this causal chain, however, is that it is premised on Mentor's failure to report adverse incidents that were not detected because of how Mentor conducted the studies rather than on a failure to report adverse incidents that actually occurred. (See Third Amended Complaint paragraphs 78-95.) Because Plaintiff has failed to allege facts showing that Mentor failed to report actual adverse events that in fact occurred, the failure to warn (failure to report adverse events) claim is preempted because Plaintiff has failed to allege how Mentor's actions in conducting these studies violated federal law. In this regard, the court adopts the reasoning of Ebrahimi v. Mentor Worldwide LLC (C.C.Cal. Sept. 15, 2017, No. CV 16-7316-DMG) 2017 U.S.Dist.LEXIS 153840 (Gee, J.).

Claim for Loss of Consortium

Because Plaintiff Mize's claims have failed, the claims of her husband for loss of consortium also fails.

_____

Ex. D - 116

Mize v. Mentor Worldwide LLC, 2018 WL 5085716 (2018)

The Court sets a Further Status Conference on December 4, 2018 at 11:00 a.m. in Department 12.

The Clerk will provide notice via Case Anywhere.

---

**End of Document**

© 2019 Thomson Reuters. No claim to original U.S. Government Works.

## **PROOF OF SERVICE**

STATE OF CALIFORNIA, COUNTY OF SANTA BARBARA

I am employed in the County of Santa Barbara, State of California.  I am over the age of eighteen (18) and not a party to the within action.  My business address is 200 East Carrillo Street, Fourth Floor, Santa Barbara, California 93101.

On May 1, 2019, I served the foregoing document described as **REQUEST FOR JUDICIAL NOTICE IN SUPPORT OF DEMURRER OF NUSIL TECHNOLOGY LLC AND NUSIL LLC TO PLAINTIFF'S COMPLAINT** on all interested parties in this action by the original and/or true copy thereof enclosed in sealed envelopes, addressed as follows:

See attached Service List

☒   BY MAIL:  I placed the original and/or true copy in a sealed envelope addressed as indicated herein.  I am readily familiar with the firm's practice of collection and processing documents for mailing.  It is deposited with the U.S. postal service on that same day in the ordinary course of business.  I am aware that on motion of the party served, service is presumed invalid if the postal cancellation date or postage meter date is more than one day after the date of deposit for mailing in affidavit.

☐   BY PERSONAL DELIVERY:  I personally delivered the original and/or true copy in a sealed envelope addressed as indicated herein.

☐   BY OVERNIGHT DELIVERY:  I placed the original and/or true copy in a sealed, fully prepaid FedEx, Next Day Air envelope addressed as indicated herein, which is picked up by FedEx on that same day in the ordinary course of business.

☐   BY FACSIMILE:  Based on an agreement of the parties to accept service by fax transmission, I faxed the referenced document(s) from fax number (805) 967-3978 at [*insert time*] to the person(s) indicated herein at the fax number(s) indicated herein.  No error was reported by the fax machine that I used.  A copy of the record of the fax transmission, which I printed out, is attached.

☐   BY E-MAIL:  I caused to be e-mailed a true copy to the e-mail addresses listed herein.

☒   (*STATE*)  I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

☐   (*FEDERAL*)  I hereby certify that I am employed in the office of a member of the Bar of this Court at whose direction the service was made.

Executed on May 1, 2019, at Santa Barbara, California.

Signature
Elizabeth Wright

## SERVICE LIST

**Brittany Billetts, et al. v. Mentor Worldwide, LLC, et al.**
**Santa Bernardino County Superior Court Case No. CIVDS1905706**

| | |
|---|---|
| Jennifer A. Lenze<br>Amanda D. McGee<br>LENZE LAWYERS, PLC<br>1300 Highland Avenue, Suite 207<br>Manhattan Beach, CA 90266<br>jlenze@lenzelawyers.com<br>McGee@lenzelawyers.com | Plaintiffs |
| Lowell W. Finson<br>FINSON LAW FIRM<br>126 Westwind Mall<br>Marina del Rey, CA 90292<br>Lowell@finsonlawfirm.com | Plaintiffs |
| Monee Takla Hanna<br>Tucker Ellis LLP<br>515 S. Flower Street, 42nd Floor<br>Los Angeles, CA  90071-2223<br>Monee.hanna@tuckerellis.com | Mentor Worldwide, LLC |

# CIV-190501-CIV-DS1905706-DOMC-150902



## Scanned Document Coversheet

System Code:   CIV

Case Number:   DS1905706

Case Type:   CIV

Action Code:   DOMC

Action Date:   05/01/19

Action Time:   3:09

Action Seq:   0002

Printed by:   SNEUB

> THIS COVERSHEET IS FOR COURT PURPOSES ONLY, AND THIS IS NOT A PART OF THE OFFICIAL RECORD. YOU WILL NOT BE CHARGED FOR THIS PAGE

# Declaration of good Faith Attempt to Meet & Confer



NEW FILE

Ex. D - 120

CIV-140

| ATTORNEY OR PARTY WITHOUT ATTORNEY: | STATE BAR NO: 135290 | FOR COURT USE ONLY |
|---|---|---|

NAME: Melissa J. Fassett
FIRM NAME: Price, Postel & Parma LLP
STREET ADDRESS: 200 East Carrillo Street, Fourth Floor
CITY: Santa Barbara          STATE: CA     ZIP CODE: 93101
TELEPHONE NO: 805-962-0011     FAX NO.: 805-965-3978
E-MAIL ADDRESS: mjf@pppplaw.com
ATTORNEY FOR (Name): NuSil LLC, NuSil Technology LLC

**SUPERIOR COURT OF CALIFORNIA, COUNTY OF SAN BERNARDINO**
STREET ADDRESS: 247 West Third Street
MAILING ADDRESS:
CITY AND ZIP CODE:  San Bernardino, CA 92415-0210
BRANCH NAME: Civil Division

F I L E D
SUPERIOR COURT OF CALIFORNIA
COUNTY OF SAN BERNARDINO
SAN BERNARDINO DISTRICT

MAY 0 1 2019

BY _____
SAMANTHA NEUBAUER, DEPUTY

Plaintiff/Petitioner:   Brittany Billetts, Vivian Aguiar, Ann Delmonico, Cornelia Ditto et al
Defendant/Respondent:   NuSil Technology LLC, a Delaware limited liability company

| DECLARATION OF DEMURRING OR MOVING PARTY REGARDING MEET AND CONFER | CASE NUMBER: CIVDS1905706 |
|---|---|

*To the party filing a demurrer, motion to strike, or motion for judgment on the pleadings: This form must be filed with the demurrer, motion to strike, or motion for judgment on the pleadings.*

1. *(Name of party making declaration)*: NuSil LLC, NuSil Technology LLC          was served with

   [x] a complaint    [ ] an amended complaint    [ ] a cross-complaint

   [ ] an answer    [ ] other   *(specify)*:

   in the above-titled action and is filing a    [x] demurrer    [ ] motion to strike    [ ] motion for judgment on the pleadings

**DECLARATION** *(Choose either a. or b.)*

2. a. [x]   At least five days before the date a responsive pleading was due to be filed (if I am filing a demurrer or motion to strike) or at least five days before filing a motion for judgment on the pleadings (if I am filing a motion for judgment on the pleadings), I met and conferred with the party who filed the pleading   [x] by telephone   [ ] in person   and we did not reach an agreement resolving the matters raised by the demurrer, motion to strike, or motion for judgment on the pleadings.

   b. [ ]   The party who filed the pleading subject to demurrer, motion to strike, or motion for judgment on the pleadings failed to respond to my request to meet and confer or otherwise failed to meet and confer in good faith.

   *To provide additional information, please use form MC-031, Attached Declaration.*

I declare under penalty of perjury under the laws of the State of California that the information above is true and correct.

Date: May 1, 2019

Melissa J. Fassett
_____
(NAME OF PARTY OR ATTORNEY FOR PARTY)

_____
(SIGNATURE OF PARTY OR ATTORNEY FOR PARTY)

Page 1 of 1

Form Approved for Optional Use
Judicial Council of California
CIV-140 [Rev. January 1, 2019]

**DECLARATION OF DEMURRING OR MOVING PARTY
REGARDING MEET AND CONFER**

Code of Civil Procedure,
§§ 430.41, 435.5, 439
www.courts.ca.gov

Ex. D - 121

**PROOF OF SERVICE**

STATE OF CALIFORNIA, COUNTY OF SANTA BARBARA

      I am employed in the County of Santa Barbara, State of California.  I am over the age of eighteen (18) and not a party to the within action.  My business address is 200 East Carrillo Street, Fourth Floor, Santa Barbara, California 93101.

      On May 1, 2019, I served the foregoing document described as **DECLARATION OF DEMURRING OR MOVING PARTY REGARDING MEET AND CONFER** on all interested parties in this action by the original and/or true copy thereof enclosed in sealed envelopes, addressed as follows:

**See Attached Service List**

☒    BY MAIL:  I placed the original and/or true copy in a sealed envelope addressed as indicated herein.  I am readily familiar with the firm's practice of collection and processing documents for mailing.  It is deposited with the U.S. postal service on that same day in the ordinary course of business.  I am aware that on motion of the party served, service is presumed invalid if the postal cancellation date or postage meter date is more than one day after the date of deposit for mailing in affidavit.

☐    BY PERSONAL DELIVERY:  I personally delivered the original and/or true copy in a sealed envelope addressed as indicated herein.

☐    BY OVERNIGHT DELIVERY:  I placed the original and/or true copy in a sealed, fully prepaid FedEx, Next Day Air envelope addressed as indicated herein, which is picked up by FedEx on that same day in the ordinary course of business.

☐    BY FACSIMILE:  Based on an agreement of the parties to accept service by fax transmission, I faxed the referenced document(s) from fax number (805) 967-3978 at [*insert time*] to the person(s) indicated herein at the fax number(s) indicated herein.  No error was reported by the fax machine that I used.  A copy of the record of the fax transmission, which I printed out, is attached.

☐    BY E-MAIL:  I caused to be e-mailed a true copy to the e-mail addresses listed herein.

☒    (***STATE***)  I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

☐    (***FEDERAL)***  I hereby certify that I am employed in the office of a member of the Bar of this Court at whose direction the service was made.


      Executed on May 1, 2019, at Santa Barbara, California.


                                   _____
                                   Signature
                                   Elizabeth Wright

## SERVICE LIST

**Brittany Billetts, et al. v. Mentor Worldwide, LLC, et al.
Santa Bernardino County Superior Court Case No. CIVDS1905706**

| | |
|---|---|
| Jennifer A. Lenze<br>Amanda D. McGee<br>LENZE LAWYERS, PLC<br>1300 Highland Avenue, Suite 207<br>Manhattan Beach, CA 90266<br>jlenze@lenzelawyers.com<br>McGee@lenzelawyers.com | Plaintiffs |
| Lowell W. Finson<br>FINSON LAW FIRM<br>126 Westwind Mall<br>Marina del Rey, CA 90292<br>Lowell@finsonlawfirm.com | Plaintiffs |
| Monee Takla Hanna<br>Tucker Ellis LLP<br>515 S. Flower Street, 42nd Floor<br>Los Angeles, CA  90071-2223<br>Monee.hanna@tuckerellis.com | Mentor Worldwide, LLC |

CIV-140

| ATTORNEY OR PARTY WITHOUT ATTORNEY: | STATE BAR NO: 135290 | FOR COURT USE ONLY |
|---|---|---|
| NAME: Melissa J. Fassett | | |

FIRM NAME: Price, Postel & Parma LLP
STREET ADDRESS: 200 East Carrillo Street, Fourth Floor
CITY: Santa Barbara          STATE: CA      ZIP CODE: 93101
TELEPHONE NO.: 805-962-0011      FAX NO.: 805-965-3978
E-MAIL ADDRESS: mjf@ppplaw.com
ATTORNEY FOR (Name):  NuSil LLC, NuSil Technology LLC

**SUPERIOR COURT OF CALIFORNIA, COUNTY OF** SAN BERNARDINO
STREET ADDRESS: 247 West Third Street
MAILING ADDRESS:
CITY AND ZIP CODE:    San Bernardino, CA 92415-0210
BRANCH NAME: Civil Division

Plaintiff/Petitioner:    Brittany Billetts, Vivian Aguiar, Ann Delmonico, Cornelia Ditto et al
Defendant/Respondent:    NuSil Technology LLC, a Delaware limited liability company

| **DECLARATION OF DEMURRING OR MOVING PARTY REGARDING MEET AND CONFER** | CASE NUMBER: CIVDS1905706 |
|---|---|

*To the party filing a demurrer, motion to strike, or motion for judgment on the pleadings: This form must be filed with the demurrer, motion to strike, or motion for judgment on the pleadings.*

1. *(Name of party making declaration):* NuSil LLC, NuSil Technology LLC                was served with

   [x] a complaint     [ ] an amended complaint     [ ] a cross-complaint

   [ ] an answer     [ ] other   *(specify):*

   in the above-titled action and is filing a   [x] demurrer   [ ] motion to strike   [ ] motion for judgment on the pleadings

**DECLARATION** *(Choose either a. or b.)*

2. a. [x] At least five days before the date a responsive pleading was due to be filed (if I am filing a demurrer or motion to strike) or at least five days before filing a motion for judgment on the pleadings (if I am filing a motion for judgment on the pleadings), I met and conferred with the party who filed the pleading   [x] by telephone   [ ] in person   and we did not reach an agreement resolving the matters raised by the demurrer, motion to strike, or motion for judgment on the pleadings.

   b. [ ] The party who filed the pleading subject to demurrer, motion to strike, or motion for judgment on the pleadings failed to respond to my request to meet and confer or otherwise failed to meet and confer in good faith.

   *To provide additional information, please use form MC-031,* Attached Declaration.

I declare under penalty of perjury under the laws of the State of California that the information above is true and correct.

Date: May 1, 2019

Melissa J. Fassett
_____
(NAME OF PARTY OR ATTORNEY FOR PARTY)

_____
(SIGNATURE OF PARTY OR ATTORNEY FOR PARTY)

Page 1 of 1

| Form Approved for Optional Use<br>Judicial Council of California<br>CIV-140 [Rev. January 1, 2019] | **DECLARATION OF DEMURRING OR MOVING PARTY REGARDING MEET AND CONFER** | Code of Civil Procedure,<br>§§ 430.41, 435.5, 439<br>www.courts.ca.gov |
|---|---|---|

Ex. D - 124

## PROOF OF SERVICE

STATE OF CALIFORNIA, COUNTY OF SANTA BARBARA

     I am employed in the County of Santa Barbara, State of California.  I am over the age of eighteen (18) and not a party to the within action.  My business address is 200 East Carrillo Street, Fourth Floor, Santa Barbara, California 93101.

     On May 1, 2019, I served the foregoing document described as **DECLARATION OF DEMURRING OR MOVING PARTY REGARDING MEET AND CONFER** on all interested parties in this action by the original and/or true copy thereof enclosed in sealed envelopes, addressed as follows:

**See Attached Service List**

☒    BY MAIL:  I placed the original and/or true copy in a sealed envelope addressed as indicated herein.  I am readily familiar with the firm's practice of collection and processing documents for mailing.  It is deposited with the U.S. postal service on that same day in the ordinary course of business.  I am aware that on motion of the party served, service is presumed invalid if the postal cancellation date or postage meter date is more than one day after the date of deposit for mailing in affidavit.

☐    BY PERSONAL DELIVERY:  I personally delivered the original and/or true copy in a sealed envelope addressed as indicated herein.

☐    BY OVERNIGHT DELIVERY:  I placed the original and/or true copy in a sealed, fully prepaid FedEx, Next Day Air envelope addressed as indicated herein, which is picked up by FedEx on that same day in the ordinary course of business.

☐    BY FACSIMILE:  Based on an agreement of the parties to accept service by fax transmission, I faxed the referenced document(s) from fax number (805) 967-3978 at [insert time] to the person(s) indicated herein at the fax number(s) indicated herein.  No error was reported by the fax machine that I used.  A copy of the record of the fax transmission, which I printed out, is attached.

☐    BY E-MAIL:  I caused to be e-mailed a true copy to the e-mail addresses listed herein.

☒    **(STATE)**  I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

☐    **(FEDERAL)**  I hereby certify that I am employed in the office of a member of the Bar of this Court at whose direction the service was made.

     Executed on May 1, 2019, at Santa Barbara, California.

                                         _____
                                         Signature
                                         Elizabeth Wright

## SERVICE LIST

**Brittany Billetts, et al. v. Mentor Worldwide, LLC, et al.**
**Santa Bernardino County Superior Court Case No. CIVDS1905706**

| | |
|---|---|
| Jennifer A. Lenze<br>Amanda D. McGee<br>LENZE LAWYERS, PLC<br>1300 Highland Avenue, Suite 207<br>Manhattan Beach, CA 90266<br>jlenze@lenzelawyers.com<br>McGee@lenzelawyers.com | Plaintiffs |
| Lowell W. Finson<br>FINSON LAW FIRM<br>126 Westwind Mall<br>Marina del Rey, CA 90292<br>Lowell@finsonlawfirm.com | Plaintiffs |
| Monee Takla Hanna<br>Tucker Ellis LLP<br>515 S. Flower Street, 42nd Floor<br>Los Angeles, CA  90071-2223<br>Monee.hanna@tuckerellis.com | Mentor Worldwide, LLC |

Jennifer A. Lenze, CA Bar# 246858
Amanda D. McGee, CA Bar#282034
**LENZE LAWYERS, PLC**
1300 Highland Avenue, Suite 207
Manhattan Beach, CA 90266
Tel: (310) 322-8800 F: (310) 322-8811
jlenze@lenzelawyers.com
mcgee@lenzelawyers.com

Lowell W. Finson, CA Bar#275586
**FINSON LAW FIRM**
126 Westwind Mall
Marina Del Rey, California 90292
Tel: (602) 377-2903 F: (310) 425-3278
lowell@finsonlawfirm.com

*Attorneys for Plaintiffs*

**SUPERIOR COURT OF THE STATE OF CALIFORNIA**

**FOR THE COUNTY OF SAN BERNARDINO**

| | |
|---|---|
| BRITTANY BILLETTS, an individual; VIVIAN AGUIAR, an individual; ANN DELMONICO, an individual; CORNELIA DITTO, an individual; LEAH JOHNSON, an individual;<br><br>    Plaintiffs,<br><br>    v.<br><br>MENTOR WORLDWIDE, LLC; NUSIL, LLC; NUSIL TECHNOLOGY, LLC; and DOES 1-100, inclusive,<br><br>    Defendants. | Case No.: CIVDS1905706<br><br>**PLAINTIFFS' OPPOSITION TO DEFENDANTS NUSIL, LLC AND NUSIL TECHNOLOGY, LLC'S DEMURRER TO PLAINTIFFS' COMPLAINT; MEMORANDUM OF POINTS AND AUTHORITIES; [PROPOSED] ORDER**<br><br>Hearing:  June 6, 2019<br>Time:     8:30 a.m.<br>Dept.:    S24<br><br>Complaint Filed: February 22, 2019 |

///

///

///

///

1

TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD HEREIN:

Plaintiffs BRITTANY BILLETTS, an individual; VIVIAN AGUIAR, an individual; ANN DELMONICO, an individual; CORNELIA DITTO, an individual; LEAH JOHNSON, an individual (hereinafter collectively "Plaintiffs"), do hereby oppose Defendant Nusil, LLC and Nusil Technology, LLC's (hereinafter "the Nusil Defendants") Demurrer to Plaintiffs' Complaint, being heard by the above-captioned court on June 6, 2019 at 8:30 a.m. in Department S24, located at 247 West Third Street, San Bernardino, California 92415-0210.

This Opposition will be based upon the facts and law set forth in the Memorandum of Points and Authorities served and filed herewith, the pleadings, records and files in this action and on such oral and documentary evidence as may be presented at the hearing of this matter.

Dated: May 23, 2019

Respectfully submitted,

LENZE LAWYERS, PLC

By: _____
JENNIFER A. LENZE
Attorney for Plaintiffs

PLAINTIFFS' OPPOSITION TO DEFENDANTS NUSIL, LLC AND NUSIL TECHNOLOGY, LLC'S DEMURRER TO COMPLAINT

Ex. D - 128

## MEMORANDUM OF POINTS AND AUTHORITIES

### I.   INTRODUCTION

Plaintiffs have made claims against NUSIL, LLC and NUSIL TECHNOLOGY, LLC (hereinafter "the Nusil Defendants") for injuries that they allege were caused by Mentor's MemoryGel Silicone Gel breast implants.  The claims made against the Nusil Defendants in the operative Complaint are for: Negligence and Negligence Per Se; Strict Products Liability – Failure to Warn; and Strict Products Liability – Manufacturing Defect.  *See* Complaint filed February 22, 2019.

In their Demurrer, the Nusil Defendants argue that each of Plaintiffs' claims are expressly and impliedly preempted and further demurred to certain of the claims on the basis that they are barred by the learned intermediary doctrine.  *See* Nusil Defendants' Demurrer ("Demurrer") to Plaintiffs' Complaint at p. 3-4.

However, Plaintiffs have sufficiently alleged parallel state law claims which are not subject to either express or implied preemption.

Furthermore, the factual allegations alleged in the Complaint are sufficient for purposes of overcoming a demurrer at this stage in the litigation.  The Nusil Defendants, in their Demurrer, attempt to hold Plaintiffs to a higher pleading standard more appropriate for a motion for summary judgment, seemingly imposing on them the impossible burden of alleging facts and evidence which are solely in the hands of the Defendants before Plaintiffs have had any opportunity to conduct discovery.

As such, the Nusil Defendants' Demurrer should be overruled in its entirety.

### II.   FACTS

Plaintiffs commenced this action in the Superior Court of the State of California for the County of San Bernardino on February 22, 2019.  In their Complaint, filed on February 22, 2019, Plaintiffs allege injuries and damages arising from the implantation of Defendants' MemoryGel Silicone Gel Breast Implants. Compl. ¶¶ 21–39. Plaintiffs allege claims against MENTOR WORLDWIDE, LLC, a company incorporated under the laws of the State of Delaware, with its principal place of business located at 201 Mentor Drive, Santa Barbara, California, 93111, and with its headquarters located at 33 Technology Drive, Irvine, California, 92618; NUSIL, LLC, a limited liability company incorporated under the laws

Ex. D - 129

1    of the State of California, with its principal place of business located at 1050 Cindy Lane, Carpinteria,

2    California 93013; and NUSIL TECHNOLOGY, LLC, a limited liability company incorporated under the

3    laws of the State of Delaware, with its principal place of business located at 1050 Cindy Lane,

4    Carpinteria, California, 93013.

5            Plaintiffs assert the following claims against Defendants: (1) Negligence/Negligence Per Se; (2)

6    Strict Products Liability – Failure to Warn; and (3) Strict Products Liability – Manufacturing Defect.

7    Plaintiffs allege that Defendants misrepresented and failed to warn Plaintiffs and Plaintiffs' treating

8    physicians.

9                        III.    **LEGAL STANDARDS**

10           A.  **Standard Governing a Demurrer**

11           Defendants blatantly misstate and misrepresent to this Court the standard for a demurrer. Indeed,

12   it is only the rare exception, and not the rule as the Nusil Defendants contend, that a Court will ever

13   examine the *plausibility* of a Plaintiffs' allegations on demurrer. *See* Demurrer p. 11, ll.12-14.

14           To the contrary, in testing the sufficiency of a Complaint as against a general demurrer, if the

15   Complaint states facts constituting a cause of action entitling Plaintiff to any relief, the demurrer will be

16   overruled. *See Addiego v. Hill*, (1965) 238 Cal. App. 2d 842, 845. This Court is to "treat the demurrer

17   as admitting all material facts properly pleaded, but not contentions, deductions or conclusions of fact or

18   law." In addition to the material facts set forth by the Plaintiffs, this Court may "also consider matters

19   which may be judicially noticed." *Evans v. City of Berkeley* (2006) 38 Cal.4th 1, 6 (citations omitted).

20   The issue to be decided is "whether the complaint states facts sufficient to constitute a cause of action."

21   Code Civ. Proc., 430.10, subd. (e). To meet this standard, the Complaint must contain a statement of

22   facts which establishes the elements of a cause of action, assuming the material allegations to be true.

23   *See Randi W. v. Muroc Joint Unified School Dist.* (1997) 14 Cal.4th 1066, 1075.

24           In personal injury lawsuits "it suffices to plead causation succinctly and generally." *Bockrath v.*

25   *Aldrich Chem. Co., Inc.*, (1999) 21 Cal.4th 71, 78. Furthermore, in negligence cases, pleading standards

26   rest "upon considerations of fairness and convenience in view of the situation of the opposing parties,

27   and the rule permitting the pleading of negligence in general terms finds justification in the fact that the

28   person charged with negligence may ordinarily be assumed to possess at least equal, if not superior,

1    knowledge of the affair to that possessed by the injured party." *Rannard v. Lockheed Aircraft Corp.*,

2    (1945) 26 Cal.2d 149, 157.

**B.  <u>Federal Preemption Does Not Bar Parallel State Law Claims</u>**

4       The primary argument presented by the Nusil Defendants in support of the pending demurrer is

5    that the claims made in the Complaint are expressly preempted[1] under the Medical Device Amendments

6    ("MDA") to the Food, Drug and Cosmetics Act ("FDCA"), specifically 21 U.S.C. § 360k(a), and *Riegel*

7    *v. Medtronic, Inc.*, 552 U.S. 312 (2008) ("*Riegel*").  The Nusil Defendants also argue that these claims

8    are impliedly preempted under *Buckman Co. v. Plaintiffs' Legal Comm.*, 531 U.S. 341 (2001)

9    ("*Buckman*").  The Nusil Defendants' arguments are incorrect and governing authority clearly

10   establishes that the claims made in the Complaint should be allowed to proceed as they parallel, and do

11   not add to, the federal requirements.

12       As discussed in *Riegel*, a two-step analysis is used to determine whether a claim is subject to

13   express preemption under § 360k(a).  The first step is to determine whether the FDA has established

14   "requirements" for the medical device at issue.  *See Riegel*, 552 U.S. at 321.  If so, the next step is to

15   determine whether the state law claims seek to impose requirements that relate to safety and effectiveness

16   which are "different from, or in addition to" the FDA requirements.  *Id.* at 321–322.  However, the fact

17   that certain claims made against a medical device manufacturer may be subject to express or implied

18   preemption does not mean that all such claims are preempted.  As explained by the court in *Coleman v.*

19   *Medtronic, Inc.* (2014) 223 Cal. App. 4th 413 ("*Coleman*"), "[s]tate law causes of action that provide 'a

20   damages remedy for claims premised on a violation of FDA regulations' are not expressly preempted if

21   they "'parallel,' rather than add to, federal requirements." 233 Cal. App. 4th at 425 (quoting *Riegel*, 552

22   U.S. at 330).

23   /// 

---

[1] "There is a presumption against federal preemption of state laws that operate in traditional state domains.'
*Stengel v. Medtronic Inc.*, 704 F.3d 1224, 1227 (9th Cir.2013) (en banc) ("Stengel").  Claims against medical
device manufacturers involve an area of traditional state law as "'the historic police powers of the State include
the regulation of health and safety.' [Citation]. 'Throughout our history the several States have exercised their
police powers to protect the health and safety of their citizens. Because these are "primarily, and historically, ...
matter[s] of local concern," the "States traditionally have had great latitude under their police powers to legislate
as to the protection of the lives, limbs, health, comfort, and quiet of all persons."' [Citation]." *Stengel*, 704 F.3d
at 1229.

3

1      In *Buckman*, the Court held that the MDA prohibits suits by private litigants which seek to enforce

2  the provisions of the FDCA because all such actions "shall be by and in the name of the United States."

3  21 U.S.C. § 337(a).  Therefore, a claim is impliedly preempted to the extent that it seeks to enforce an

4  exclusively federal requirement not grounded in traditional state tort law.  531 U.S. at 352–53.

5      The *Coleman* court succinctly summarized the scope of preemption as follows: "The rule that

6  emerges from these cases is that the MDA does not preempt a state-law claim for violating a state-law

7  duty that parallels a federal-law duty under the MDA." *Coleman*, 223 Cal. App. 4th at 427.

## IV.    ARGUMENT

### A.    Plaintiffs Have Sufficiently Alleged Parallel State Law Claims Which Are Not Preempted

10      The claims made in the Complaint are not expressly or impliedly preempted because they are all

11  based on state law claims that parallel, but do not add to, the federal requirements imposed by the FDA.

12  The Nusil Defendants agree that "Section 360k(a) [], 'does not prevent a State from providing a damages

13  remedy for claims premised on a violation of FDA regulations' because the state duties in such a case

14  "parallel," rather than add to, federal requirements.' *Riegel*, 552 U.S. at 330." Demurrer at p. 14, ll. 13–

15  15.  Because all of the claims which are presented against the Nusil Defendants in the Complaint are such

16  "parallel" claims[2], they are not subject to either express or implied preemption.  Plaintiffs' allegations

17  regarding violations of the FDCA are all based on parallel state law causes of action.  Accordingly, these

18  claims are not subject to implied preemption as they are not based solely on enforcement of a federal

19  requirement.

20      The Nusil Defendants attempt to avoid this reality by citing to federal cases which are not on

21  point, as well as to non-binding Superior Court case decisions which are distinguishable on their facts,

22  in support of the incorrect assertion that "[c]ourts across the country routinely find that failure-to-warn

23  and manufacturing-defect claims involving breast implants . . . are subject to dismissal." *See, e.g., Rowe*

24  *v. Mentor Worldwide*, 297 F. Supp. 3d 1288 (M.D. Fla. 2018) (claim for negligent manufacture not

25

26  _____

27  [2] *See, e.g.*, Complaint at ¶ 120 ("Defendants breached their duty under federal law, and the parallel state duty []"); Complaint at ¶ 121 ("[t]his duty is parallel to the state law duty []"); Complaint at ¶ 125 ("[t]his duty is parallel to the post-sale duty to warn under California law []"); Complaint at ¶ 135 ("Under parallel federal law []"); Complaint at ¶ 141 ("[Defendants] had a duty under Federal law, and a parallel duty under California law []"); Complaint at ¶ 187 ("California imposes a parallel duty []").

28

PLAINTIFFS' OPPOSITION TO DEFENDANTS NUSIL, LLC AND NUSIL TECHNOLOGY, LLC'S DEMURRER TO COMPLAINT

Ex. D - 132

1   preempted); *Mize v. Mentor Worldwide LLC*, 2018 WL 5085716 (Cal. Sup. Ct. Oct. 2, 2018) (*Mize I*);

2   *Mize v. Mentor Worldwide LLC*, 2018 WL 1364257 (involving a pre-Post-Market Approval [PMA] study

3   Plaintiff) (*Mize II*).

4   　　　The Nusil Defendants specifically rely on *Mize I* and *Mize II*, *supra*, in an attempt to persuade

5   this Court to apply the same reasoning herein in order to dismiss Plaintiffs' claims.  Again, not only are

6   *Mize I* and *Mize II* not binding precedent, but a Notice of Appeal has now been filed relating to the *Mize*

7   *II* decision.

8   　　　In *Coleman*, *supra*, which *is* binding precedent, the plaintiff made claims related to a medical

9   device asserting theories of strict liability and negligence, including allegations of manufacturing defects

10   and failure to warn.  After reviewing the applicable law, the *Coleman* court reversed the trial court's

11   decision to sustain the demurrer to the causes of action for "(1) strict liability failure to warn based on a

12   failure to warn the FDA theory, (2) negligence, and (3) manufacturing defect." *Id.* at 319.  That same

13   result should be reached in the present case and the Nusil Defendants' demurrer should be overruled.

14   　　　**C.   Plaintiffs' Manufacturing Defect Claim is Sufficiently Pled**

15   　　　In their argument related to the claims for manufacturing defects, the Nusil Defendants again

16   ignore the binding decision in *Coleman* and instead seek to rely on decisions from federal courts and/or

17   Superior Court decisions which are not controlling.  The Nusil Defendants do not appear to dispute that

18   a claim of manufacturing defect would be a "parallel" claim which would not be subject to express or

19   implied preemption.  Instead, they again focus on the incorrect position that Plaintiffs have not alleged

20   sufficient "facts" to support this claim.  These arguments are unpersuasive, misstate the facts alleged, and

21   are contrary to the holding in *Coleman*.

22   　　　As the court noted in *Coleman*, there is a significant "concern with the concept of dismissing a

23   claim on preemption grounds without at least providing a plaintiff with some opportunity for discovery."

24   *Coleman*, 223 Cal. App. 4th at 436 (citing *In re Medtronic, Inc., Sprint Fidelis Leads Products Liability*

25   *Litigation* (8th Cir. 2010) 623 F.3d 1200, 1205–06 and *Bausch v. Stryker Corp.* (7th Cir. 2010) 630 F.3d

26   546, 556–57).  The *Coleman* court adopted the reasoning in *Bausch* "that claims of negligence and strict

27   liability for a defective product can survive preemption based on general allegations that the company

28   violated federal law." 223 Cal. App. 4th at 436.

The conclusion reached in *Coleman* clearly shows that the Nusil Defendants' Demurrer is due to be overruled. "In light of the reasoning in *Sprint Fidelis* and *Bausch* we conclude that it is premature to determine whether Coleman has alleged a state law requirement that is parallel to federal requirements so as to survive preemption. At the pleading stage, we can only conclude that the complaint alleges sufficient facts to state a cause of action for manufacturing defect, the issue of preemption will necessarily be addressed after Coleman has some opportunity to conduct discovery." 223 Cal. App. 4th at 436.

As noted by the court in *Bausch,* courts "must keep in mind that much of the product-specific information about manufacturing needed to investigate such a claim fully is kept confidential by federal law," and that as such, "formal discovery is necessary before a plaintiff can fairly be expected to provide a detailed statement of the specific bases for her claim." 630 F.3d 546, 558. This is particularly applicable to cases involving IDE products, as information regarding the manufacturing process which the applicant was required to follow is confidential and not publicly available.

The analysis set forth in *Killen v. Stryker Spine* is very instructive on this point. *See* No. 11-1508, 2012 WL 4498865 (W.D. Penn. Sept. 28, 2012) ("Killen"). As that court reasoned, when ruling on an argument similar to the one raised by the Nusil Defendants in the present case, "it is disingenuous to identify the parallel claim exception to the Medical Device Act Amendments of 1976 ("MDA") exemption as articulated in *Riegel v. Medtronic, Inc.,* 552 U.S. 312, 128 S.Ct. 999, 169 L.Ed.2d 892 (2008), but foreclose a plaintiff any opportunity to prove the exception." *Id.* at *3. The court quoted with approval from *Burgos v. Satiety,* No. 10–CV–2680, 2011 WL 1327684 (E.D.N.Y. Apr. 5, 2011): "[P]laintiffs alleging state-law parallel claims based on a violation of a manufacturer's agreement with the FDA often suffer from a unique disadvantage: the agreements that would provide the necessary factual specificity are confidential, and available only to the defendants and the FDA. [A] plaintiff's pleading burden should be commensurate with the amount of information available to them. Other courts have similarly observed that it would be an injustice to penalize a plaintiff for alleging, through no fault of her own, what turned out to be insufficient facts about the manufacturing process of a device that caused injury. See *Hofts v. Howmedica Osteonics Corp.,* 597 F.Supp.2d 830 (S.D.Ind.2009); see also *Bausch v. Stryker Corp.,* 630 F.3d 546 (7th Cir.2010)." Id. at *4 (bold added). The *Killen* court concluded that because "Plaintiff advanced factual allegations that plausibly suggest the existence of

6

1  parallel claims, but does not have access to the confidential information to plead more specifically the

2  alleged violation of FDA regulations, the court concludes the pleading standards are satisfied." *Id.* at *3

3  (bold added).

4        The Nusil Defendants seek to place an impossible burden on Plaintiffs by arguing that they must

5  plead more specific facts to state a manufacturing claim against them, knowing that the information which

6  the Nusil Defendants allege Plaintiffs should have included is confidential and known only to the

7  Defendants and the FDA.  Adopting the reasoning of the Nusil Defendants would insulate them from

8  ever being subject to a claim related to the manufacturing process, as no plaintiff can allege facts based

9  on information which is confidential.

10            **D.**     **Plaintiffs' Negligence and Negligence Per Se Claims Are Sufficiently Pled**

11        In *Coleman*, the court held that the plaintiff had "alleged facts sufficient to state causes of action

12  in [] negligence based on Medtronic's failure to warn." 223 Cal. App. 4th at 431.  In so ruling, the court

13  cited with approval to the decision of the Ninth Circuit in *Stengel*.[3]  The *Coleman* court reasoned that

14  "California recognizes the applicability of negligence per se in a broad range of scenarios, including

15  violation of federal law." *Id.* at 434.  After analyzing California law on negligence per se, the *Coleman*

16  court concluded that "Medtronic does not present a persuasive argument as to why a negligence claim

17  resting on a theory of negligence per se would be subject to preemption.  Because Coleman's negligence

18  claim based on Medtronic's failure to file adverse event reports is cognizable under California law and

19  is parallel to federal requirements, he may proceed on this theory." *Id.*

20        The court went further and held: "[w]e conclude that Coleman's negligence claim is not

21  preempted.  The claim is rooted in traditional state tort law and exists regardless of the FDCA and its

22  regulations because the manufacturer of a medical device owes a duty of reasonable care to the consumer

23  of such a device even in the absence of FDA regulations." *Id.* at 435.

24            **E.**     **The Court Should Allow Amendment to Cure Any Pleading Defects**

25        California *Code of Civil Procedure* section 473 provides, in pertinent part, that "[t]he court may

26  . . . in its discretion, . . . allow, upon any terms as may be just, an amendment to any pleading or proceeding

27

28  [3] The *Coleman* court acknowledged that *Stengel* was not binding on it, but found its reasoning to be very persuasive. *Id.* at 429-30.

parseБ

in other particulars . . . ."  Additionally, *Code of Civil Procedure* section 576 provides that "[a]ny judge, at any time before or after commencement of trial, in furtherance of justice, and upon such terms as may be proper, may allow the amendment of any pleading or pretrial conference order."

Case law further supports the California Legislature's policy of great liberality in permitting amendments to the pleadings at any stage in the proceedings.  *See, e.g., Hirs v. Superior Court* (1981) 118 Cal. App. 3d 486, 488–89 ("Trial courts are vested with the discretion to allow amendments to pleadings in furtherance of justice.  That trial courts are to liberally permit such amendments, at any stage of the proceeding, has been established by policy in this state . . . rest[ing] on the fundamental policy that 'cases should be decided on their merits'" (citation omitted)).

Finally, California courts have also consistently held that it is an abuse of discretion if a Court sustains a demurrer without leave to amend if there is any reasonable possibility that a defect can be cured by amendment.  *See, e.g., Quelimane Co. v. Stewart Title Guaranty Co.* (1998) 19 Cal.4th 26, 39 (if "there is a reasonable possibility that the defect can be cured by amendment, leave to amend *must* be granted" (citation omitted) (emphasis added)).

Here, in the event this Court is inclined to sustain the Nusil Defendants' Demurrer on any of the causes of action, Plaintiffs request an opportunity to amend consistent with the facts stated herein.  If the Court believes that some elements of Plaintiffs' claim are inadequately pleaded, leave to amend should be granted so that any technical defect(s) can be cured.

## V.   CONCLUSION

Based on the foregoing, Plaintiffs respectfully request that the Court overrule Defendants Nusil, LLC and Nusil Technology, LLC's Demurrer in its entirety.  Alternatively, Plaintiffs request that this Court grant leave to amend the Complaint to cure any technical defects therein.

Dated: May 23, 2019

Respectfully submitted,

LENZE LAWYERS, PLC

By: _____
JENNIFER A. LENZE
Attorney for Plaintiffs

PLAINTIFFS' OPPOSITION TO DEFENDANTS NUSIL, LLC AND NUSIL TECHNOLOGY, LLC'S DEMURRER TO COMPLAINT
Ex. D - 136

1 | Jennifer A. Lenze, CA Bar# 246858
2 | Amanda D. McGee, CA Bar# 282034
   | **LENZE LAWYERS, PLC**
3 | 1300 Highland Avenue, Suite 207
   | Manhattan Beach, CA 90266
4 | Telephone: (310) 322-8800 Facsimile: (310) 322-8811
   | jlenze@lenzelawyers.com
5 | mcgee@lenzelawyers.com
   | *Attorneys for Plaintiff*
6 |
7 | Lowell W. Finson, CA Bar#275586
   | **FINSON LAW FIRM**
8 | 126 Westwind Mall
   | Marina Del Rey, California 90292
9 | Tel: (602) 377-2903 F: (310) 425-3278
   | lowell@finsonlawfirm.com
10 | *Attorneys for Plaintiff*

11 |
12 | **SUPERIOR COURT OF THE STATE OF CALIFORNIA**
   | **FOR THE COUNTY OF SAN BERNARDINO**

13 | BRITTANY BILLETTS, an individual; VIVIAN | Case No.: CIVDS1905706
   | AGUIAR, an individual; ANN DELMONICO, an
14 | individual; CORNELIA DITTO, an individual; | **[PROPOSED] ORDER OVERRULING**
   | LEAH JOHNSON, an individual; | **DEFENDANTS NUSIL, LLC AND NUSIL**
15 | | **TECHNOLOGY, LLC'S DEMURRER TO**
   | | **PLAINTIFFS' COMPLAINT**
16 | Plaintiffs, |
17 | | Hearing:   June 6, 2019
   | v. | Time:        8:30 a.m.
18 | | Dept.:       S24
19 | MENTOR WORLDWIDE, LLC; NUSIL, LLC;
   | NUSIL TECHNOLOGY, LLC; and DOES 1-100, | Complaint Filed: February 22, 2019
20 | inclusive,
21 | Defendants.
22 |

23 |     **AFTER FULL REVIEW AND CONSIDERATION** of Plaintiffs' Memorandum of Points and

24 | Authorities in Opposition to Defendants Nusil, LLC and Nusil Technology, LLC's Demurrer to

25 | Plaintiffs' Complaint, it is hereby ORDERED that Defendants' Demurrer is **OVERRULED**.

26 |     IT IS SO ORDERED.

27 |
28 | Dated: _____          _____
   |                              Honorable Donna Gunnell Garza

1

[PROPOSED] ORDER

Ex. D - 137

**PROOF OF SERVICE**
STATE OF CALIFORNIA, COUNTY OF SAN BERNARDINO
C.C.P. §§1011(a), 1013, 1013a

I am employed in the county of Los Angeles, State of California.  I am over the age of 18 and not a party to the within action; my business address is 1300 Highland Ave., Suite 207, Manhattan Beach, California 90266.

On May 23, 2019, I served the foregoing document described as

**PLAINTIFFS' OPPOSITION TO DEFENDANTS NUSIL, LLC AND NUSIL TECHNOLOGY, LLC'S DEMURRER TO PLAINTIFFS' COMPLAINT; MEMORANDUM OF POINTS AND AUTHORITIES; DECLARATION OF JENNIFER A. LENZE IN SUPPORT THEREOF; [PROPOSED] ORDER**

on the interested parties or attorneys for parties in this action who are identified on the attached service list, using the following means of service:

(X)       **BY FEDERAL EXPRESS.** I placed (x ) the original or ( ) a true copy of the foregoing document(s) in a sealed envelope or package designated by Federal Express with delivery fees paid or provided for, individually addressed to each of the parties on the attached service list, and caused each such envelope or package to be delivered at 1300 Highland Ave Ste 207, Manhattan Beach, CA 90266, to an authorized courier or driver authorized by Federal Express to receive documents.

( )       **BY FACSIMILE.** I caused ( ) the original or ( ) a true copy of the foregoing document(s) to be transmitted to each of the parties on the attached service list at the facsimile telephone number as last given by that person on any document which he or she has filed in this action and served upon this office.

( )       **BY PERSONAL SERVICE.** I placed ( ) the original or ( ) a true copy of the foregoing document(s) in sealed envelopes individually addressed to each of the parties on the attached service list, and caused such envelope(s) to be delivered by hand to the offices of each addressee.

()       **BY E-MAIL.** I caused the foregoing document(s) to be transmitted by e-mail electronic transmission to the e-mail address as indicated on the attached service list as last given by that person on any document which he or she has filed in this action and served upon this office.

()       **BY ELECTRONIC SERVICE**: I provided the document listed above electronically through the Case Anywhere system. I did not receive, within a reasonable time after the transmission, any electronic message or other indication that the transmission was unsuccessful.

(X)       **(State)** I declare under penalty of perjury

Executed on May 23, 2019, at Manhattan Beach, California.

*Brandy Torres*
Brandy Torres

## SERVICE LIST

*Billetts, et al v. Mentor, et al*
Case No. CIVDS1905706

MELISSA J. FASSETT
**PRICE, POSTAL & PARMA LLP**
3330 Cameron Park Drive, Suite 100
Cameron Park, California 95682-7652
Tel: (805) 962-0011
Fax: (805) 965-3978
*Attorneys for Defendants NUSIL LLC and NUSIL RECHNOLOGY LLC*

MOLLIE F. BENEDICT SBN 187084
mollie.benedict@tuckerellis.com
MONEE TAKLA HANNA SBN 259468
monee.hanna@tuckerellis.com
**TUCKER ELLIS LLP**
515 S. Flower Street, 42nd Floor
Los Angeles, CA 90071
T 213.430.3400/ F 213.430.3409
*Attorneys for Defendant MENTOR WORLDWIDE LLC*

DUSTIN B. RAWLIN
dustin.rawlin@tuckerellis.com
**TUCKER ELLIS LLP**
950 Main Avenue, Suite 1100
Cleveland, OH 44113-7213
T 216.592.5000 / F 216.592.5009
*Attorneys for Defendant MENTOR WORLDWIDE LLC*

# CIV-190531-CIV-DS1905706-N-105902



## Scanned Document Coversheet

System Code:   CIV

Case Number:   DS1905706

Case Type:   CIV

Action Code:   N

Action Date:   05/31/19

Action Time:   10:59

Action Seq:   0002

Printed by:   DVARG

> THIS COVERSHEET IS FOR COURT
> PURPOSES ONLY, AND THIS IS NOT
> A PART OF THE OFFICIAL RECORD.
> YOU WILL NOT BE CHARGED FOR
> THIS PAGE

## Notice OF ORDER ASSIGNING COORDINATION MOTION JUDGE filed by BRITTANY BILLETTS.

NEW FILE

**F I L E D**
SUPERIOR COURT OF CALIFORNIA
COUNTY OF SAN BERNARDINO
SAN BERNARDINO DISTRICT

MAY 3 1 2019

BY _Daniela Vargas_
DANIELA VARGAS, DEPUTY

1  Jennifer A. Lenze (CA Bar#246858)
2  Amanda D. McGee, (CA Bar#282034)
   **LENZE LAWYERS, PLC**
3  1300 Highland Avenue, Suite 207
   Manhattan Beach, CA 90266
4  Tel: (310) 322-8800 F: (310) 322-8811
   jlenze@lenzelawyers.com
5  mcgee@lenzelawyers.com
   *Attorneys for JCCP Plaintiffs and Petitioners*
6
7  Lowell W. Finson, (CA Bar#275586)
   **FINSON LAW FIRM**
8  126 Westwind Mall
   Marina Del Rey, California 90292
9  Tel: (602) 377-2903 F: (310) 425-3278
   lowell@finsonlawfirm.com
10 *Attorneys for JCCP Plaintiffs and Petitioners*

11              **SUPERIOR COURT OF THE STATE OF CALIFORNIA**
12                      **COUNTY OF SAN BERNARDINO**

13 **MEMORYGEL IMPLANT CASES**            ) Case No.: CIVDS1905706
   **JCCP 5022:**                          )
14                                          )                    **BY FAX**
                                            )
15 *Rexina Mize, et al. v. Mentor Worldwide, LLC, et* )
   *al., Los Angeles County Superior Court*, Case No. )
16 BC649083                                 ) **NOTICE OF ORDER ASSIGNING**
                                            ) **COORDINATION MOTION JUDGE AND**
17 *Nicole Vieira, et al v. Mentor Worldwide, LLC, et* ) **SETTING DATE FOR HEARING**
   *al., Los Angeles County Superior Court, Case No.* )
18 *BC711663*                               )
                                            )
19                                          )
   Mary Sewell, et al. v. *Mentor Worldwide, LLC, et* )
20 *al., Orange County Superior Court, Case No. 30-* )
   *2018-01040633-CU-PL-CXC*                )
21                                          )
                                            )
22 *Brittany Billetts, et al v. Mentor Worldwide, LLC,* )
   *et al., San Bernardino County Superior Court,* )
23 *Case No. CIVDS1905706*                  )
                                            )
24                                          )
   *Tammi Jacob, et al v. Mentor Worldwide, LLC, et* )
25 *al., Los Angeles County Superior Court, Case No.* )
   *19STCV06514*                            )
26                                          )
                                            )
27 **THIS DOCUMENT RELATES TO:**           )
   *Brittany Billetts, et al v. Mentor Worldwide, LLC,* )
28 *et al., San Bernardino County Superior Court,* )
   *Case No. CIVDS1905706*                  )

---

1
NOTICE OF ORDER ASSIGNING COORDINATION MOTION JUDGE AND SETTING DATE FOR HEARING
Ex. D - 141

1    TO THE COURT AND ALL ATTORNEYS OF RECORD:

2          PLEASE TAKE NOTE that, the Judicial Council of California has assigned a Coordination

3    Motion Judge and set a hearing date of June 25, 2019 at 2:00 p.m. in a coordination proceeding given

4    the special title of "MEMORYGEL IMPLANT CASES" and numbered JCCP 5022, attached hereto as

5    "Exhibit A". This action is an included action pending coordination in JCCP 5022.

6

7    Date: May 30, 2019

8                                            By:_____
                                             Jennifer A. Lenze
9                                            **LENZE LAWYERS, PLC**
                                             1300 Highland Ave, Suite 207
10                                           Manhattan Beach, CA 90266

11                                           *Attorneys for JCCP Plaintiffs and Petitioners*

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# EXHIBIT "A"

NOTICE OF ORDER ASSIGNING COORDINATION MOTION JUDGE AND SETTING DATE OF HEARING

**CHAIR, JUDICIAL COUNCIL OF CALIFORNIA**
**455 Golden Gate Avenue, San Francisco, CA  94102-3688**

| | | |
|---|---|---|
| Coordination Proceeding | ) | |
| Special Title (Rule 3.550) | ) | |
| | ) | |
| | ) | |
| **MEMORYGEL IMPLANT CASES** | ) | JUDICIAL COUNCIL |
| | ) | COORDINATION PROCEEDING |
| | ) | NO. **5022** |
| | ) | |
| _____ | ) | |

**ORDER ASSIGNING COORDINATION MOTION JUDGE**
**AND SETTING DATE FOR HEARING**

THE ASSISTANT SUPERVISING JUDGE of Complex Litigation Courts
of the Superior Court of California, County of Los Angeles, is hereby assigned pursuant
to Code of Civil Procedure section 404 and rule 3.524 of the California Rules of Court to
sit as coordination motion judge to determine whether the included actions listed below
are complex (rule 3.502), and if so, whether coordination of those actions is appropriate.
If the coordination motion judge grants the petition for coordination, he or she must (1)
recommend a particular superior court for the site of the coordination proceedings,
pursuant to rule 3.530, and (2) select the reviewing court having appellate jurisdiction if
the actions to be coordinated are within the jurisdiction of more than one reviewing court,
pursuant to rule 3.505(a).

**INCLUDED ACTIONS**

| <u>COURT</u> | <u>NUMBER</u> | <u>SHORT TITLE</u> |
|---|---|---|
| Superior Court of California
County of Los Angeles | BC649083 | Mize, et al. v. Mentor
Worldwide LLC, et al. |

Ex. D - 144

| **COURT** | **NUMBER** | **SHORT TITLE** |
|---|---|---|
| Superior Court of California County of Los Angeles | BC711663 | Vieira, et al. v. Mentor Worldwide, LLC, et al. |
| Superior Court of California County of Los Angeles | 19STCV06514 | Jacob, et al. v. Mentor Worldwide, LLC, et al. |
| Superior Court of California County of Orange | 30-2018-01040633 | Sewell, et al. v. Mentor Worldwide, LLC, et al. |
| Superior Court of California County of Santa Barbara | CIVDS1905706 | Billetts, et al. v. Mentor Worldwide, LLC, et al. |

Pursuant to Code of Civil Procedure section 404.5 and rule 3.515, pending the determination of whether coordination is appropriate, the coordination motion judge may stay any action being considered for, or affecting an action being considered for, coordination.

Pursuant to rule 3.524, the clerk of each court in which an included action is pending is directed to file this order in the included action. Also pursuant to rule 3.524, all documents required to be submitted to the coordination motion judge must be transmitted to the court address designated below:

> Assistant Supervising Judge of Complex Litigation Courts
> Superior Court of California,
>   County of Los Angeles
> 312 North Spring Street, Dept. 14
> Los Angeles, CA  90012

Pursuant to rule 3.511, a copy of every notice of opposition, application for stay order, stay order, notice of hearing on the petition, and order granting or denying coordination must be transmitted to the Chair of the Judicial Council at the following address:

Ex. D - 145



Chair, Judicial Council of California
Attn:  Appellate Court Services
(Civil Case Coordination)
455 Golden Gate Avenue, 5th Floor
San Francisco, CA  94102-3688

Unless otherwise ordered by the coordination motion judge, it is ordered
that a hearing on the petition for coordination be set before the coordination motion judge
at the time and place as follows:

June 25, 2019; 2:00 p.m.
312 North Spring Street, Dept. 14
Los Angeles, CA  90012

Petitioners are directed to serve a copy of this order on (1) all parties to the
included actions, and (2) the clerk of each court for filing in each included action.

Dated:  May 17, 2019

T. Cau
_____
Chief Justice of California and
Chair of the Judicial Council

Ex. D - 146

# CHAIR, JUDICIAL COUNCIL OF CALIFORNIA

## PROOF OF SERVICE BY MAIL

| JUDICIAL COUNCIL COORDINATION NUMBER:<br>**5022** | CASE NUMBER: |
|---|---|

1.  I am over the age of 18 and not a party to this legal action.

2.  I am employed in the City and County of San Francisco and my business address is

    **455 Golden Gate Avenue
    San Francisco, CA  94102-3688**

3.  On May 20, 2019, I served a copy of the following documents:

    ☐  ORDER ASSIGNING COORDINATION MOTION JUDGE

    ☐  ORDER ASSIGNING COORDINATION TRIAL JUDGE

    ☒  ORDER ASSIGNING COORDINATION MOTION JUDGE
    AND SETTING DATE FOR HEARING

    ☐  AMENDED ORDER ASSIGNING COORDINATION MOTION JUDGE

    ☐  AMENDED ORDER ASSIGNING COORDINATION TRIAL JUDGE

    ☐  OTHER

    on the interested parties listed on the attached mailing list by placing a true copy enclosed in a
    sealed envelope with postage fully prepaid in the outgoing mailbox in my office, in accordance with
    ordinary business practices for deposit with the United States Postal Service in San Francisco,
    California. I am readily familiar with my office's business practice for collection of and processing of
    correspondence for mailing, and under that practice the above document is being deposited with
    the United States Postal Service this date in San Francisco, California, in the ordinary course of
    business.

4.  I declare under penalty of perjury under the laws of the State of California that the foregoing
    is true and correct.

Date:  Monday, May 20, 2019

                                        Bernadine M. Adams

## MAILING LIST

## JUDICIAL COUNCIL COORDINATION PROCEEDING NO.  5022

Jennifer A. Lenze
Amanda D. McGee
LENZE LAWYERS, PLC
1300 Highland Avenue, Suite 207
Manhattan Beach, CA 90266


Lowell W. Finson
FINSON LAW FIRM
126 Westwind Mall
Marina Del Rey, CA 90292



# JUDICIAL COUNCIL OF CALIFORNIA

455 Golden Gate Avenue • San Francisco, California 94102-3688
Telephone 415-865-4200 • Fax 415-865-4205 • TDD 415-865-4272

TANI G. CANTIL-SAKAUYE
*Chief Justice of California*
*Chair of the Judicial Council*

MARTIN HOSHINO
*Administrative Director*

MILLICENT TIDWELL
*Chief Deputy Director*

LAURA E. SPEED
*Director, Leadership Support Services*

May 20, 2019

Jennifer A. Lenze
Amanda D. McGee
LENZE LAWYERS, PLC
1300 Highland Avenue, Suite 207
Manhattan Beach, California 90266

Lowell W. Finson
FINSON LAW FIRM
126 Westwind Mall
Marina Del Rey, California 90292

Dear Counsel:

Enclosed is a copy of the order assigning a coordination motion judge and setting a hearing date of June 25, 2019 at 2:00 p.m., in a coordination proceeding given the special title of **"MEMORYGEL IMPLANT CASES"** and numbered JCCP **5022**.

Petitioner is directed to serve a copy of this order on all parties to the included actions and on the clerk of each court in which an included action is pending for filing in the included action.

Ex. D - 149

Counsel—JCCP 5022
May 20, 2019
Page 2


If we can assist you in any way, please call me at 415-865-7629.

Sincerely,

Bernadine M. Adams
Administrative Coordinator

/bma
Enclosure

## PROOF OF SERVICE

I, the undersigned, certify and declare that I am a citizen of the United States, over 18 years of age and not a party to the within action. I am employed in the County of Los Angeles; my business address is 1300 Highland Ave., Suite 207, Manhattan Beach, CA 90266.

**On May 30, 2019, I served the foregoing document(s) described as:**

**NOTICE OF ORDER ASSIGNING COORDINATION MOTION JUDGE AND SETTING DATE FOR HEARING**

On all parties in this action, as addressed below, by causing a true copy thereof to be distributed as follow:

**(X)    [VIA ELECTRONIC MAIL] to The Judicial Council) I served the above-listed documents to the Judicial Council at Coordination@jud.ca.gov**

**(X)    BY MAIL**. I placed () the original or (x) a true copy of the foregoing document(s) in a sealed envelope individually addressed to each of the parties on the attached service list, and caused each such envelope to be deposited in the mail at I deposited such envelope in the mail at 1300 Highland Ave., Suite 207, Manhattan Beach, California 90266.  Each envelope was mailed with postage thereon fully prepaid.  I am readily familiar with this firm's practice of collection and processing of correspondence for mailing.  Under that practice, mail is deposited with the United States Postal Service the same day that it is collected in the ordinary course of business.

**(XX) BY ELECTRONIC SERVICE**: I provided the document listed above electronically through the Case Anywhere system. I did not receive, within a reasonable time after the transmission, any electronic message or other indication that the transmission was unsuccessful.

**Chief Justice Tani G. Cantil-Sakauye**
Chair, Judicial Council of California
Attn: Appellate Court Services
(Civil Case Coordination)
455 Golden Gate Avenue, 5th Floor
San Francisco, California 94102-3688
**Coordination@jud.ca.gov**

**Assistant Supervising Judge of Complex Courts**
Superior Court of California,
County of Los Angeles
312 North Spring Street, Dept. 14
Los Angeles, CA 90012

MOLLIE F. BENEDICT SBN 187084
mollie.benedict@tuckerellis.com
MONEE TAKLA HANNA SBN 259468
monee.hanna@tuckerellis.com
**TUCKER ELLIS LLP**
515 S. Flower Street, 42nd Floor
Los Angeles, CA 90071

NOTICE OF ORDER ASSIGNING COORDINATION MOTION JUDGE AND SETTING DATE OF HEARING

1    T 213.430.3400/ F 213.430.3409
2    *Attorneys for Defendant MENTOR WORLDWIDE LLC*

3    DUSTIN B. RAWLIN
     dustin.rawlin@tuckerellis.com
4    **TUCKER ELLIS LLP**
     950 Main Avenue, Suite 1100
5    Cleveland, OH 44113-7213
6    T 216.592.5000 / F 216.592.5009
     *Attorneys for Defendant MENTOR WORLDWIDE LLC*
7

8    **REBACK, MCANDREWS, KJAR,**
     **WARFORD & STOCKALPER, LLP**
9    1230 Rosecrans Ave., Suite 450
     Manhattan Beach, CA 90266
10   T (310) 297-9900 / F (310) 297-9800
     JAMES J. KJAR
11   jkjar@rmkws.com
12   ALEXANDRA E. BARAFF
     abaraff@rmkws.com
13   *Attorneys for Defendant NEAL HANDEL, M.D.*

14
     MELISSA J. FASSETT
15   **PRICE, POSTAL & PARMA LLP**
16   200 E. Carrillo Street, Suite 400
     Santa Barbara, CA 93101
17   Tel: (805) 962-0011
     Fax: (805) 965-3978
18   *Attorneys for Defendants NUSIL LLC and NUSIL RECHNOLOGY LLC*

19
     COURT ADDRESSES:
20   **Clerk at Los Angeles County Superior Court**
     ***Stanley Mosk Courthouse***
21   111 North Hill Street #123A
     Los Angeles, CA 90012
22   *Rexina Mize, et al. v. Mentor Worldwide, et al.  Case No. BC649083*
23   *Nicole Vieira, et al, et al. v. Mentor Worldwide, et al  Case No. BC711663*
     *Tammi Jacob, et al v. Mentor Worldwide, LLC, et al  Case No. 19STCV06514*
24

25   **Clerk at Superior Court, County of Orange**
     ***Central Justice Center***
26   700 Civic Center Drive West
     Santa Ana, CA 92701
27   Mary Sewell, et al. v. *Mentor Worldwide, LLC, et al., Orange County Superior Court, Case No. 30-2018-01040633-CU-PL-CXC*
28

     **Clerk at San Bernardino County Superior Court**
     **San Bernardino District-Civil Division**
     247 West Third Street

1 | San Bernardino, CA 92415-0210
| *Brittany Billetts, et al v. Mentor Worldwide, LLC, et al.,* Case No. CIVDS1905706.

2

3 |     I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

4 |         Executed on May 30, 2019 at Manhattan Beach, California.

5

6

7 |                     *Brandy Torres*
|                     Brandy Torres

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Jennifer A. Lenze, CA Bar# 246858
Amanda D. McGee, CA Bar#282034
**LENZE LAWYERS, PLC**
1300 Highland Avenue, Suite 207
Manhattan Beach, CA 90266
Tel: (310) 322-8800 F: (310) 322-8811
jlenze@lenzelawyers.com
mcgee@lenzelawyers.com

Lowell W. Finson, CA Bar#275586
**FINSON LAW FIRM**
126 Westwind Mall
Marina Del Rey, California 90292
Tel: (602) 377-2903 F: (310) 425-3278
lowell@finsonlawfirm.com

*Attorneys for Plaintiffs*

## SUPERIOR COURT OF THE STATE OF CALIFORNIA

## FOR THE COUNTY OF SAN BERNARDINO

| | |
|---|---|
| BRITTANY BILLETTS, an individual; VIVIAN AGUIAR, an individual; ANN DELMONICO, an individual; CORNELIA DITTO, an individual; LEAH JOHNSON, an individual; <br><br> Plaintiffs, <br><br> v. <br><br> MENTOR WORLDWIDE, LLC; NUSIL, LLC; NUSIL TECHNOLOGY, LLC; and DOES 1-100, inclusive, <br><br> Defendants. | Case No.: CIVDS1905706 <br><br> **PLAINTIFFS' OPPOSITION TO DEFENDANT MENTOR WORLDWIDE, LLC'S DEMURRER TO PLAINTIFFS' COMPLAINT; MEMORANDUM OF POINTS AND AUTHORITIES; [PROPOSED] ORDER** <br><br> Hearing:   June 13, 2019 <br> Time:        8:30 a.m. <br> Dept.:       S24 <br><br> Complaint Filed: February 22, 2019 <br> Trial Date: None Assigned |

///

///

///

///

i

PLAINTIFFS' OPPOSITION TO DEFENDANT MENTOR'S DEMURRER TO COMPLAINT

1    TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD HEREIN:

2        Plaintiffs BRITTANY BILLETTS, an individual; VIVIAN AGUIAR, an individual; ANN

3    DELMONICO, an individual; CORNELIA DITTO, an individual; LEAH JOHNSON, an individual

4    (hereinafter collectively "Plaintiffs"), do hereby oppose Defendant Mentor Worldwide, LLC's

5    (hereinafter "Mentor") Demurrer to Plaintiffs' Complaint, being heard by the above-captioned court on

6    June 13, 2019 at 8:30 a.m. in Department S24, located at 247 West Third Street, San Bernardino,

7    California 92415-0210.

8        This Opposition will be based upon the facts and law set forth in the Memorandum of Points and

9    Authorities served and filed herewith, the Declaration of Jennifer Lenze in support thereof, the

10    pleadings, records and files in this action and on such oral and documentary evidence as may be

11    presented at the hearing of this matter.

12    Dated: May 31, 2019                 Respectfully submitted,

13                                      LENZE LAWYERS, PLC

14

15                    By:     _____

16                              JENNIFER A. LENZE
                                  Attorney for Plaintiffs

ii

PLAINTIFFS' OPPOSITION TO DEFENDANT MENTOR'S DEMURRER TO COMPLAINT

## **TABLE OF CONTENTS**

I. INTRODUCTION ...................................................................................................1

II. FACTS ...................................................................................................................1

III. LEGAL STANDARDS ........................................................................................2

   A.     Standard Governing a Demurrer .................................................................. 2

   B.     Federal Preemption Does Not Bar Parallel State Law Claims ........................... 3

IV. ARGUMENT.........................................................................................................4

   A.     Plaintiffs Have Sufficiently Alleged Parallel State Law Claims Which Are Not
Preempted ............................................................................................................... 4
        1. California Law Applies to All Plaintiffs' Claims, Regardless of Their States of
        Domicile, and Plaintiffs Have Alleged Sufficient Parallel California State Law Claims .. 5

   C.     Plaintiffs' Failure to Warn Claims Are Proper .................................................. 6
        1. Plaintiffs' Failure to Warn Allegations Are Sufficiently Pled........................ 6
        2. Plaintiffs' Claims Grounded in Mentor's Failure to Conduct Post-Market Surveillance
        Are Not Preempted ................................................................................. 7

   D.     Plaintiffs' Manufacturing Defect Claim Is Sufficiently Pled ........................... 10

   E.     Plaintiffs' Negligence and Negligence Per Se Claims Are Sufficiently Pled.................. 13

   F.     The Court Should Allow Amendment to Cure Any Pleading Defects ............................ 13

V. CONCLUSION......................................................................................................14

PLAINTIFFS' OPPOSITION TO DEFENDANT MENTOR'S DEMURRER TO COMPLAINT

Ex. D - 156

1

**TABLE OF AUTHORITIES**

2

**Cases**

3
*Addiego v. Hill,* (1965) 238 Cal. App. 2d 842, 845 ........................................................ 2

4
*Ashcroft v. Iqbal,* 556 U.S. 662 (2009) ....................................................................... 7

5
*Bausch v. Stryker Corp.* (2010) 630 F.3d 546 .............................................................. 8

6
*Bausch v. Stryker Corp.* (7th Cir. 2010) 630 F.3d 546, 556–57 ................................. 10

7
*Bausch v. Stryker Corp.,* 630 F.3d 546 (7th Cir.2010) ............................................... 12

8
*Bell Atlantic Corp. v. Twombly,* 550 U.S. 544 (2007) ................................................. 7

*Bockrath v. Aldrich Chem. Co., Inc.,* (1999) 21 Cal.4th 71, 78 .................................. 2

9
*Browne v. McDonnell Douglas Corp.* (N.D. Cal. 1980) 504 F. Supp. 514 ................ 6

10
*Buckman Co. v. Plaintiffs' Legal Comm.,* 531 U.S. 341 (2001) ................................. 3

11
*Burgos v. Satiety,* No. 10–CV–2680, 2011 WL 1327684 (E.D.N.Y. Apr. 5, 2011) ............... 11

12
*Cashen v. Johnson & Johnson,* 2018 WL 6809093 .................................................... 4

13
*Chen v. L.A. Truck Centers, LLC* (2017) 7 Cal. App. 5th 757 ................................ 5, 6

*City of Industry v. City of Fillmore* (2011) 198 Cal.App.4th 191, 212 ....................... 7

14
*Coleman v. Medtronic, Inc.* (2014) 223 Cal.App.4th 413 ........................................... 3

15
*Doe v. City of Los Angeles* (2007) 42 Cal.4th 531, 550 .............................................. 7

16
*Evans v. City of Berkeley* (2006) 38 Cal.4th 1, 6 ....................................................... 2

17
*Funke v. Sorin Grp. USA, Inc.,* 147 F. Supp. 3d 1017, 1024 (C.D. Cal. 2015) ........ 9

18
*Hirs v. Superior Court* (1981) 118 Cal. App. 3d 486, 488-89 ................................... 13

*Hofts v. Howmedica Osteonics Corp.,* 597 F.Supp.2d 830 (S.D.Ind.2009) ............. 12

19
*Hurtado v. Superior Court* (1974) 11 Cal.3d 574, 581 .............................................. 5

20
In *Kasel v. Remington Arms Co.* (1972) 24 Cal. App. 3d 711 .................................... 5

21
*In re Medtronic, Inc., Sprint Fidelis Leads Products Liability Litigation* (8th Cir. 2010) 623 F.3d 120010

22
*Killen v. Stryker Spine,* No. 11-1508, 2012 WL 4498865 (W.D. Penn. Sept. 28, 2012) ........................ 11

23
*McLaughlin v. Bayer Corporation* (2017) C. A. No. 14-7315, 2017 WL 697047 at *6-8 ...................... 9

24
*McMahon v. Craig* (2009) 176 Cal.App.4th 1502, 1508–1509, 97 Cal.Rptr.3d 555 .............. 7

25
*Mize v. Mentor Worldwide LLC,* 2018 WL 5085716 (Cal. Sup. Ct. Oct. 2, 2018) ....... 4

*Quelimane Co. v. Stewart Title Guaranty Co.* (1998) 19 Cal. 4th 26, 39 ................... 13

26
*Randi W. v. Muroc Joint Unified School Dist.* (1997) 14 Cal.4th 1066, 1075 ........... 2

27
*Rannard v. Lockheed Aircraft Corp.,* (1945) 26 Cal.2d 149, 157 .............................. 2

28
*Riegel v. Medtronic, Inc.,* 552 U.S. 312 (2008) ......................................................... 3

iv

*Riegel v. Medtronic, Inc.*, 552 U.S. 312, 128 S.Ct. 999, 169 L.Ed.2d 892 (2008) .................................. 11

*Robinson v. Endovascular Techs., Inc.*, 190 Cal. App. 4th 1490, 1494 (Cal. Ct. App. 2010)................. 11

*Rowe v. Mentor Worldwide*, 297 F. Supp. 3d 1288 (M.D. Fla. 2018) ....................................................... 4

*Siliga v. Mortgage Electronic Registration Systems, Inc.* (2013) 219 Cal.App.4th 75, 81 ....................... 7

**Statutes**

21 C.F.R. § 803.50(a ....................................................................................................................... 8

21 C.F.R. § 803.50(b)(3) ................................................................................................................. 8

21 C.F.R. § 812.35 ......................................................................................................................... 11

21 C.F.R. § 820.1 ............................................................................................................................ 8

21 C.F.R. § 820.1(c) ........................................................................................................................ 8

21 C.F.R. §§ 812.20 ...................................................................................................................... 11

21 U.S.C. § 337(a) .......................................................................................................................... 3

21 U.S.C. § 360i ............................................................................................................................. 7

21 U.S.C. § 360j(g)(3 .................................................................................................................... 11

21 U.S.C. § 360k(a) ........................................................................................................................ 3

**Rules**

Code Civ. Proc., 430.10 .................................................................................................................. 2

PLAINTIFFS' OPPOSITION TO DEFENDANT MENTOR'S DEMURRER TO COMPLAINT

## MEMORANDUM OF POINTS AND AUTHORITIES

### I.   INTRODUCTION

Plaintiffs have made claims against MENTOR WORLDWIDE, LLC (hereinafter "Mentor") for injuries that they allege were caused by Mentor's MemoryGel Silicone Gel breast implants.  The claims made against Mentor in the operative Complaint are for: Negligence and Negligence Per Se; Strict Products Liability – Failure to Warn; and Strict Products Liability – Manufacturing Defect.  *See* Complaint filed February 22, 2019.

In its Demurrer, Mentor argues that each of Plaintiffs' claims are expressly and impliedly preempted and further demurred to certain of the claims on the basis that they are barred by the learned intermediary doctrine.  *See* Mentor's Demurrer ("Demurrer") to Plaintiffs' Complaint at p. 2.

Plaintiffs have sufficiently alleged parallel state law claims which are not subject to either express or implied preemption.

Furthermore, the factual allegations alleged in the Complaint are sufficient for purposes of overcoming a demurrer at this stage in the litigation.  Mentor, in its Demurrer, attempts to hold Plaintiffs to a higher pleading standard more appropriate for a motion for summary judgment, seemingly imposing on them the impossible burden of alleging facts and evidence which are solely in the hands of the Defendants before Plaintiffs have had any opportunity to conduct discovery.

As such, Mentor's Demurrer should be overruled in its entirety.

### II.   FACTS

Plaintiffs commenced this action in the Superior Court of the State of California for the County of San Bernardino on February 22, 2019.  In their Complaint, filed on February 22, 2019, Plaintiffs allege injuries and damages arising from the implantation of Defendants' MemoryGel Silicone Gel Breast Implants. Compl. ¶¶ 21–39. Plaintiffs allege claims against MENTOR WORLDWIDE, LLC, a company incorporated under the laws of the State of Delaware, with its principal place of business located at 201 Mentor Drive, Santa Barbara, California, 93111, and with its headquarters located at 33 Technology Drive, Irvine, California, 92618; NUSIL, LLC, a limited liability company incorporated under the laws of the State of California, with its principal place of business located at 1050 Cindy Lane, Carpinteria,

1  California 93013; and NUSIL TECHNOLOGY, LLC, a limited liability company incorporated under the

2  laws of the State of Delaware, with its principal place of business located at 1050 Cindy Lane,

3  Carpinteria, California, 93013.

4         Plaintiffs assert the following claims against Defendants: (1) Negligence/Negligence Per Se; (2)

5  Strict Products Liability – Failure to Warn; and (3) Strict Products Liability – Manufacturing Defect.

6  Plaintiffs allege that Defendants misrepresented and failed to warn Plaintiffs and Plaintiffs' treating

7  physicians.

8                              III.    **LEGAL STANDARDS**

9
        A. **Standard Governing a Demurrer**

10        Defendants blatantly misstate and misrepresent to this Court the standard for a demurrer.  Indeed,

11  it is only the rare exception, and not the rule as Defendant contends, that a Court will ever examine the

12  plausibility of a Plaintiffs' allegations on demurrer.  See Demurrer p. 3, ll.20-22.

13

14        To the contrary, in testing the sufficiency of a Complaint as against a general demurrer, if the

15  Complaint states facts constituting a cause of action entitling Plaintiff to any relief, the demurrer will be

16  overruled.  *See Addiego v. Hill*, (1965) 238 Cal. App. 2d 842, 845.  This Court is to "treat the demurrer

17  as admitting all material facts properly pleaded, but not contentions, deductions or conclusions of fact or

18  law."  In addition to the material facts set forth by the Plaintiff, this Court may "also consider matters

19  which may be judicially noticed."  *Evans v. City of Berkeley* (2006) 38 Cal.4th 1, 6 (citations omitted).

20  The issue to be decided is "whether the complaint states facts sufficient to constitute a cause of action."

21  Code Civ. Proc., 430.10, subd. (e).  To meet this standard, the Complaint must contain a statement of

22  facts which establishes the elements of a cause of action, assuming the material allegations to be true.

23  *See Randi W. v. Muroc Joint Unified School Dist*. (1997) 14 Cal.4th 1066, 1075.

24        In personal injury lawsuits "it suffices to plead causation succinctly and generally." *Bockrath v.*

25  *Aldrich Chem. Co., Inc*., (1999) 21 Cal.4th 71, 78.  Furthermore, in negligence cases, pleading standards

26  rest "upon considerations of fairness and convenience in view of the situation of the opposing parties,

27  and the rule permitting the pleading of negligence in general terms finds justification in the fact that the

28  person charged with negligence may ordinarily be assumed to possess at least equal, if not superior,

1   knowledge of the affair to that possessed by the injured party." *Rannard v. Lockheed Aircraft Corp.*,

2   (1945) 26 Cal.2d 149, 157.

### B.   Federal Preemption Does Not Bar Parallel State Law Claims

4         The primary argument presented by Mentor in support of the pending demurrer is that the claims

5   made in the Complaint are expressly preempted[1] under the Medical Device Amendments ("MDA") to

6   the Food, Drug and Cosmetics Act ("FDCA"), specifically 21 U.S.C. § 360k(a), and *Riegel v. Medtronic,*

7   *Inc.*, 552 U.S. 312 (2008) ("*Riegel*"). Mentor also argues that these claims are impliedly preempted under

8   *Buckman Co. v. Plaintiffs' Legal Comm.*, 531 U.S. 341 (2001) ("*Buckman*"). Mentor's arguments are

9   incorrect and governing authority clearly establishes that the claims made in the Complaint should be

10   allowed to proceed as they parallel, and do not add to, the federal requirements.

11         As discussed in *Riegel*, a two-step analysis is used to determine whether a claim is subject to

12   express preemption under § 360k(a). The first step is to determine whether the FDA has established

13   "requirements" for the medical device at issue. *See Riegel*, 552 U.S. at 321. If so, the next step is to

14   determine whether the state law claims seek to impose requirements that relate to safety and effectiveness

15   which are "different from, or in addition to" the FDA requirements. *Riegel*, 552 U.S. at 321–22.

16   However, the fact that certain claims made against a medical device manufacturer may be subject to

17   express or implied preemption does not mean that all such claims are preempted. As explained by the

18   court in *Coleman v. Medtronic, Inc.* (2014) 223 Cal. App. 4th 413 ("*Coleman*"), "[s]tate law causes of

19   action that provide 'a damages remedy for claims premised on a violation of FDA regulations' are not

20   expressly preempted if they "'parallel,' rather than add to, federal requirements." 233 Cal. App. 4th at

21   425 (quoting *Riegel*, 552 U.S. at 330).

22         In *Buckman*, the Court held that the MDA prohibits suits by private litigants which seek to enforce

23   the provisions of the FDCA because all such actions "shall be by and in the name of the United States."

24

---

25   [1] "There is a presumption against federal preemption of state laws that operate in traditional state domains."
*Stengel v. Medtronic Inc.*, 704 F.3d 1224, 1227 (9th Cir. 2013) (en banc) ("Stengel"). Claims against medical

26   device manufacturers involve an area of traditional state law as "'the historic police powers of the State include
the regulation of health and safety.' [Citation]. 'Throughout our history the several States have exercised their

27   police powers to protect the health and safety of their citizens. Because these are "primarily, and historically, ...
matter[s] of local concern," the "States traditionally have had great latitude under their police powers to legislate

28   as to the protection of the lives, limbs, health, comfort, and quiet of all persons."' [Citation]." *Stengel*, 704 F.3d
at 1229.

21 U.S.C. § 337(a).  Therefore, a claim is impliedly preempted to the extent that it seeks to enforce an exclusively federal requirement not grounded in traditional state tort law.  *See* 531 U.S. at 352–53.

The *Coleman* court succinctly summarized the scope of preemption as follows: "The rule that emerges from these cases is that the MDA does not preempt a state-law claim for violating a state-law duty that parallels a federal-law duty under the MDA." *Coleman*, 223 Cal. App. 4th at 427.

## IV.     ARGUMENT

### A.     Plaintiffs Have Sufficiently Alleged Parallel State Law Claims Which Are Not Preempted

The claims made in the Complaint are not expressly or impliedly preempted because they are all based on state law claims that parallel, but do not add to, the federal requirements imposed by the FDA. Mentor agrees that "Section 360k(a) [], 'does not prevent a State from providing a damages remedy for claims premised on a violation of FDA regulations' because the state duties in such a case "parallel," rather than add to, federal requirements.' *Riegel*, 552 U.S. at 330." Demurrer at p. 5, ll. 2–4.  Because all of the claims which are presented against Mentor in the Complaint are such "parallel" claims[2], they are not subject to either express or implied preemption.  Plaintiffs' allegations regarding violations of the FDCA are all based on parallel state law causes of action.  Accordingly, these claims are not subject to implied preemption as they are not based solely on enforcement of a federal requirement.

Mentor attempts to avoid this reality by citing to federal cases which are not on point, as well as to non-binding Superior Court case decisions which are distinguishable on their facts, in support of the incorrect assertion that "[c]ourts across the country routinely find that failure-to-warn and manufacturing-defect claims involving breast implants . . . are subject to dismissal." *See, e.g., Rowe v. Mentor Worldwide*, 297 F. Supp. 3d 1288 (M.D. Fla. 2018) (claim for negligent manufacture not preempted); *Mize v. Mentor Worldwide LLC,* 2018 WL 5085716 (Cal. Sup. Ct. Oct. 2, 2018) (*Mize I*); *Mize v. Mentor Worldwide LLC*, 2018 WL 1364257 (involving a pre-Post-Market Approval [PMA] study Plaintiff); *Cashen v. Johnson & Johnson*, 2018 WL 6809093 (ALCL case).

---

[2] *See, e.g.,* Compl. ¶ 120 ("Defendants breached their duty under federal law, and the parallel state duty []"); Compl. ¶ 121 ("[t]his duty is parallel to the state law duty []"); Compl. ¶ 125 ("[t]his duty is parallel to the post-sale duty to warn under California law []"); Compl. ¶ 135 ("Under parallel federal law []"); Compl. ¶ 141 ("[Defendants] had a duty under Federal law, and a parallel duty under California law []"); Compl. ¶ 187 ("California imposes a parallel duty []").

PLAINTIFFS' OPPOSITION TO DEFENDANT MENTOR'S DEMURRER TO COMPLAINT

Mentor specifically relies on *Mize I* and *Mize II, supra,* in an attempt to persuade this Court to apply the same reasoning herein in order to dismiss Plaintiffs' claims. Again, not only are *Mize I* and *Mize II* not binding precedent, but a Notice of Appeal has now been filed relating to the *Mize II* decision.

In *Coleman, supra,* which is binding precedent, the plaintiff made claims related to a medical device asserting theories of strict liability and negligence, including allegations of manufacturing defects and failure to warn. After reviewing the applicable law, the *Coleman* court reversed the trial court's decision to sustain the demurrer to the causes of action for "(1) strict liability failure to warn based on a failure to warn the FDA theory, (2) negligence, and (3) manufacturing defect." *Id.* at 319. That same result should be reached in the present case and Mentor's demurrer should be overruled.

      1.    California Law Applies to All Plaintiffs' Claims, Regardless of Their States of Domicile, and Plaintiffs Have Alleged Sufficient Parallel California State Law Claims

Mentor further argues that because Plaintiffs Vivian Aguiar and Cornelia Ditto are domiciled in a state which allegedly does not recognize a state-law claim for failure to report adverse events, Plaintiff Aguiar and Ditto therefore cannot assert a failure-to-report claim.

Generally speaking, California courts will apply California substantive laws "unless a party litigant timely invokes the law of a foreign state. In such event he must demonstrate that the latter rule of decision will further the interest of the foreign state and therefore that is an appropriate one for the forum to apply to the case before it." *Chen v. L.A. Truck Centers, LLC* (2017) 7 Cal. App. 5th 757, 766 (quoting *Hurtado v. Superior Court* (1974) 11 Cal.3d 574, 581). California courts will only apply a foreign state's law if a party files a choice of law motion and persuades the court the law of a foreign state should apply. *See Hurtado v. Superior Court* (1974) 11 Cal.3d 574, 581.

Additionally, "[t]he parties to the action are relevant to the determination of the jurisdictions' relative interests." *Chen, supra,* at 767. In *Kasel v. Remington Arms Co.,* cited by Mentor, Plaintiff, a California resident, was injured in Mexico by a defective shotgun shell manufactured in Mexico. *See* (1972) 24 Cal. App. 3d 711. Despite the fact that Mexico was the place of manufacture, purchase, use of, and injury by the defective shotgun shell, the Court found it to be significant that no Mexican nationals

/ / /

1  were litigants in the action.   The Court of Appeal ultimately upheld the trial Court's application of

2  California law.

3      The facts here are distinguishable from those of *Kasel* in that, here, Plaintiffs allege causes of

4  of action against California LLCs.   Compl. ¶¶ 6, 8, 9.   California law will be the appropriate choice of

5  law in this instance to the claims asserted by all Plaintiffs, even Plaintiffs Aguiar and Ditto who are

6  domiciled in another state.   *See, e.g., Chen v. L.A. Truck Centers, LLC* (2017) 7 Cal. App. 5th 757; *see*

7  *also Browne v. McDonnell Douglas Corp.* (N.D. Cal. 1980) 504 F. Supp. 514.   Furthermore, the

8  Complaint sufficiently alleges facts to support parallel state law failure-to-report claims by all Plaintiffs.

9  *See fn.* 2, *supra.*

10      **C.      Plaintiffs' Failure to Warn Claims Are Proper**

11          1.      Plaintiffs' Failure to Warn Allegations Are Sufficiently Pled

12      Plaintiffs allege that Mentor failed to report adverse event information to the FDA.   Compl. ¶¶

13  121, 122, 129, 130, 133, 134, 135, 136, 137, 139, 154, 165, 174, 176, 185, 186, 189, 200, 205, 206, 219.

14  This is sufficient at the demurrer stage to state a parallel claim for failure to warn under the analysis set

15  forth in *Coleman.*

16      Mentor misstates the allegations set forth in the Complaint by implicitly asserting that Plaintiffs

17  seek to recover "based on the theory that Mentor had a duty to provide warnings to their physicians that

18  were different from those approved by the FDA."  Demurrer at p. 7, ll. 9–10.   Plaintiffs make no such

19  claim as they seek to recover only under parallel claims.[3]

20      Mentor also seeks to place an evidentiary burden on Plaintiffs with regard to their claim of failure

21  to report adverse events which does not exist under the law.   Mentor improperly seeks to conflate the

22  burden of proof applicable in federal court with the pleading burden at the demurrer stage in California

23  courts.   Mentor bases its argument on the claim that "[a]pplying *Coleman*, **federal courts** routinely

24  dismiss failure-to-report claims where the plaintiff does not identify actual instances of unreported

25

26  [3] Mentor also asserts that it cannot be liable for violating a duty to revise its labeling through the Changes Being
    Effected ("CBE") procedure because "[t]hat procedure is permissive, *not* mandatory." (Demurrer at p. 7, ll. 23–
27  24).   Mentor cites no authority which supports this position and the California Supreme Court recently
    addressed this very question in discussing the duty of a brand-name drug manufacturer and ruled that the law
28  allowed a manufacturer to unilaterally update a label, without waiting for FDA preapproval.  *T.H. v. Novartis
    Pharmaceuticals Corp,*, (2017) 4 Cal.5th 145, 159, 407 P.3d 18226 Cal.Rptr.3d 336.

PLAINTIFFS' OPPOSITION TO DEFENDANT MENTOR'S DEMURRER TO COMPLAINT

**Ex. D - 164**

adverse events." Demurrer at p. 10, ll. 14–16 (bold added).  The fact that a claim may not survive a Federal Rule of Civil Procedure 12(b)(6) motion to dismiss under the heightened pleading requirements of *Ashcroft v. Iqbal*, 556 U.S. 662 (2009) and *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007) does not govern whether that claim is sufficient under California pleading standards.

A demurrer tests the legal sufficiency of the complaint to determine whether the allegations state a legally cognizable cause of action and assumes the truth of the factual allegations pleaded.  *See Siliga v. Mortgage Electronic Registration Systems, Inc.* (2013) 219 Cal. App. 4th 75, 81.  The sole inquiry is "whether the complaint states a cause of action as a matter of law." *McMahon v. Craig* (2009) 176 Cal. App. 4th 1502, 1508–09.  The "complaint ordinarily is sufficient if it alleges ultimate rather than evidentiary facts," *Doe v. City of Los Angeles* (2007) 42 Cal.4th 531, 550, and allegation of "ultimate fact [] must be accepted as true for purposes of ruling on a demurrer." *City of Industry v. City of Fillmore* (2011) 198 Cal. App. 4th 191, 212.

In their Complaint, Plaintiffs allege that "Mentor failed to report adverse events from the studies it was required to conduct" and that "had Mentor complied with its obligation to report this newly acquired information[,] . . . [this] information would have been provided to the FDA and would have been available to Plaintiffs' treating physicians, who would have communicated that information to Plaintiffs." Compl. ¶ 129, 130.  These allegations are sufficient at the demurrer stage under California law. While the *Coleman* court noted that the plaintiff would "ultimately" have to prove that a different warning would have reached the treating physician in time to prevent his injury, it found this was not the burden at the demurrer stage.  "However, at this stage of the proceedings, taking the allegations of the Complaint as true, Coleman has alleged facts sufficient to state causes of action in strict liability and negligence based on Medtronic's failure to warn." *Coleman*, 223 Cal. App. 4th at 429-30.  The remainder of Mentor's arguments seeking to place burdens on Plaintiffs are equally flawed.  In conclusion, Plaintiffs have alleged facts sufficient to present claims for failure to warn.

2.   Plaintiffs' Claims Grounded in Mentor's Failure to Conduct Post-Market Surveillance Are Not Preempted

As set forth in the Complaint, Mentor's failure to meet the federal requirements for proper post-market surveillance violate a plethora of federal regulations including 21 CFR 812.46, 21 CFR

7

812.150(b), 21 CFR 814.39(d), 21 U.S.C. § 360i, 21 CFR 803.50, 21 CFR 820.198(a).   Compl. ¶¶ 185, 186, 188, 190, 191.  Because the claims properly allege actions that violate both federal requirements and state negligence and strict liability laws, such claims are not preempted.  *See, e.g., Bausch v. Stryker Corp.* (2010) 630 F.3d 546, 555 ("federal law is clear: for manufacturers of Class III medical devices, the Quality System Regulations and Current Good Manufacturing Practices adopted by the FDA under its delegated regulatory authority are legally binding requirements 'under this chapter.' 21 C.F.R. § 820.1.  'The failure to comply with any applicable provision in this part [of the regulations] renders a device adulterated under section 501(h) of the act.  Such a device, as well as any person responsible for the failure to comply, is subject to regulatory action.' 21 C.F.R. § 820.1(c).").

In another Class III medical device action against Bayer Corporation relating to its Essure product, the court held that plaintiffs' claims at issue for "breaching a duty to have in place a reasonable risk management procedure" survived dismissal (aside from a single averment that the device should have been removed from the market as a result of Bayer's risk management failures which the court held was preempted):

> The SAC alleges that Bayer breached its duties to have in place risk management plans that effectively provided for (1) identification and consideration of all adverse reports about Essure, including internal procedures to review complaints and event reports, (2) monitoring of Essure to identify additional complaints or adverse health consequences, (3) additional investigation of Essure's risks, and (4) comprehensive risk analysis. (SAC ¶ 132). The SAC alleges that the duties to have such plans are embodied in federal requirements in the Code of Federal Regulations, federal statutes, and the PMA, including requirements that a manufacturer "'establish and maintain adverse event files'" (*id.* ¶ 133(c)) (quoting 21 C.F.R. § 803.1(a)); "'establish and maintain procedures for receiving, reviewing, and evaluating complaints by a formally designated unit'" "'review and evaluate all complaints to determine whether an investigation is necessary,'" and investigate certain specified complaints (*id.* ¶ 133(o) (quoting 21 C.F.R. § 820.198(a)-(c)); "'conduct analysis, testing, or other evaluation'" to determine whether Essure "'may have . . . contributed to a death or serious injury,'" (*id.* ¶ 133(e) (quoting 21 C.F.R. § 803.50(a), (b)(1)(iii)); and "'conduct[] an investigation of each event [in which Essure may have contributed to a death or serious injury] and evaluat[e] the cause of the event'" (*id.*) (quoting 21 C.F.R. § 803.50(b)(3)).  The SAC alleges that the breaches of these duties caused Plaintiffs' injuries because Bayer's negligent risk management resulted in its failure to report "thousands of adverse events and complaints for migrations, perforations, pregnancies, device failures and

8

PLAINTIFFS' OPPOSITION TO DEFENDANT MENTOR'S DEMURRER TO COMPLAINT

Ex. D - 166

malfunctions" to the FDA, which, in turn, meant that the adverse
events and complaints were never disclosed to Plaintiffs, who never
would have had Essure implanted had they known of the full
magnitude of adverse events and complaints. (See *id.* ¶ 136).

4   *McLaughlin v. Bayer Corporation* (2017) C. A. No. 14-7315, 2017 WL 697047 at *6–8.

5   This Court should overrule Mentor's Demurrer on their post-market surveillance claims for the

6   same reason that the *McLaughlin* court refused to dismiss claims like those now being alleged by

7   Plaintiffs herein. Plaintiffs' claims are well-pleaded and specify each of the federal regulations

8   violated. Furthermore, the claims are consistent with Ninth Circuit and California precedent governing

9   negligence claims against Class III medical device manufacturers such as the Defendants. *See, e.g.*,

10   *Coleman, supra.*

11   *Coleman*'s failure to warn claim based on Medtronic's failure to file adverse event reports with

12   the FDA is not subject to express or implied preemption. Mentor inexplicably asserts that in *Coleman*

13   the court mandated that "to prevail on failure-to-report claim, plaintiff must show that adverse events

14   would have reached her doctor and prevented her injury." Demurrer at p. 9, ll. 19–20. This assertion is

15   incorrect and the actual holding in *Coleman* supports the claim made in the Complaint that a claim based

16   on the failure to file adverse event reports with the FDA is not subject to express or implied preemption.

17   *Coleman*, 223 Cal. App. 4th at 428. The *Coleman* court concluded that to the extent Coleman's claims

18   for failure to warn were based on the defendant's failure to file adverse event reports with the FDA, they

19   were not subject to express or implied preemption and that same result should be reached in the present

20   case. The very case Mentor cites in its Demurrer, *Funke v. Sorin Grp. USA, Inc.*, 147 F. Supp. 3d 1017,

21   1024 (C.D. Cal. 2015) states: "[b]oth *Stengel* and *Coleman* demonstrate that a claim alleging a device

22   manufacturer's failure to warn the FDA of something FDA regulations required it to warn about is not

23   preempted—such a failure is both contrary to FDA regulations and California tort law." Unlike the

24   plaintiff's claims in *Funke*, in the present case there are allegations regarding the duty under both federal

25   law and California law which Mentor violated.

26   The reporting of adverse events is the *end result* of the post-market surveillance for a Class III

27   medical device manufacturer. Indeed, post-market surveillance and adverse event reporting are

28   inextricably intertwined. In short, if Mentor fails to conduct post-market surveillance, it will be unable

9

1    to gather, review, and report adverse events to the FDA as it is required to do.  Mentor cannot adequately

2    comply with reporting requirements unless it engages in post-market surveillance to determine whether

3    adverse events are occurring, whether those events are device related, as well as the frequency with which

4    the adverse events are occurring.   It would render those federal regulations toothless to attempt to

5    disassemble the post-market surveillance responsibilities (including reporting) in the way that Mentor

6    suggests.  The reality is that the FDA has implemented a comprehensive, integrated scheme requiring

7    post-market surveillance, complaint handling, and reporting for Class III medical device manufacturers,

8    and the violation of any or all of those provisions can form the basis of a non-preempted claim against

9    such manufacturers.

10                    D.  **Plaintiffs' Manufacturing Defect Claim Is Sufficiently Pled**

11          In its argument related to the claims for manufacturing defects, Mentor again ignores the binding

12   decision in *Coleman* and instead seeks to rely on decisions from federal courts and/or Superior Court

13   decisions which are not controlling.  Mentor does not appear to dispute that a claim of manufacturing

14   defect would be a "parallel" claim which would not be subject to express or implied preemption.  Instead

15   it again focuses on the incorrect position that Plaintiffs have not alleged sufficient "facts" to support this

16   claim.  These arguments are unpersuasive, misstate the facts alleged, and are contrary to the holding in

17   *Coleman.*

18          As the court noted in *Coleman*, there is a significant "concern with the concept of dismissing a

19   claim on preemption grounds without at least providing a plaintiff with some opportunity for discovery."

20   *Coleman*, 223 Cal. App. 4th at 436 (citing *In re Medtronic, Inc., Sprint Fidelis Leads Products Liability*

21   *Litigation* (8th Cir. 2010) 623 F.3d 1200, 1205–06 and *Bausch v. Stryker Corp.* (7th Cir. 2010) 630 F.3d

22   546, 556–57).  The *Coleman* court adopted the reasoning in *Bausch* "that claims of negligence and strict

23   liability for a defective product can survive preemption based on general allegations that the company

24   violated federal law." 223 Cal. App. 4th at 436.

25          The conclusion reached in *Coleman* clearly shows that Mentor's Demurrer is due to be overruled.

26   "In light of the reasoning in *Sprint Fidelis* and *Bausch* we conclude that it is premature to determine

27   whether Coleman has alleged a state law requirement that is parallel to federal requirements so as to

28   survive preemption. At the pleading stage, we can only conclude that the complaint alleges sufficient

facts to state a cause of action for manufacturing defect, the issue of preemption will necessarily be addressed after Coleman has some opportunity to conduct discovery." 223 Cal. App. 4th at 436.

Here, the Complaint sets forth facts detailing numerous requirements governing Mentor's conduct during the IDE process. Compl. ¶¶ 50, 51, 53, 54, 142, 143, 185, 194, 209, 218. More specifically, to obtain IDE approval, a manufacturer must submit an application to the FDA containing: (1) a complete report of prior device investigations; (2) a detailed description of the manufacturing procedures and quality controls used in device production; (3) copies of all device labeling; and (4) detailed information about the proposed clinical investigation including, "an analysis of all risks involved" and "a full set of written procedures for monitoring the investigation, including record and report maintenance." 21 U.S.C. § 360j(g)(3); 21 C.F.R. §§ 812.20, 812.25, 812.27. Once the IDE application has been approved, the FDA prohibits any deviation from the investigational plan, design, manufacturing techniques, clinical protocol, warnings, or consent form which could potentially affect clinical subjects unless the FDA first approves the change. *See Robinson v. Endovascular Techs., Inc.* (Cal. Ct. App. 2010) 190 Cal. App. 4th 1490, 1494 (citing 21 C.F.R. § 812.35).

As noted by the court in *Bausch*, courts "must keep in mind that much of the product-specific information about manufacturing needed to investigate such a claim fully is kept confidential by federal law," and that as such, "formal discovery is necessary before a plaintiff can fairly be expected to provide a detailed statement of the specific bases for her claim." 630 F.3d 546, 558. This is particularly applicable to cases involving IDE products, as information regarding the manufacturing process which the applicant was required to follow is confidential and not publicly available.

The analysis set forth in *Killen v. Stryker Spine* is very instructive on this point. *See* No. 11-1508, 2012 WL 4498865 (W.D. Penn. Sept. 28, 2012) ("Killen"). As that court reasoned, when ruling on an argument similar to the one raised by Mentor in the present case, "it is disingenuous to identify the parallel claim exception to the Medical Device Act Amendments of 1976 ("MDA") exemption as articulated in *Riegel v. Medtronic, Inc.*, 552 U.S. 312, 128 S.Ct. 999, 169 L.Ed.2d 892 (2008), but foreclose a plaintiff any opportunity to prove the exception." *Id.* at *3. The court quoted with approval from *Burgos v. Satiety*, No. 10–CV–2680, 2011 WL 1327684 (E.D.N.Y. Apr. 5, 2011): "[P]laintiffs alleging state-law parallel claims based on a violation of a manufacturer's agreement with the FDA often suffer from a

1  unique disadvantage: **the agreements (including IDEs) that would provide the necessary factual**

2  **specificity are confidential, and available only to the defendants and the FDA.** [A] plaintiff's

3  pleading burden should be commensurate with the amount of information available to them. Other courts

4  have similarly observed that it would be an injustice to penalize a plaintiff for alleging, through no fault

5  of her own, what turned out to be insufficient facts about the manufacturing process of a device that

6  caused injury. See *Hofts v. Howmedica Osteonics Corp.*, 597 F.Supp.2d 830 (S.D.Ind.2009); see also

7  *Bausch v. Stryker Corp.*, 630 F.3d 546 (7th Cir.2010)." Id. at *4 (bold added).   The *Killen* court

8  concluded that because "Plaintiff advanced factual allegations that plausibly suggest the existence of

9  parallel claims, **but does not have access to the confidential information to plead more specifically**

10 **the alleged violation of FDA regulations**, the court concludes the pleading standards are satisfied." *Id.*

11 at *3 (bold added).

12     As the *Burgos* court noted, unlike PMA data which is a matter of public record, IDE

13 documentation submitted to the FDA is confidential and not available to the public. *See id.* at *4.  For

14 that reason, the *Burgos* court found that the plaintiff had alleged facts as specifically as she could, without

15 the benefit of the confidential IDE documentation, and allowed her claims to proceed. *See id.*

16     Mentor seeks to place an impossible burden on Plaintiffs by arguing that they must plead more

17 specific facts to state a manufacturing claim, knowing that the information which it alleges Plaintiffs

18 should have included is confidential and known only to Mentor and the FDA.  Adopting the reasoning of

19 Mentor would insulate it from ever being subject to a claim related to the manufacturing process, as no

20 plaintiff can allege facts based on information which is confidential.

21     Mentor is also incorrect in its assertion that references to cGMP are inappropriate in a case

22 involving an IDE product.  As noted by the court in *Killen*, a plaintiff may cite to cGMP's to "set forth a

23 plausible claim of what [the IDE] requirements were [as] before discovery, she cannot determine what

24 requirements the FDA actually imposed on defendant in the IDE approval process because that

25 information is confidential." *Id.* at *1.  As that court correctly reasoned: "claims, therefore, are not

26 preempted to the extent that requirements imposed by the FDA [] during the IDE approval process were

27 the same as the requirements imposed by the CGMPs." *Id.*

28 ///

**E.**     <u>**Plaintiffs' Negligence and Negligence Per Se Claims Are Sufficiently Pled**</u>

In *Coleman*, the court held that the plaintiff had "alleged facts sufficient to state causes of action in [] negligence based on Medtronic's failure to warn." 223 Cal. App. 4th at 431.  In so ruling, the court cited with approval to the decision of the Ninth Circuit in *Stengel*.[4]  The *Coleman* court reasoned that "California recognizes the applicability of negligence per se in a broad range of scenarios, including violation of federal law." *Id.* at 434.  After analyzing California law on negligence per se, the *Coleman* court concluded that "Medtronic does not present a persuasive argument as to why a negligence claim resting on a theory of negligence per se would be subject to preemption.  Because Coleman's negligence claim based on Medtronic's failure to file adverse event reports is cognizable under California law and is parallel to federal requirements, he may proceed on this theory." *Id.*

The court went further and held: "[w]e conclude that Coleman's negligence claim is not preempted.  The claim is rooted in traditional state tort law and exists regardless of the FDCA and its regulations because the manufacturer of a medical device owes a duty of reasonable care to the consumer of such a device even in the absence of FDA regulations." *Id.* at 435.

**F.**     <u>**The Court Should Allow Amendment to Cure Any Pleading Defects**</u>

California *Code of Civil Procedure* section 473 provides, in pertinent part, that "[t]he court may . . . in its discretion, . . . allow, upon any terms as may be just, an amendment to any pleading or proceeding in other particulars . . . ."  Additionally, *Code of Civil Procedure* section 576 provides that "[a]ny judge, at any time before or after commencement of trial, in furtherance of justice, and upon such terms as may be proper, may allow the amendment of any pleading or pretrial conference order."

Case law further supports the California Legislature's policy of great liberality in permitting amendments to the pleadings at any stage in the proceedings. *See, e.g., Hirs v. Superior Court* (1981) 118 Cal. App. 3d 486, 488–89 ("Trial courts are vested with the discretion to allow amendments to pleadings in furtherance of justice.  That trial courts are to liberally permit such amendments, at any stage of the proceeding, has been established by policy in this state . . . rest[ing] on the fundamental policy that 'cases should be decided on their merits'" (citation omitted)).

---

[4] The *Coleman* court acknowledged that *Stengel* was not binding on it, but found its reasoning to be very persuasive. *See id.* at 429–30.

13

1   Finally, California courts have also consistently held that it is an abuse of discretion if a Court

2   sustains a demurrer without leave to amend if there is any reasonable possibility that a defect can be

3   cured by amendment. *See, e.g., Quelimane Co. v. Stewart Title Guaranty Co.* (1998) 19 Cal.4th 26, 39

4   (if "there is a reasonable possibility that the defect can be cured by amendment, leave to amend *must* be

5   granted" (citation omitted) (emphasis added)).

6   Here, in the event this Court is inclined to sustain Mentor's Demurrer on any of the causes of

7   action, Plaintiffs request an opportunity to amend consistent with the facts stated herein. If the Court

8   believes that some elements of Plaintiffs' claim are inadequately pleaded, leave to amend should be

9   granted so that any technical defect(s) can be cured.

10  ## V.   CONCLUSION

11  Based on the foregoing, Plaintiffs respectfully request that the Court overrule Defendant Mentor

12  Worldwide, LLC's Demurrer in its entirety. Alternatively, Plaintiffs request that this Court grant leave

13  to amend the Complaint to cure any technical defects therein.

14  Dated: May 31, 2019                              Respectfully submitted,

15                                                   LENZE LAWYERS, PLC

16

17

18                              By:   _____

19                                    JENNIFER A. LENZE
                                      Attorney for Plaintiffs

20

21

22

23

24

25

26

27

28

14

1  Jennifer A. Lenze, CA Bar# 246858
2  Amanda D. McGee, CA Bar# 282034
   **LENZE LAWYERS, PLC**
3  1300 Highland Avenue, Suite 207
   Manhattan Beach, CA 90266
4  Telephone: (310) 322-8800 Facsimile: (310) 322-8811
   jlenze@lenzelawyers.com
5  mcgee@lenzelawyers.com
   *Attorneys for Plaintiff*
6
7  Lowell W. Finson, CA Bar#275586
   **FINSON LAW FIRM**
8  126 Westwind Mall
   Marina Del Rey, California 90292
9  Tel: (602) 377-2903 F: (310) 425-3278
   lowell@finsonlawfirm.com
10 *Attorneys for Plaintiff*

11

12                **SUPERIOR COURT OF THE STATE OF CALIFORNIA**
                  **FOR THE COUNTY OF SAN BERNARDINO**

13 BRITTANY BILLETTS, an individual; VIVIAN       Case No.: CIVDS1905706
14 AGUIAR, an individual; ANN DELMONICO, an
   individual; CORNELIA DITTO, an individual;    **[PROPOSED] ORDER OVERRULING**
15 LEAH JOHNSON, an individual;                  **DEFENDANT MENTOR WORLDWIDE,**
                                                 **LLC'S DEMURRER TO PLAINTIFFS'**
16                                               **COMPLAINT**

17         Plaintiffs,
                                                 Hearing:  June 13, 2019
18         v.                                    Time:     8:30 a.m.
                                                 Dept.:    S24
19 MENTOR WORLDWIDE, LLC; NUSIL, LLC;
   NUSIL TECHNOLOGY, LLC; and DOES 1-100,        Complaint Filed: February 22, 2019
20 inclusive,                                    Trial Date: None Assigned

21         Defendants.

22

23         **AFTER FULL REVIEW AND CONSIDERATION** of Plaintiffs' Memorandum of Points and

24 Authorities in Opposition to Defendant Mentor Worldwide, LLC's Demurrer to Plaintiffs' Complaint, it

25 is hereby ORDERED that Defendant's Demurrer is **OVERRULED**.

26         IT IS SO ORDERED.

27 Dated: _____   _____
                                       Honorable Daniel Buckley
28

                                        1
                            [PROPOSED] ORDER

                                                               Ex. D - 173

**PROOF OF SERVICE**
STATE OF CALIFORNIA, COUNTY OF SAN BERNARDINO
C.C.P. §§1011(a), 1013, 1013a
I am employed in the county of Los Angeles, State of California.  I am over the age of 18 and not a party to the within action; my business address is 1300 Highland Ave., Suite 207, Manhattan Beach, California 90266.

On May 31, 2019, I served the foregoing document described as

**PLAINTIFFS' OPPOSITION TO DEFENDANT MENTOR WORLDWIDE, LLC'S DEMURRER TO PLAINTIFFS' COMPLAINT; MEMORANDUM OF POINTS AND AUTHORITIES; [PROPOSED] ORDER**

on the interested parties or attorneys for parties in this action who are identified on the attached service list, using the following means of service:

(X)  **BY MAIL.** I placed ( ) the original or (X) a true copy of the foregoing document(s) in a sealed envelope individually addressed to each of the parties on the attached service list, and caused each such envelope to be deposited in the mail at I deposited such envelope in the mail at 1300 Highland Ave #207 Manhattan Beach, CA 90266.  Each envelope was mailed with postage thereon fully prepaid.  I am readily familiar with this firm's practice of collection and processing of correspondence for mailing.  Under that practice, mail is deposited with the United States Postal Service the same day that it is collected in the ordinary course of business.

( )  **BY FACSIMILE.** I caused ( ) the original or ( ) a true copy of the foregoing document(s) to be transmitted to each of the parties on the attached service list at the facsimile telephone number as last given by that person on any document which he or she has filed in this action and served upon this office.

( )  **BY PERSONAL SERVICE.** I placed ( ) the original or ( ) a true copy of the foregoing document(s) in sealed envelopes individually addressed to each of the parties on the attached service list, and caused such envelope(s) to be delivered by hand to the offices of each addressee.

( )  **BY E-MAIL.** I caused the foregoing document(s) to be transmitted by e-mail electronic transmission to the e-mail address as indicated on the attached service list as last given by that person on any document which he or she has filed in this action and served upon this office.

( )  **BY ELECTRONIC SERVICE**: I provided the document listed above electronically through the Case Anywhere system. I did not receive, within a reasonable time after the transmission, any electronic message or other indication that the transmission was unsuccessful.

(X)  **(State)** I declare under penalty of perjury

Executed on May 31, 2019, at Manhattan Beach, California.

*Brandy Torres*
Brandy Torres

Ex. D - 174

**SERVICE LIST**
*Billetts, et al v. Mentor, et al*
Case No. CIVDS1905706

MOLLIE F. BENEDICT SBN 187084
mollie.benedict@tuckerellis.com
MONEE TAKLA HANNA SBN 259468
monee.hanna@tuckerellis.com
TUCKER ELLIS LLP
515 S. Flower Street, 42nd Floor
Los Angeles, CA 90071
T 213.430.3400/ F 213.430.3409
*Attorneys for Defendant MENTOR WORLDWIDE LLC*

DUSTIN B. RAWLIN
dustin.rawlin@tuckerellis.com
TUCKER ELLIS LLP
950 Main Avenue, Suite 1100
Cleveland, OH 44113-7213
T 216.592.5000 / F 216.592.5009
*Attorneys for Defendant MENTOR WORLDWIDE LLC*

MELISSA J. FASSETT
PRICE, POSTAL & PARMA LLP
200 E. Carrillo St., Suite 200
Santa Barbara, CA 93101
Tel: (805) 962-0011
Fax: (805) 965-3978
*Attorneys for Defendants NUSIL LLC and NUSIL RECHNOLOGY LLC*

3

PROOF OF SERVICE